201.    The Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

> a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the OneWest Servicer Defendants publicly represented they would administer;

> b.   fraudulently and deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

> c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

> d.  deceptively and fraudulently seeking to and/or completing foreclosures on
> Plaintiff and other borrower's homes while having full knowledge that no
> actual default under the terms of the note/deed of trust exists.

202.  Defendants' conduct as described in this complaint was willful or knowing.

**Sophin In v The One West Servicer Defendants**

203.  Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

204.  Plaintiff, Sophin In is a citizen of Rhode Island and is residing at and claims to be the
rightful owner of 22 Iron Drive, West Warwick, RI 02893 which is one of the subject
properties referred to herein.

205.  Plaintiff refinanced the subject property on or about March 15, 2007 for Two Hundred
Twenty Four Thousand and 00/100 dollars ($224,000.00) and was given a mortgage loan from
IndyMac Bank, F.S.B.

206.  Sometime after said refinance Plaintiff began experiencing difficulties repaying her
mortgage obligation due in part to the significant rise in the interest rate she was required to
pay.

207.  In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in
2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC.  On March 19,
2009 Defendant IMB HoldCo, LLC formed One West Bank and began operations as a newly
formed Pasadena, California based federal savings bank.  From and after its acquisition of
IndyMac in March 2009, OneWest Bank, F.S.B. was the servicer of Plaintiff's mortgage loan.

208.  Plaintiff made an application to the Defendant OneWest Bank for consideration for her
mortgage to be modified under the guidelines and supplemental directives of the U.S.
Treasury Department's Making Home Affordable Home Affordable Modification Program
that included personal financial information, tax information, and a statement attesting to her
hardship on or about June 15, 2009.

209.    On or about July 1, 2009 Plaintiff was told by said Defendant to resubmit the entire application package a second time. Plaintiff complied with said request and forwarded her request again on or about July 1, 2009.

210.    On or about July 21, 2009 Plaintiff spoke with Defendant's representative named Melissa and was told that her request would take 30-90 days to be reviewed.

211.    On or about July 30, 2009 Plaintiff spoke with Defendant's representative named Ken and was informed that her request was still "in review" [stage].

212.    On or about August 4, 2009 Plaintiff spoke with Defendant's representative named Angela and was informed that her request had been put on hold due to a bankruptcy filing by the Plaintiff (Chapter 13 filed on April 1, 2009) and Defendant was not sure if they could process a request if the borrower on an account was in bankruptcy.

213.    On or about October 19, 2009 Plaintiff spoke with Defendant's representative (unnamed) and was informed that she would have to resubmit all application documents in order to "re-open" her request. On or about that aforementioned date Plaintiff did comply with said request and forwarded all or her application documents again.

214.    On or about December 17, 2009 Plaintiff was informed by her legal counsel handling her bankruptcy that she could submit her request for modification through the bankruptcy court in Rhode Island and that by doing so she might have better luck.

215.    On or about February 8, 2010 Plaintiff forwarded all documentation necessary to apply for modification consideration under the HAMP Program to her Attorney handling her bankruptcy case. Said Attorney did forward said documentation to the OneWest Servicer Defendants for consideration.

216.    Sometime after receiving said documentation the OneWest Servicer Defendants denied Plaintiff's request for modification under HAMP Guidelines. Defendants claimed that Plaintiff had insufficient income to qualify. Plaintiff, on information and belief believes that this decision was wrongful and states truthfully that she had sufficient income to qualify for modification under the guidelines of the HAMP Program.

53

217.    During the entire one year and seven months since she first applied for the HAMP program, Plaintiff was stalled by the OneWest Servicer Defendants' customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in her modification attempts.

218.    During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as the OneWest Servicer Defendants and Defendant Harmon Law threatened her repeatedly with foreclosure in notices sent to Plaintiff.

219.    On or about February 7, 2011 a foreclosure sale was held by the OneWest Servicer Defendants and the Plaintiff's subject property was sold at auction and subsequently purchased at said auction by Trustee Defendant FNMA.

220.    It is upon information and belief that the OneWest Servicer Defendants purposefully and fraudulently misled Plaintiff, and purposefully hindered her modification requests. The OneWest Servicer Defendants misrepresented to Plaintiff their intentions, which were to use Plaintiff as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiff's and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, interest on recoverable advances, and/or to exploit the OneWest Servicer Defendants loss sharing agreement with the FDIC.

221.    The OneWest Servicer Defendants knew that they would not grant Plaintiff's request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiff's and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, interest earning advances to accumulate.

222.    The Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

a.   fraudulently misrepresenting their intentions to properly review requests
for loan modifications for Plaintiff and others, while in fact purposefully
creating abusive roadblocks to deprive Plaintiff and others of the opportunity
to seek assistance under a federal government program the OneWest Servicer
Defendants publicly represented they would administer;

b.   deceptively misleading Plaintiff and others by publicly claiming to be a
participating servicer in a federal government mortgage modification program
yet purposefully, willfully and intentionally ignored guidelines and directives
of said federal program, seeking instead to enrich themselves by first
hindering the modification process in order to maximize the collection of
servicing fees and billing of servicing advances and then foreclosing (and/or
facilitating short sales) on borrowers properties to make recovery of said
advances and/or take advantage of the OneWest Servicer Defendants loss
sharing agreement with the FDIC in order to maximize profits, while Plaintiff
and others sought, in good faith, to modify their mortgage under said federal
program;

c.   fraudulently misleading Plaintiff and others by instructing them to
repeatedly submit documentation for application to have their mortgages
modified under said federal program while full well knowing that Plaintiff and
others mortgages could not be modified due to the contractual restrictions
against modification contained in the pooling and servicing agreements
governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on
Plaintiff and other borrower's homes while having full knowledge that no

actual default under the terms of the note/deed of trust exists.

Defendants' conduct as described in this complaint was willful or knowing.

**Roth K. Neary v Ocwen Loan Servicing, LLC**

223.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

224.    Plaintiff, Roth K. Neary is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 96-98 Roosevelt Street, Providence, RI 02909 which is one of the subject properties referred to herein.

225.    Plaintiff purchased the subject property on or about April 27, 2006 for Three Hundred Twenty Two Thousand and 00/100 dollars ($322,000.00) and was given a mortgage loan of Two Hundred Eighty Nine Thousand Eight Hundred and -------00/100 ($289, 800.00) dollars from New Century Mortgage Corporation.

226.    On or about August, 2006, Defendant Ocwen Loan Servicing, LLC became the servicer of said Plaintiff's mortgage loan.

227.    Sometime after said purchase Plaintiff began experiencing difficulties repaying her mortgage obligation due in part to the significant rise in the interest rate she was required to pay.

228.    Plaintiff made an application to Defendant Ocwen Loan Servicing, LLC (Ocwen) for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about May 17, 2010.

229.    On or about October 23, 2010, Plaintiff was granted acceptance into the Trial Period Plan under HAMP. Plaintiff executed the documents sent to her by Ocwen and returned them with her first payment of One Thousand Two Hundred Forty and -------48/100 ($1,240.48) dollars in the form of money orders in the amounts of $500.00 (2) and $240.48 respectively

56

(Exhibit 12). Said documents and payment were sent to Ocwen via United States Postal Services, Express Mail, on October 29, 2010, tracking number EG4017122900US (Exhibit 13). Said documents and payment was received by Ocwen at their West Palm Beach headquarters, on October 30, 2010 at 10:36 am, and said package was accepted and signed for by an Ocwen employee named A. Biamonte (Exhibit 14).

230.    On or about November 11, 2010, Ocwen sent a letter to Plaintiff stating that she was eligible for a Home Affordable Modification (Exhibit 15). Enclosed with said letter were two copies of a Modification Agreement or a Final Modification. Said letter instructed the Plaintiff to sign and execute both Modification Agreements and return them by February 1, 2011. Plaintiff executed and had her signature notarized on both Modification Agreements and returned them to Ocwen on or about January 23, 2011.

231.    On or about February 14, 2011, Plaintiff received her mortgage loan billing statement from Ocwen. On said statement she noticed that her monthly payment due did not reflect her modified payment amount so she contacted Ocwen. A representative from Ocwen claimed that they had not received her fully signed and executed Modification Agreement, which Plaintiff had previously forwarded. Said representative said that it was no problem and that he would send out another agreement to Plaintiff right away.

232.    Plaintiff received a second set of Modification Agreements from Ocwen, on or about March 6, 2011. Plaintiff executed said Modification Agreements (Exhibit 16) and returned them to Ocwen, via United States Postal Service, 1st Class Mail, on March 10, 2011.

233.    Plaintiff made all payments required under her Trial Period Plan and Modification Agreement, in full and on time (Exhibit 17).

234.    On or about September 16, 2011, Ocwen and Trustee Defendant Deutsche Bank National Trust Company initiated foreclosure action against Plaintiff, through their Attorney, Defendant Korde & Associates, P.C.

235.    In spite of the Plaintiffs numerous attempts to demonstrate to Ocwen and Korde & Associates, P.C, that she had a Modification Agreement in place, and had made all of the

57

agreed upon payments under said Modification Agreement, the subject property was sold at auction on November 9, 2011. Ocwen returned to Plaintiff a portion of the payments (approximately 5 months worth) Plaintiff made under said Modification Agreement in order to establish that they were not accepting payments under said Modification agreement during the 5 months prior to  said auction .

236.    During the entire one year and six months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by Ocwen's customer service representatives, inundated with repetitive requests for the same documentation over and over again, otherwise purposefully hindered in her modification attempts, was repeatedly told that her fully executed Modification Agreements, which Plaintiff had returned to Ocwen twice, had not been received and repeatedly threatened with foreclosure.

237.    It is upon information and belief that Ocwen fraudulently and purposefully misled Plaintiff and hindered her modification requests in an effort to enrich themselves by ignoring her legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

238.    During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as she was threatened repeatedly with foreclosure.

239.    It is upon information and belief that the Ocwen Servicer Defendant purposefully and fraudulently misled Plaintiff, and purposefully hindered her modification requests. The Ocwen Servicer Defendant misrepresented to Plaintiff their intentions, which were to use Plaintiff as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiff's and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, and interest on recoverable advances.

240.    Contained in the Prospectus outlining the organization of the Trust that owned and/or owns Plaintiff's Mortgage and Note, the GSAMP Trust 2006-NC2, modification of the

Mortgages owned by said Trust is allowed (Exhibit 18 *id. at pp. 154 {S-89} "Collections and Other Servicing Procedures"*).

241.    However, in modifying Plaintiff mortgage loan, Ocwen would only make $1,000.00 and recovery of its servicing advances made on behalf of Plaintiff's mortgage loan account would be added to the principal balance of said mortgage loan and paid out over the 25 year time period of the modified loan. Ocwen knew it would be far more profitable to simply ignore the fact that they had granted Plaintiff a HAMP modification and foreclose on her property instead, in order to recover its illicit servicing advances sooner so as to increase short term profits.

242.    The Ocwen Servicer Defendants knew that they would not grant Plaintiff's request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiff's and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, potentially interest earning advances to accumulate.

243.    The Servicer Defendants' conduct was fraudulent, unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

> a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Ocwen Servicer Defendant publicly represented they would administer;

> b.    fraudulently and deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich

themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c. fraudulently misleading other members of the class by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that other members of the class' mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of said mortgages;

d. deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

Defendants' conduct as described in this complaint was willful or knowing.

**Carlos Franco v Wells Fargo Home Mortgage & Wells Fargo Bank, N.A.**

244.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

245.    Plaintiff, Carlos Franco is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 505 Fountain Street, Pawtucket, RI 02863 which is one of the subject properties referred to herein.

246.    Plaintiff refinanced the subject property on or about November 18, 2005 and was given a mortgage loan of Two Hundred Twenty Two Thousand and -------00/100 ($222, 000.00) dollars from Webster Bank National Association.

247.   Approximately one year after said refinance transaction, Servicer Defendant Wells Fargo Home Mortgage, a wholly owned subsidiary of Wells Fargo Bank, N.A., became the servicer of Plaintiff's said mortgage loan.

248.   Sometime during the first quarter of 2010 Plaintiff began experiencing difficulties repaying his mortgage obligation.

249.   Plaintiff made an application to the Wells Fargo Servicer Defendants for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about July 1, 2010.

250.   During the entire one year and three months since Plaintiff first applied for the HAMP program (the subject property was foreclosed on or about October 20, 2011), Plaintiff was stalled by the Wells Fargo Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, otherwise purposefully hindered in his modification attempts, was repeatedly told that his documents sent to them had not been received and/or lost and repeatedly threatened with foreclosure. Plaintiff was told by the Wells Fargo Defendant Servicer's representatives that his file was in the short sale department, when no such request for a short sale existed and was informed that Wells Fargo automatically put HAMP Modification requests into short sale as a matter of policy.

251.   Making this Plaintiff's case particularly egregious is the fact that his mortgage is owned by a FNMA Mortgage Backed Trust. As FNMA is one of the administrators of the HAMP Program on behalf of the U.S. Government and most if not all homeowners that meet HAMP Qualifications should easily be able to obtain a HAMP Modification as FNMA does not restrict or prohibit modifications of mortgages owned by the Trusts it acts as Trustee for, under HAMP. It is this Plaintiff's claim that he was qualified for a HAMP Modification and that his denial of such by the Wells Fargo Servicer Defendant was wrongful.

252.   Moreover, it is upon information and belief that the Wells Fargo Servicer Defendants fraudulently and purposefully misled Plaintiff and hindered his modification requests in an effort to enrich themselves by ignoring his legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

253.   The Wells Fargo Servicer Defendant fraudulently misrepresented to Plaintiff their intentions, which were to use Plaintiff as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiff's and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, and interest on recoverable advances.

254.   In modifying Plaintiff's mortgage loan, the Wells Fargo Servicer Defendants would only make $1,000.00 and recovery of its servicing advances made on behalf of Plaintiff's mortgage loan account would be added to the principal balance of said mortgage loan and paid out over the fully amortized time period of the modified loan. The Wells Fargo Servicer Defendants knew it would be far more profitable to simply ignore Plaintiff's requests for consideration for a HAMP modification and foreclose on his property instead, in order to recover its illicit servicing advances sooner so as to increase short term profits.

255.   The Wells Fargo Servicer Defendants knew that they would not grant Plaintiff's request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiff's and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, potentially interest earning advances to accumulate.

256.   The Servicer Defendants' conduct was fraudulent, unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

> a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity

to seek assistance under a federal government program the Wells Fargo
Servicer Defendants publicly represented they would administer;

b.  fraudulently and deceptively misleading Plaintiff and others by publicly
claiming to be a participating servicer in a federal government mortgage
modification program yet purposefully, willfully and intentionally ignored
guidelines and directives of said federal program, seeking instead to enrich
themselves by first hindering the modification process in order to maximize
the collection of servicing fees and billing of servicing advances and then
foreclosing (and/or facilitating short sales) on borrowers properties to make
recovery of said advances in order to maximize profits, while Plaintiff and
others sought, in good faith, to modify their mortgage under said federal
program;

c.  deceptively and fraudulently seeking to and/or completing foreclosures on
Plaintiff and other borrower's homes while having full knowledge that no
actual default under the terms of the note/deed of trust exists.

Defendants' conduct as described in this complaint was willful or knowing.

**John Hernandez v BAC Home Loans Servicing, LP & Bank of America, N.A.**

257.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

258.    Individual and Representative Plaintiff John Hernandez is a citizen of Rhode Island
residing at and claims to be one of the rightful owner of 37 Redwing Street, Providence, RI
02907 which is one of the subject properties referred to herein.

259.    On or about June 27, 2006, Plaintiff was granted a mortgage loan by Defendant
HSBC's Decision One Mortgage unit to purchase the subject property and executed two
Mortgages and Notes with in the amount of One Hundred Thirty Six Thousand and 00/100
dollars ($136,000.00) and Thirty Four Thousand and 00/100 ($34,000.00) Dollars,

respectively, each of which was secured by the subject property. Said Mortgages were recorded in the Providence Recorder of Deeds Office in Book 8135, at page 318 (1st Mortgage), and Book 8135, at page 335 (2nd Mortgage).

260.   On or about November 2006, Countrywide became the servicer of Plaintiffs 1st mortgage loan, and through its acquisition of Countrywide, eventually Bank of America, N.A., through its wholly owned subsidiary, BAC Home Loans Servicing, LP (hereinafter BAC), became the servicer of Plaintiff's said mortgage loan.

261.   On or about October 2009 Plaintiff began experiencing difficulties repaying his mortgage obligation.

262.   Plaintiff made an application to the BAC Servicer Defendant for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about November 6, 2009.

263.   During the entire two years since Plaintiff first applied for the HAMP program (Plaintiff gave up modification attempts on or about November 2011), Plaintiff was stalled by the BAC Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, otherwise purposefully hindered in his modification attempts, was repeatedly told that his documents sent to them had not been received and/or lost and repeatedly threatened with foreclosure.

264.   Making this Plaintiff's case particularly egregious is the fact that his mortgage is owned by a Mortgage Backed Trust named the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7 and this Trust does allow for modification of the mortgages in the pool of mortgages it owns. As stated in the Prospectus Supplement of the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7 modifications of mortgages owned by said Trust is not restricted or prohibited (Exhibit 20 *Id. at pp. 92 "Collection and Other Servicing*

*Procedures*"). It is this Plaintiff's claim that he was qualified for a HAMP Modification and that his denial and/or refusal by BAC to properly review his request was wrongful.

265.    Moreover, it is upon information and belief that the BAC Servicer Defendants fraudulently and purposefully misled Plaintiff and hindered his modification requests in an effort to enrich themselves by ignoring his legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

266.    The BAC Servicer Defendant fraudulently misrepresented to Plaintiff their intentions, which were to use Plaintiff as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiff's and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, and interest on recoverable advances.

267.    In modifying Plaintiff's mortgage loan, the BAC Servicer Defendant would only make $1,000.00 and recovery of its servicing advances made on behalf of Plaintiff's mortgage loan account would be added to the principal balance of said mortgage loan and paid out over the fully amortized time period of the modified loan. The BAC Servicer Defendant knew it would be far more profitable to simply ignore Plaintiff's requests for consideration for a HAMP modification and foreclose on his property instead, in order to recover its illicit servicing advances sooner so as to increase short term profits.

268.    The BAC Servicer Defendant knew that they would not grant Plaintiff's request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiff's and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, potentially interest earning advances to accumulate.

269.    The Servicer Defendants' conduct was fraudulent, unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

a.  fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the BAC Servicer Defendant's publicly represented they would administer;

b.  fraudulently and deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.  deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

Defendants' conduct as described in this complaint was willful or knowing.

### The Servicer Defendants' Actions Caused Injury to Plaintiffs

270.  Plaintiffs have suffered injury caused by the Servicer Defendants' actions, including but not limited to, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.

271.   Moreover, whenever the Servicer Defendants delay the tender of a timely review of a modification request, TPP agreement and/or permanent HAMP modification the terms of such a modification are less beneficial to the homeowner than they otherwise would be had the Servicer Defendants properly performed.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to.   If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.  If an eligible homeowner has been serially strung along in violation of HAMP Guidelines, then their injury is measured by the difference between their current circumstances and the terms of a modification to which they were entitled. Further, if an eligible homeowner has been foreclosed upon during the modification process, in violation of HAMP Guidelines and Supplemental Directives, then the Plaintiffs' are entitled to the return of said property and/or any value of same and/or costs arising from said foreclosure.

272.   The Servicer Defendants' behavior has also left class members in limbo, wondering if their homes can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward trial period-level payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

273.   Plaintiffs have been damaged because many are being, or have been, foreclosed upon, may have suffered the loss of rightful property, and have incurred the costs of legal fees associated with foreclosure and eviction defense and in some cases made rental payments to the purported new owner of their rightful property.

274.   Furthermore, the Plaintiffs owe far more money on their loans than they would have had the Servicer Defendants not fraudulently, misleadingly and deceptively represented to the

67

public and to the borrowers of the mortgages it holds and/or services that it would follow the guidelines and supplemental directives of HAMP.

275.    Furthermore, Plaintiffs have suffered significant mental and emotional distress as a direct result of the Servicer Defendants' actions. Said damages are representative of damages sustained by other members of the class.

<u>FNMA and the Trustee Defendants Attempt and/or Complete Foreclosure when No Default Exists to Note-Holder/Owner of Mortgage</u>

**Abraham Diaz, Norma Pimentel v Deutsche Bank National Trust Company, The OneWest Servicer Defendants, and Ablitt Scofield, P.C.**

276.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

277.    Individual and Representative Plaintiff Abraham Diaz is a citizen of Rhode Island residing at 250 Washington Avenue, Providence, RI 02905 and claims to be one of the rightful owner of 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

278.    Individual and Representative Plaintiff Norma Pimentel is a citizen of Rhode Island residing at 26 Bergen Street, Providence, RI 02905 and claims to be one of the rightful owner of and is residing at 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

279.    On or about April 24, 2007, Plaintiffs were granted a refinance mortgage loan by IndyMac Bank, F.S.B. and executed a Mortgage and Note with in the amount of One Hundred Forty Thousand and 00/100 dollars ($140,000.00) secured by the subject property. Said Mortgage was recorded in the Providence Recorder of Deeds Office in Book 8650, at page 16

280.    Sometime after said refinance Plaintiffs began experiencing difficulties repaying their mortgage obligation due in part to the significant rise in the interest rate they were required to pay.

281.    In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in 2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC. On March 19, 2009 Defendant IMB HoldCo, LLC formed One West Bank and began operations as a newly formed Pasadena, California based federal savings bank. From and after its acquisition of IndyMac in March 2009, OneWest Bank, F.S.B. was the servicer of Plaintiffs' mortgage loan.

282.    Unknown to the Plaintiffs, IndyMac Bank had sold Plaintiffs' Mortgage and Note to a Mortgage Backed Trust, named the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, on or about June 12, 2007. Trustee Defendant Deutsche Bank National Trust Company was appointed as Trustee for said Trust.

283.    Plaintiffs made an application to the OneWest Bank Servicer Defendants for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about April, 2009.

284.    On or about February 12, 2010, Defendant Ablitt Scofield, P.C. served a Notice of Mortgage Foreclosure Sale to Plaintiffs, on behalf of its client, Deutsche Bank National Trust Company as Trustee for the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B (the Trust), to foreclose on the subject property located at 247 Indiana Avenue, Providence, RI 02905 on or about April 6, 2010.

285.    The Defendant Deutsche Bank National Trust Company sold said Plaintiffs' subject property at foreclosure auction on or about April 6, 2010, and said subject property was subsequently purchased on behalf of said Trust, by Deutsche Bank National Trust Company, acting as its Trustee.

286.    Unknown to Plaintiffs at that time, upon information and belief, the OneWest Servicer Defendants had in fact made all Plaintiffs' mortgage payments, on Plaintiffs' behalf, as a third party servicer with no security interest, to the true Holder of Plaintiffs' Note and Mortgage, the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, as is required

under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiffs' mortgage loan, secured by 247 Indiana Avenue, Providence, RI 02905 (Exhibit 10 *Id. at pp. 44 "Advances"*).

287.   As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiffs' Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

288.   The Plaintiffs do not dispute that their Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

289.   As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

290.   The actions taken by the OneWest Servicer Defendants, and Trustee Defendants Deutsche Bank and Ablitt Scofield, P.C., are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

291.   The documents, records and information pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of the OneWest Servicer Defendants and Deutsche Bank National Trust Company and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

292.   Plaintiffs suffered extreme emotional damage and mental distress as their efforts to stay a subsequent illegal eviction action instituted against them in lower Courts failed and Plaintiff Abraham Diaz, his wife and three children were forcibly evicted in an action involving multiple local law enforcement officers.

293.   This type of action is representative of the OneWest Servicer Defendants and Trustee Defendants Deutsche Bank National Trust Company and Ablitt Scofield, P.C.'s behavior in

all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in this Plaintiff's case, in the State of Rhode Island and nationwide.

**Sophin In v  FNMA, The One West Servicer Defendants, and Harmon Law, P.C.**

294.	Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

295.	Plaintiff, Sophin In is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 22 Iron Drive, West Warwick, RI 02893 which is one of the subject properties referred to herein.

296.	Plaintiff refinanced the subject property on or about March 15, 2007 for Two Hundred Twenty Four Thousand and 00/100 dollars ($224,000.00) and was given a mortgage loan from IndyMac Bank.

297.	Upon information and belief sometime on or about April - May 2007, Plaintiff's mortgage was purchased by an as yet accurately identified FNMA created Mortgage Backed Trust. At that point in time, said as yet identified Trust became the true Holder in Due Course of the Plaintiff's Mortgage and Note.

298.	Sometime after said refinance Plaintiff began experiencing difficulties repaying her mortgage obligation due in part to the significant rise in the interest rate she was required to pay and she fell behind on her mortgage obligation.

299.	The OneWest Servicer Defendants initiated foreclosure action, through their Attorney, Harmon Law, P.C., against Plaintiff's property on or about December 14, 2010.

300.	On or about February 7, 2011 a foreclosure sale was held by the OneWest Servicer Defendants and the Plaintiff's subject property was sold at auction and subsequently purchased at said auction by Trustee Defendant FNMA.

301.	Unknown to Plaintiff at that time, upon information and belief, the OneWest Servicer Defendants and /or FNMA, by virtue of its guarantee, did in fact make all of Plaintiff's

mortgage payments, on Plaintiff's behalf, as a third party with no security interest, to the true Holder of Plaintiff's Mortgage and/or Note (said Trust), without her knowledge or consent. As such the Note referenced herein is believed to have been in good standing at the time foreclosure was initiated and completed, due to the Delinquency Advances paid by the OneWest Servicer Defendants and/or FNMA, on behalf of the Plaintiff, to said as yet identified true Note Holder in Due Course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11).

302.    In said Master Trust Agreement the Direct Servicer (i.e. IndyMac/OneWest) is often responsible for *"Delinquency Advances"* (Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans to the FNMA created Mortgage Backed Trusts it services mortgages for.

303.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not (or is not required to) forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59)*.

304.    Regardless of whether the OneWest Servicer Defendants or FNMA paid the Plaintiff's mortgage payments on her behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee were adhered to, all of the Plaintiff's mortgage payments were paid to the true Holder in Due Course of her Note and Mortgage and as such there existed no default of the Note at the time foreclosure action was commenced and/or completed.

305.    Upon information and belief the OneWest Servicer Defendants were not the Holder of Plaintiff's Mortgage and/or Note instruments at the time of said auction and were merely foreclosing at the instruction of FNMA, which was acting in its capacity as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

306.    Furthermore, FNMA's subsequent purchase (on behalf of said Trust) of Plaintiff's property at auction was an action by FNMA as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

307.    The Plaintiff does not dispute that her Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

308.    As no default of the Note existed to said, as yet identified, FNMA Mortgage Backed Trust, which was the Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

309.    The actions taken by the OneWest Servicer Defendants, and Trustee Defendants FNMA and Harmon Law, P.C. are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

310.    The documents, records and information regarding the identification of said Mortgage Backed Trust that was (and/or may still be) the true Holder of Plaintiff's Note and Mortgage, and the records pertaining to the payments made to said Trust regarding Plaintiff's mortgage loan, are in the exclusive control of Defendant FNMA (and the OneWest Servicer Defendants with respect to any payments they may have made on behalf of Plaintiff) and as such can only be obtained through discovery. However, if the terms of said FNMA Master Trust Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

311.    This type of action is representative of the OneWest Servicer Defendants, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized by FNMA and whereby their

servicing is governed by Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Rhode Island and nationwide.

**Hui Ly v Deutsche Bank National Trust Company, The OneWest Servicer Defendants, and Ablitt Scofield, P.C.**

312.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

313.    Plaintiff, Hui Ly is a citizen of Rhode Island and is residing at 114 Warwick Avenue, Cranston, RI 02905 and claims to be the rightful owner of 1235-1237 Cranston Street, Cranston, RI 02920 which is one of the subject properties referenced herein.

314.    Plaintiff Ly's first mortgage loan was originated by IndyMac Bank, serviced by Defendants IndyMac and through acquisition of IndyMac, OneWest Bank and its consortium of investors.

315.    On or about May 1 2006, Defendant IndyMac sold Plaintiff's mortgage to a Real Estate Mortgage Investment Conduit entity named IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series 2006-AR15 (hereinafter referred to as the "Trust").

316.    Defendant Deutsche Bank National Trust Company was appointed Trustee of said Trust.

317.    On or about September 17, 2010, Defendant Ablitt Scofield, P.C. served a Notice of Mortgage Foreclosure Sale to Plaintiff, on behalf of its client, Deutsche Bank National Trust Company as Trustee for IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series 2006-AR15, to foreclose on the subject property located at 1235-1237 Cranston Street, Cranston, RI 02920 on or about November 8, 2010.

318.    The OneWest Servicer Defendants sold said Plaintiff's property (1235-1237 Cranston Street) at foreclosure auction on or about November 8, 2010, and said subject property was subsequently purchased on behalf of said Trust, by Deutsche Bank National Trust Company, acting as its Trustee.

319.    Unknown to Plaintiff at that time, upon information and belief, the OneWest Servicer Defendants had in fact made all Plaintiff's mortgage payments, on Plaintiff's behalf, as a third party servicer with no security interest, to the true Holder of Plaintiff's Note and Mortgage, IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series 2006-AR15, as is required under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiff's mortgage loan, secured by 1235-1237 Cranston Street, Cranston, RI 02920 (Exhibit 9 *Id. at pp. S-48 "Advances"*).

320.    As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

321.    The Plaintiff does not dispute that his Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

322.    As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

323.    The actions taken by the OneWest Servicer Defendants, and Trustee Defendants Deutsche Bank and Ablitt Scofield, P.C., are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

324.    The documents, records and information pertaining to the payments made to said Trust regarding Plaintiff's mortgage loan, are in the exclusive control of the OneWest Servicer Defendants and Deutsche Bank National Trust Company and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

75

325.    This type of action is representative of the OneWest Servicer Defendants and Trustee Defendants Deutsche Bank National Trust Company and Ablitt Scofield, P.C.'s behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in this Plaintiff's case, in the State of Rhode Island and nationwide.

**Charles F. & Michelle Gregory v JPMorgan Chase Bank, N.A., E.M.C Mortgage, Bank of America, N.A., and Marinosci Law Group, P.C.**

326.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

327.    Married Couple and Representative Plaintiffs Charles F. & Michelle Gregory are citizens of Rhode Island residing at and owner of that property located at 199 Reservoir Avenue, Lincoln, RI 02865 which is one of the subject properties referred to herein.

328.    Plaintiffs refinanced the subject property on or about June 1, 2004 for One Hundred Sixty Eight Thousand Seven Hundred Fifty and 00/100 dollars ($168,750.00) and were given a mortgage loan from Fremont Investment and Loan d/b/a Fremont Mortgage.

329.    On or about October 28, 2004, Plaintiffs received notification from EMC Mortgage Corporation that the servicing of their mortgage loan had been transferred from Fremont Investment & Loan to EMC Mortgage (which is now a wholly owned subsidiary of JPMorgan Chase Bank, N.A.), effective November 1, 2004.

330.    Sometime after said refinance Plaintiffs began experiencing difficulties repaying their mortgage obligation due in part to the significant rise in the interest rate they were required to pay.

331.    Unknown to Plaintiffs at the time, on or about October 29, 2004, Fremont Investment & Loan sold Plaintiff's Mortgage and Note to a Real Estate Mortgage Investment Conduit entity named Bear Sterns Asset Backed Securities I, LLC, Asset Backed Certificates, Series 2004-FR-3 (hereinafter referred to as the "Trust").

332.    LaSalle Bank National Association was appointed Trustee of said Trust, and through its acquisition of LaSalle Bank, Bank of America, N.A. became Trustee of said Trust as successor by merger.

333.    On or about June 23, 2010, October 12, 2011 and December 20, 2011 Defendant Marinosci Law Group, P.C. served a Notice of Intent to Foreclose and Notices of Mortgage Foreclosure Sale to Plaintiffs, on behalf of its client, Bank of America, N.A. as Trustee for Bear Sterns Asset Backed Securities I, LLC, Asset Backed Certificates, Series 2004-FR-3, to foreclose on the subject property located at 199 Reservoir Avenue, Lincoln, RI 02865 on or about November 11, 2011 and February 10, 2012 respectively.

334.    Unknown to Plaintiffs at that time, upon information and belief, the JPMorgan Chase Bank, N.A. and/or EMC Mortgage Corporation Servicer Defendants had in fact made all Plaintiffs' mortgage payments, on Plaintiffs' behalf, as a third party servicer with no security interest, to the true Holder of Plaintiffs' Note and Mortgage, Bear Sterns Asset Backed Securities I, LLC, Asset Backed Certificates, Series 2004-FR-3, as is required under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiffs' mortgage loan,  secured by 199 Reservoir Avenue, Lincoln, RI 02865 (Exhibit 19 *Id. at pp. 17, {S-10} and 70, {S-37} "Advances"*).

335.    As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiffs' Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

336.    The Plaintiffs do not dispute that their Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

337.    As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

338.    The actions taken by the JPMorgan Chase Bank, N.A. and/or EMC Mortgage Corporation Servicer Defendants, and Trustee Defendants Bank of America, N.A. and

Marinosci Law Group, P.C., are without any force or effect relative to the actual attempted sale of the subject property because upon information and belief no default regarding payment of the Note to the actual Note Holder exists and/or has ever existed.

339.    The documents, records and information pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of the JPMorgan Chase Bank, N.A. and EMC Mortgage Corporation Servicer Defendants and Bank of America, N.A. and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted.

340.    This type of action is representative of the JPMorgan Chase Bank, N.A. and/or EMC Mortgage Corporation Servicer Defendants and Trustee Defendants Bank of America, N.A. and Marinosci Law Group, P.C.'s behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in these Plaintiffs case, in the State of Rhode Island and nationwide.

**Roth K. Neary v Ocwen Loan Servicing, LLC, Deutsch Bank National Trust Company, and Korde & Associates, P.C.**

341.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

342.    Plaintiff, Roth K. Neary is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 96-98 Roosevelt Street, Providence, RI 02909 which is one of the subject properties referred to herein.

343.    Plaintiff purchased the subject property on or about April 27, 2006 for Three Hundred Twenty Two Thousand and 00/100 dollars ($322,000.00) and was given a mortgage loan of Two Hundred Eighty Nine Thousand Eight Hundred and -------00/100 ($289, 800.00) dollars from New Century Mortgage Corporation.

344.    On or about August, 2006, Defendant Ocwen Loan Servicing, LLC became the servicer of said Plaintiff's mortgage loan.

345.    Sometime after said purchase Plaintiff began experiencing difficulties repaying her mortgage obligation due in part to the significant rise in the interest rate she was required to pay.

346.    Unknown to Plaintiff at the time, on or about June 26, 2006, New Century Mortgage Corporation sold Plaintiff's Mortgage and Note to a Real Estate Mortgage Investment Conduit entity named GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2 (hereinafter referred to as the "Trust").

347.    Deutsche Bank National Trust Company was appointed Trustee of said Trust.

348.    Plaintiff made an application to Defendant Ocwen Loan Servicing, LLC (Ocwen) for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about May 17, 2010.

349.    On or about October 23, 2010, Plaintiff was granted acceptance into the Trial Period Plan under HAMP. Plaintiff executed the documents sent to her by Ocwen and returned them with her first payment of One Thousand Two Hundred Forty and -------48/100 ($1,240.48) dollars in the form of money orders in the amounts of $500.00 (2) and $240.48 respectively (Exhibit 12). Said documents and payment were sent to Ocwen via United States Postal Services, Express Mail, on October 29, 2010, tracking number EG4017122900US (Exhibit 13). Said documents and payment was received by Ocwen at their West Palm Beach headquarters, on October 30, 2010 at 10:36 am, and said package was accepted and signed for by an Ocwen employee named A. Biamonte (Exhibit 14).

350.    On or about November 11, 2010, Ocwen sent a letter to Plaintiff stating that she was eligible for a Home Affordable Modification (Exhibit 15). Enclosed with said letter were two copies of a Modification Agreement or a Final Modification. Said letter instructed the Plaintiff

to sign and execute both Modification Agreements and return them by February 1, 2011. Plaintiff executed and had her signature notarized on both Modification Agreements and returned them to Ocwen on or about January 23, 2011.

351.    On or about February 14, 2011, Plaintiff received her mortgage loan billing statement from Ocwen. On said statement she noticed that her monthly payment due did not reflect her modified payment amount so she contacted Ocwen. A representative from Ocwen claimed that they had not received her fully signed and executed Modification Agreement, which Plaintiff had previously forwarded. Said representative said that it was no problem and that he would send out another agreement to Plaintiff right away.

352.    Plaintiff received a second set of Modification Agreements from Ocwen, on or about March 6, 2011. Plaintiff executed said Modification Agreements (Exhibit 16) and returned them to Ocwen, via United States Postal Service, 1st Class Mail, on March 10, 2011.

353.    Plaintiff made all payments required under her Trial Period Plan and Modification Agreement, in full and on time (Exhibit 17).

354.    On or about September 16, 2011, Ocwen and Trustee Defendant Deutsche Bank National Trust Company initiated foreclosure action against Plaintiff, through their Attorney, Defendant Korde & Associates, P.C.

355.    In spite of the Plaintiffs numerous attempts to demonstrate to Ocwen and Korde & Associates, P.C, that she had a Modification Agreement in place, and had made all of the agreed upon payments under said Modification Agreement, the subject property was sold at auction on November 9, 2011. Ocwen returned to Plaintiff a portion of the payments (approximately 5 months worth) Plaintiff made under said Modification Agreement in order to establish that they were not accepting payments under said Modification agreement during the 5 months prior to  said auction.

356.    Unknown to Plaintiff at that time, upon information and belief, the Ocwen Servicer Defendant had in fact made all Plaintiff's mortgage payments, on Plaintiffs' behalf, as a third party servicer with no security interest, to the true Holder of Plaintiff's Note and Mortgage,

GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2, as is required under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiff's mortgage loan (Exhibit 18 *Id. at pp. 21, {S-12} "Advances", 148-150, {S-86-87} "P & I Advances and Servicing Advances", and 366-367 "Advances"*).

357.    As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

358.    The Plaintiff does not dispute that her Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have been legally be exercised.

359.    As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

360.    The actions taken by the Ocwen Servicer Defendant, and Trustee Defendants Deutsche Bank National Trust Company and Korde & Associates, P.C., are without any force or effect relative to the actual sale of the subject property because upon information and belief no default regarding payment of the Note to the actual Note Holder exists and/or has ever existed.

361.    The documents, records and information pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of the Ocwen Servicer Defendant and Deutsche Bank National Trust Company and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

362.    This type of action is representative of the Ocwen Loan Servicing, LLC Servicer Defendant's and Trustee Defendants Deutsche Bank National Trust Company and Korde & Associates, P.C.'s behavior in all cases where foreclosure has been initiated and/or completed,

on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in this Plaintiff's case, in the State of Rhode Island and nationwide.

**Carlos Franco v  FNMA, Wells Fargo Bank, N.A., and Harmon Law, P.C.**

363.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

364.    Plaintiff, Carlos Franco is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 505 Fountain Street, Pawtucket, RI 02863 which is one of the subject properties referred to herein.

365.    Plaintiff refinanced the subject property on or about November 18, 2005 and was given a mortgage loan of Two Hundred Twenty Two Thousand and -------00/100 ($222, 000.00) dollars from Webster Bank National Association.

366.    Upon information and belief sometime on or about January – February 2006, Plaintiff's mortgage was purchased by an as yet accurately identified FNMA created Mortgage Backed Trust (hereinafter referred to as the "Trust"). At that point in time, said as yet identified Trust became the true Holder in Due Course of the Plaintiff's Mortgage and Note

367.    Approximately one year after said refinance transaction, Servicer Defendant Wells Fargo Home Mortgage, a wholly owned subsidiary of Wells Fargo Bank, N.A., became the servicer of Plaintiff's said mortgage loan.

368.    Sometime during the first quarter of 2010 Plaintiff began experiencing difficulties repaying his mortgage obligation.

369.    Plaintiff made an application to the Wells Fargo Servicer Defendants for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program

that included personal financial information, tax information, and a statement attesting to his hardship on or about July 1, 2010.

370.    During the tome Plaintiff was attempting to request a HAMP Modification, Wells Fargo Bank, N.A. initiated foreclosure action, through their Attorney, Harmon Law, P.C., against Plaintiff's property, by sending him Notices of Mortgage Foreclosure Sale, on or about November 15, 2010 and again on August 29, 2011.

371.    On or about October 20, 2011 a foreclosure sale was held by Wells Fargo Bank, N.A. and the Plaintiff's subject property was sold at auction and subsequently purchased at said auction by Trustee Defendant FNMA.

372.    Unknown to Plaintiff at that time, upon information and belief, Wells Fargo Bank, N.A. and /or FNMA, by virtue of its guarantee, did in fact make all of Plaintiff's mortgage payments, on Plaintiff's behalf, as a third party with no security interest, to the true Holder of Plaintiff's Mortgage and/or Note (said Trust), without his knowledge or consent. As such the Note referenced herein is believed to have been in good standing at the time foreclosure was initiated and completed, due to the Delinquency Advances paid by Wells Fargo Bank, N.A. and/or FNMA, on behalf of the Plaintiff, to said as yet identified true Note Holder in Due Course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11).

373.    In said Master Trust Agreement the Direct Servicer (i.e. Wells Fargo Bank, N.A.) is often responsible for *"Delinquency Advances"* (Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans to the FNMA created Mortgage Backed Trusts it services mortgages for.

374.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not (or is not required to) forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it

created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59).*

375.    Regardless of whether the Wells Fargo Servicer Defendant or FNMA paid the Plaintiff's mortgage payments on his behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee were adhered to, all of the Plaintiff's mortgage payments were paid to the true Holder in Due Course of his Note and Mortgage and as such there existed no default of the Note at the time foreclosure action was commenced and/or completed.

376.    Upon information and belief Wells Fargo Bank, N.A. was not the Holder of Plaintiff's Mortgage and/or Note instruments at the time of said auction and were merely foreclosing at the instruction of FNMA, which was acting in its capacity as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

377.    Furthermore, FNMA's subsequent purchase (on behalf of said Trust) of Plaintiff's property at auction was an action by FNMA as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

378.    The Plaintiff does not dispute that his Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

379.    As no default of the Note existed to said, as yet identified, FNMA Mortgage Backed Trust, which was the Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

380.    The actions taken by Wells Fargo Bank, N.A., and Trustee Defendants FNMA and Harmon Law, P.C. are without any force or effect relative to the actual sale of the property

84

because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

381.    The documents, records and information regarding the identification of said Mortgage Backed Trust that was (and/or may still be) the true Holder of Plaintiff's Note and Mortgage, and the records pertaining to the payments made to said Trust regarding Plaintiff's mortgage loan, are in the exclusive control of Defendant FNMA (and the Wells Fargo Bank, N.A. with respect to any payments they may have made on behalf of Plaintiff) and as such can only be obtained through discovery. However, if the terms of said FNMA Master Trust Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

382.    This type of action is representative of Wells Fargo Bank, N.A., FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized by FNMA and whereby their servicing is governed by Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Rhode Island and nationwide.

**John Hernandez v Deutsche Bank National Trust Company, The Bank of America, N.A. Servicer Defendants, and Harmon Law, P.C.**

383.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

384.    Individual and Representative Plaintiff John Hernandez is a citizen of Rhode Island residing at and claims to be one of the rightful owner of 37 Redwing Street, Providence, RI 02907 which is one of the subject properties referred to herein.

385.    On or about June 27, 2006, Plaintiff was granted a mortgage loan by Defendant HSBC's Decision One Mortgage unit to purchase the subject property and executed two Mortgages and Notes with in the amount of One Hundred Thirty Six Thousand and 00/100 dollars ($136,000.00) and Thirty Four Thousand and 00/100 ($34,000.00) Dollars, respectively, each of which was secured by the subject property. Said Mortgages were

recorded in the Providence Recorder of Deeds Office in Book 8135, at page 318 (1st
Mortgage), and Book 8135, at page 335 (2nd Mortgage).

386.    On or about November 2006, Countrywide became the servicer of Plaintiffs 1st
mortgage loan, and through its acquisition of Countrywide, eventually Bank of America,
N.A., through its wholly owned subsidiary, BAC Home Loans Servicing, LP (hereinafter
BAC), became the servicer of Plaintiff's said mortgage loan.

387.    Unknown to the Plaintiffs, Decision One Mortgage had sold Plaintiffs' Mortgage and
Note to a Mortgage Backed Trust, named the Morgan Stanley ABS Capital I, Inc. Trust 2006-
HE7, on or about October 31, 2006. Trustee Defendant Deutsche Bank National Trust
Company was appointed as Trustee for said Trust.

388.    On or about October 2009 Plaintiff began experiencing difficulties repaying his
mortgage obligation.

389.    Plaintiff made an application to the BAC Servicer Defendant for consideration for his
mortgage to be modified under the guidelines and supplemental directives of the U.S.
Treasury Department's Making Home Affordable Home Affordable Modification Program
that included personal financial information, tax information, and a statement attesting to his
hardship on or about November 6, 2009.

390.    On or about October 22, 2009, Defendant Harmon Law, P.C. caused a Notice of Intent
to Foreclosure to be recorded at the Providence Recorder of Deeds Office in Book 9553, at
Page 316 to Plaintiffs, on behalf of its client, Deutsche Bank National Trust Company as
Trustee for the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7 (the Trust), to foreclose
on the subject property located at 37 Redwing Street, Unit 1, Providence, RI 02907 on or
about November 9, 2009.

391.    Unknown to Plaintiff at that time, upon information and belief, the OneWest Servicer
Defendants had in fact made all Plaintiff's mortgage payments, on Plaintiff's behalf, as a third
party servicer with no security interest, to the true Holder of Plaintiff's Note and Mortgage,
the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7, as is required under the Prospectus,

Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiff's mortgage loan, secured by 37 Redwing Street, Unit 1, Providence, RI 02907 (Exhibit 20 *Id. at pp. 14 "Advances", 72 "Payments on the Mortgage Loans", and 90 "P&I Advances and Servicing Advances"*).

392.    As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

393.    The Plaintiff does not dispute that his Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

394.    As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

395.    The actions taken by the Bank of America, N.A. Servicer Defendants, and Trustee Defendants Deutsche Bank and Harmon Law, P.C., are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

396.    The documents, records and information pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of the Bank of America, N.A. Servicer Defendants and Deutsche Bank National Trust Company and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

397.    Plaintiff has suffered (and still suffers) extreme emotional damage and mental distress as he was repeatedly, and currently is still, threatened with foreclosure.

398.    This type of action is representative of the Bank of America, N.A. Servicer Defendants and Trustee Defendants Deutsche Bank National Trust Company and Harmon Law, P.C.'s behavior in all cases where foreclosure has been initiated and/or completed, on mortgage

loans that were securitized in Private Label Mortgage Backed Trusts and whereby the

servicing of mortgage loans held by said Trusts is governed by standardized Pooling and

Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as

demonstrated and evidenced in this Plaintiff's case, in the State of Rhode Island and

nationwide

## Defendant's Actions Caused Injury to Plaintiffs

399.    Plaintiffs have suffered injury caused by Defendant's actions, including but not limited

to, the loss of property through foreclosure, legal costs incurred to stay eviction and contest

foreclosure, severe mental and emotional distress intentionally inflicted by Defendants.

## CLASS ACTION ALLEGATIONS

400.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

401.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2),

and (b)(3).

402.    So as to the Originator Defendants, the named Plaintiffs sue on behalf of themselves

and all Rhode Island homeowners whose loans have been originated by the Originator

Defendants using significantly reduced underwriting standards designed to allow borrowers to

obtain mortgages without proper verification of income, no-doc and no money down

programs, offering extremely risky credit terms to unsophisticated borrowers such as negative

amortization, interest only payment options and, adjustable rate mortgage terms that the

Originator Defendants knew would be unsustainable for borrowers.

403.    So as to the Servicer Defendants, the named Plaintiffs sue on behalf of themselves and

all Rhode Island homeowners whose loans were originated, since January 2000, but not after

December 31, 2008, and/or have been serviced by the Servicer Defendants, and who, since

March 5, 2009, have requested consideration and/or applied with the Servicer Defendants for

a HAMP modification and whereby the Servicer Defendants fraudulently represented it was a participating servicer in the HAMP Program, bound to abide by its rules, guidelines and supplemental directives all while knowing they could not modify Plaintiffs' and others mortgages due to contractual limitations contained in the Prospectus' and/or Pooling and Servicing Agreements they had previously entered into governing the servicing of Plaintiffs' and others mortgages yet fraudulently misrepresented to those Plaintiffs and others that their mortgages could in fact be modified and purposefully hindered the modification process in an effort to enrich themselves, and also Plaintiffs and others who were either;

    a.    Referred to foreclosure while being considered for a HAMP modification and/or while under a HAMP Trial Period Plan agreement and/or having been granted a HAMP permanent modification;

    or

    b.    Foreclosed upon while being considered for a HAMP modification and/or while under a HAMP Trial Period Plan agreement and/or having been granted a HAMP permanent modification;

    or

    c.    Suffered systematic, redundant and repetitive documentation requests, deceptive claims that documents were lost or never received, deceptive and misleading claims that request were stalled in underwriting, negotiation and/or quality control, in violation of HAMP Guidelines and Supplemental Directives regarding the timely review of requests, in an effort to keep those mortgage loans in a near perpetual state of default as part of a

scheme to increase servicing fees through artificial inflation of principal balance totals, the billing of servicing advances and other illicit mortgage servicing activities as described herein of the pools of mortgages they serviced;

or

d.    Denied a HAMP Modification without due cause;

404.   So as to the Trustee Defendants, the named Plaintiffs sue on behalf of themselves and all Rhode Island homeowners whose loans have been serviced by the Servicer Defendants, that are/were held in Trusts governed by standard Private Label Prospectus' and/or Pooling and Servicing agreements and/or FNMA Master Trust Agreements, with respect to periodic/delinquent/monthly advances required to be made by the Servicer Defendants and or FNMA, as servicer and/or Master Servicer, regarding all payments not received by the Servicer Defendants and/or FNMA, to the Trusts which owned Plaintiffs' and others Mortgages and/or Notes serviced by the Servicer Defendants and/or FNMA acting in its capacity as Master Servicer and/or Trustee, and had foreclosure proceedings initiated against and/or completed against them by the Trustee Defendants and or the Servicer Defendants acting on behalf of, or at the instruction of, the Trustee Defendants and/or FNMA who were either;

a.    Referred to foreclosure whereby fraudulent and false representations were made to establish a default of Note to true owner of said Note;

or

b.    Foreclosed upon whereby fraudulent and false representations were made to establish a right to chain of title of said

Mortgage/Note (i.e. "robo-signing", wrongful and invalid assignments, etc.);

405.   Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, the Defendants' current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

406.   Plaintiffs do not know the exact size or identities of members of the Class, since such information is in the exclusive control of Defendants. Plaintiffs believe that the Class encompasses tens or hundreds of thousands of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the Class is so numerous that joinder of all members is impracticable.

407.   All members of the Class have been subject to and affected by the same conduct. The claims are based on standard form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

      a.    the nature and scope of the Servicer Defendants' misrepresentations regarding its intentions to properly administer and adhere to the guidelines and supplemental directives of the HAMP program and its fraudulent misrepresentations to homeowners regarding HAMP and their ability to obtain a HAMP modification;

      b.    whether all Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to fraud;

     c.     whether all Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to deceptive and misleading business practices;

     d.     whether all Defendants' conduct in the circumstances described herein and in the underlying complaints violates state consumer protection laws;

     e.     whether the Originator Defendants' conduct violates applicable predatory lending laws;

     f.     whether the Servicer and Trustee Defendants' conduct violates state foreclosure law;

     g.     whether Servicer and Trustee Defendants' conduct violates applicable state Commercial Code and corresponding regulations; and

     h.     whether the Court can order damages and enter injunctive relief.

408.     The claims of the Named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the class in that the Named Plaintiffs and the other members of the class were subject to the same conduct.

409.     The named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

410.     A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

411.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

412.     The Defendants acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I

### *Fraud and Deceptive Trade Practices*

### *Re: Originator Defendants' Representations*

### *Regarding Soundness of its Mortgage Products*

413.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

414.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the

Class described above.

415.    Plaintiffs suffered damages as a result of Defendants originating residential mortgage

loans using significantly reduced underwriting standards designed to allow borrowers to

obtain mortgages without proper verification of income, and no money down programs,

offering extremely risky credit terms to borrowers such as negative amortization, interest only

payment options and, adjustable rate mortgage terms that Defendants knew would be

unsustainable for borrowers.

416.    Plaintiffs suffered damages as a result of Defendants' fraudulent misrepresentations

regarding financial soundness of its mortgage loan products. Defendants knew Plaintiffs and

other borrowers had paid no down payment in property purchase transactions, that Plaintiffs

and other borrowers did not earn enough income to qualify for mortgage loan transactions,

etc., yet had developed high risk lending instruments specifically tailored to the Plaintiffs' and

others situations so as to make said loan(s) to enrich themselves by fraudulently

misrepresenting the financial soundness of these lending instruments to Plaintiffs (and to

others so similarly situated), knowing said loans would cause injury to the Plaintiffs and

others.

417.    Plaintiffs and others have suffered harm and are threatened with additional harm from

Defendants' fraudulent, deceptive and misleading statements, including but not limited to

longer loan payoff times, higher principle balances, improper negative reporting to credit

bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees,

inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, the wrongful loss of a property interest for those who have suffered foreclosure, and legal fees for defense of foreclosure and eviction.

418.    As a result of these fraudulent misrepresentations, Defendants caused Plaintiffs and others harm, as alleged above. Defendants' bad faith was thus to Plaintiffs' detriment.

419.    Defendants' conduct amounts to Fraud and Deceptive Trade Practices and is in violation of R.I.G.L. § 6-13.1-1(6)(vii), (xii) & (xiii).

420.    Defendants' represented that their goods or services were of a particular standard, quality, or grade and were of another.

421.    Defendants' engaged in conduct that created confusion and misunderstanding.

422.    Defendants' engaged in practices that were unfair and deceptive to consumers.


## COUNT II

### *Violations of Rhode Island General Laws § 6-13.1 and Applicable Regulations*
### *And/or Fraud*
### *By the Servicer Defendants*

423.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

424.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

425.    Defendants have violated and continue to violate the R.I.G.L. § 6-13.1-1 including, without limitation;

> a.    § 6-13.1-1(6)(ii), in that Defendants' conduct caused the likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services;

b.   § 6-13.1-1(6)(v), in that Defendants' conduct represented that goods or
services had sponsorship, approval, characteristics, ingredients, uses, benefits, or
quantities they did not have;

c.   § 6-13.1-1(6)(xii), in that Defendants' made deceptive representations or
failed to disclose relevant information as to its intentions regarding its
administration of the HAMP program, its contractual obligations under pre-
existing Pooling and Servicing Agreements with the Trusts it serviced mortgages
for (and for the OneWest Servicer Defendants - the misuse of its Loss Sharing
Agreement with the FDIC). Said conduct was intended to create the likelihood of
confusion or misunderstanding; and

d.   § 6-13.1-1(6)(xiii), in that it is a Mortgage Lender and made false or
misleading representations to borrowers. Said conduct was Fraudulent, part of an
overall fraudulent scheme to illegally profit from recovery of servicing advances
and other related fees, and was unfair and deceptive to consumers.

426.   Plaintiffs have been injured suffering damages as a result of Defendants' fraudulent
misrepresentations regarding the defaulted status of their Notes

427.   Plaintiffs and others have suffered harm and are threatened with additional harm from
Defendants' fraudulent, deceptive and misleading statements, including the wrongful loss of a
property interest for those who have suffered foreclosure.

428.   Defendants conduct as described in this complaint was and is willful or knowing
within the meaning of the Rhode Island General Laws § 6-13.1.

429.   As a result of these violations of Rhode Island General Laws § 6-13.1, Defendants
caused Plaintiffs and others harm, as alleged above.  Defendants' bad faith was thus to
Plaintiffs' detriment.

430.   Defendants conduct as set forth herein violates established public policy, and the
harms caused to consumers greatly outweighs any benefits associated with that conduct.

431.    As a result of Defendants conduct, Plaintiffs and others suffered ascertainable
damages and ascertainable losses including:

        a.      wrongful foreclosures;

        b.      otherwise avoidable losses of homes to foreclosure;

        c.      increased fees and other costs to avoid or attempt to avoid
               foreclosure;

        d.      loss of savings in pointless attempts at modification;

        e.      loss of opportunities to pursue other loss mitigation strategies;

        f.      significant stress and emotional distress, and;

432.    Plaintiffs are entitled to actual, statutory and exemplary damages, restitution, an
accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state
law.

### *COUNT III*

### *Violation of Rhode Island General Laws–*
### *Title 6A -Uniform Commercial Code § 6A-3-602*
### *By FNMA and the Trustee & Servicer Defendants*

433.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

434.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the
Class described above.

435.    As the entity responsible for exercising the statutory power of sale, Defendants owed
Plaintiff a duty of good faith and fair dealing in their conduct leading up to the foreclosure
proceedings and sale.

436.    Defendants knew that Plaintiffs' and others mortgage payments had been made to the
true Holder in due course of the instrument (Note) on behalf of Plaintiffs by third parties
(Servicer Defendants and/or FNMA) and as such Plaintiffs' monthly obligations were
discharged.

437.    Defendants conduct as set forth herein affects the public interest and is part of a generalized course of conduct affecting numerous consumers.

438.    Defendants have violated and continue to violate the Rhode Island Uniform Commercial Code, § 6A-3-602 including, without limitation;

        a.    §6A-3-602(a); the instruments (Notes) were paid to the extent payment was made on behalf of the parties obliged to pay the instruments, yet the default provisions of the instruments were enforced;

439.    Plaintiffs and others have been injured suffered damages as a result of Defendants' fraudulent misrepresentations regarding the defaulted status of their Mortgages and/or Notes.

440.    Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

441.    As a result of these violations of Rhode Island General Laws § 6A-3-602, Defendants caused Plaintiffs and others harm, as alleged above.  Defendants' bad faith was thus to Plaintiffs' detriment.

442.    Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

443.    Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

444.    Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

445.    As a result of Defendants conduct, Plaintiffs and others suffered ascertainable damages and ascertainable losses including:

        a.    wrongful foreclosures and/or foreclosure attempts;

        b.    otherwise avoidable losses of homes to foreclosure;

        c.    wrongful evictions

        d.    significant stress and emotional distress, and;

446.    Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

447.    Plaintiffs and others were damaged by this violation of law including without limitation, loss of equity, lost opportunity to work out modification of their mortgages, imposition of inappropriate foreclosure fees, extreme mental and emotional distress, and costs of defending themselves from foreclosure and/or eviction.

448.    The Plaintiffs and others are entitled to a declaratory judgment determining that the foreclosure proceedings and/or sales of their property are void.

449.    Plaintiffs and others are entitled to an injunction requiring that Defendants' take all necessary steps to restore legal title to their property as if no foreclosure sale had ever occurred.

450.    Plaintiffs and others are entitled to an injunction requiring that the Defendants be prevented from foreclosure action against Plaintiffs and others so similarly situated, or any eviction action until such time as proper notice is made pursuant to statute.

451.    The Plaintiffs and others so similarly situated are entitled to cancellation of costs and fees assessed to their accounts for wrongful foreclosure, together with additional damages.

452.    Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

453.    Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.      Certify this case as a class action and appoint the named Plaintiffs to be class

        representatives and their counsel to be class counsel;

b.      Enter a judgment declaring the acts and practices of Defendants complained of

        herein do constitute a fraud, unfair and deceptive acts and practices, breach of

        duty of good faith and reasonable diligence, violations of state uniform

        commercial code, violations of state foreclosure law, and violation of state

        predatory lending laws together with an award of monetary damages and other

        available relief on those claims;

c.      Grant a permanent or final injunction enjoining Defendants agents and

        employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the

        members of the Class;

d.      Order Defendants to adopt and enforce a policy that requires appropriate training

        of their employees and agents regarding their duties under HAMP;

e.      Order specific performance of Defendants obligations together with other relief

        required by law;

f.      Award actual, exemplary and/or statutory minimum damages;

g.      Award restitution and prejudgment interest;

h.      Award punitive damages;

i.      Award Plaintiffs the costs of this action, including the fees and costs of experts,

        together with reasonable attorneys' fees;

j.      Grant Plaintiff and the Class such other and further relief as this Court finds

        necessary and proper.

Dated:  March 8, 2012

Respectfully Submitted,

Todd S. Dion, Esq. (#6852)
1319 Cranston Street
Cranston, RI 02920
Telephone: 401-942-9924
Facsimile:  401-942-9925
toddsdion@msn.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2012, a copy of the foregoing document, filed through the
CM/ECF System, will be sent electronically to the registered participants as identified on the
Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage
prepaid on the parties listed on the NEF as not receiving electronic notice.

Todd S. Dion, Esq.