**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ABRAHAM DIAZ, SOPHIN IN,** | ) | |
| **HUI LY, CHARLES F. &** | ) | |
| **MICHELLE GREGORY, ROTH K.** | ) | |
| **NEARY, CARLOS FRANCO, JOHN** | ) | |
| **HERNANDEZ, ALEJANDRO BARBEL,** | ) | |
| **JOSE BARBEL, and ROBERT** | ) | |
| **BLOOMINGBURGH & MELINDA** | ) | |
| **BLOOMINGBURGH** | ) | |
| on behalf of themselves and all | ) | |
| others similarly situated | ) | **C.A. NO. 1:12-CV-00166-S-DLM** |
| | ) | |
| **Plaintiffs,** | ) | **AMENDED COMPLAINT** |
| | ) | |
| **vs.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **FEDERAL NATIONAL** | ) | |
| **MORTGAGE ASSOCIATION** | ) | |
| *also known as* **FNMA** *and/or* **Fannie Mae,** | ) | |
| **INDEPENDENT NATIONAL** | ) | |
| **MORTGAGE CORPORATION** | ) | |
| *also known as* **INDYMAC BANK,** | ) | |
| **ONEWEST BANK, IMB HOLDCO,** | ) | |
| **LLC, IMB MANAGEMENT** | ) | |
| **HOLDINGS, LP, DUNE CAPITAL,** | ) | |
| **LLC, J.C. FLOWERS & CO., MSD** | ) | |
| **CAPITAL, LP, STONE POINT** | ) | |
| **CAPITAL, SOROS FUND** | ) | |
| **MANAGEMENT, LLC, SSP** | ) | |
| **OFFSHORE, LLC, PAULSON & CO.,** | ) | |
| **SILAR ADVISORS, LP, SILAR MCF-1,** | ) | |
| **LLC, WELLS FARGO BANK, N.A.,** | ) | |
| **WELLS FARGO HOME MORTGAGE,** | ) | |
| **HSBC HOLDINGS, PLC,** | ) | |
| **JPMORGAN CHASE BANK, N.A.,** | ) | |
| **EMC MORTGAGE CORPORATION,** | ) | |
| **OCWEN LOAN SERVICING, LLC,** | ) | |
| **FLAGSTAR BANK,** | ) | |
| **BAC HOME LOANS SERVICING, LP,** | ) | |
| **BANK OF AMERICA, N.A.,** | ) | |
| **DEUTSCHE BANK** | ) | |
| **NATIONAL TRUST COMPANY** | ) | |
| as trustee for **THE VARIOUS TRUSTS** | ) | |

1

**NOTED HEREIN,**                                )
**and ABLITT SCOFIELD, P.C.,**                   )
**HARMON LAW OFFICES, P.C.,**                    )
**MARINOSCI LAW GROUP, P.C., KORDE**             )
**& ASSOCIATES, P.C., and PARTRIDGE**            )
**SNOW & HAHN, LLP**                             )

　　　　**Defendants.**

_____

## INTRODUCTION

1.　　Plaintiffs Abraham Diaz, Sophin In, Hui Ly, Charles F. & Michelle Gregory, Roth K. Neary, Carlos Franco, John Hernandez, Alejandro Barbel, Jose Barbel, Robert Bloomingburgh & Melinda Bloomingburgh on behalf of themselves and all other similarly-situated individuals ("Plaintiffs") bring this class action as described in the paragraphs set forth herein.

2.　　This complaint arises from the acts and/or intentional omissions of multiple Defendants, acting independently and through their subsidiaries, owners and/or predecessors in interest as follows;

　　　　a.　　Defendants Independent National Mortgage Corporation also known as IndyMac Bank, and HSBC Holdings, PLC, (collectively referred to as "Originator Defendants");

　　　　b.　　Defendants OneWest Bank and its consortium of Investors; IMB HoldCo, LLC, IMB Management Holdings, LP, Dune Capital, LLC, J.C. Flowers & Co., MSD Capital, L.P., Stone Point Capital, Soros Fund Management, LLC, SSP Offshore, LLC, Paulson & Co., Silar Advisors, LP,  SILAR MCF-1, LLC (collectively referred as the "OneWest Servicer Defendants" where not otherwise described in their individual capacities), Bank of America, N.A. & BAC Home Loans Servicing, LP (collectively referred to as the "BOA Servicer Defendants"), JPMorgan Chase Bank, & EMC Mortgage Corporation, (collectively referred to as the "Chase Servicer Defendants"),Wells Fargo Bank, Wells Fargo Home Mortgage, (collectively referred

2

to as the "Wells Fargo Servicer Defendants"), Ocwen Loan Servicing, LLC, and Flagstar Bank (all collectively referred to as "Servicer Defendants");

    c.   Federal National Mortgage Association, a.k.a. FNMA and/or Fannie Mae, in its capacity as Trustee for various, as yet identified FNMA Trusts, Deutsche Bank National Trust Company, Bank of America, N.A., Marinosci Law Group, P.C., Ablitt Scofield, P.C., Korde & Associates, P.C., Partridge Snow & Hahn, LLP and Harmon Law, P.C. (collectively referred to as "Trustee Defendants")

as a result of:

    a.   the Originator Defendants; by deceptively lowering mortgage underwriting standards and misrepresenting the financial soundness of their mortgages products with full knowledge that Plaintiffs and others obtaining said mortgages as a result would likely be unable to perform;

    b.   the Servicer Defendants; by fraudulently and deceptively misleading Plaintiffs and others by exploiting homeowners attempts to modify their mortgages as part of an overall fraudulent scheme to maximize mortgage servicing profitability, and their role in a fraudulent scheme to foreclose mortgages in violation of State Uniform Commercial Code;

    c.   the Servicer and Trustee Defendants; by attempting foreclosure and/or foreclosing on Plaintiffs' on others property when no actual default existed to the Holder of Plaintiffs' and others Notes, in violation State uniform Commercial Code.

3.   Plaintiff's claims are threefold:

    a.   Defendants Independent National Mortgage Corporation also known as IndyMac Bank, and HSBC Holdings, PLC (collectively referred to as "Originator Defendants") were/are leading financial institutions and mortgage originators on which Plaintiffs' and others thought they could and did rely. The Originator Defendants did willfully perpetrate a fraudulent scheme to enrich themselves by significantly lowering their underwriting standards, creating high risk lending instruments, and the employment of

predatory lending practices in order to make mortgage loans to borrowers they knew had an extremely high probability of non-performance.

b.    The OneWest Servicer Defendants, the BOA Servicer Defendants, the Chase Servicer Defendants, the Wells Fargo Servicer Defendants, Ocwen Loan Servicing, LLC, Flagstar Bank[1] (collectively referred to as "Servicer Defendants")  committed a fraud and employed deceptive and misleading business practices by encouraging homeowner borrowers to apply for modification of their mortgages under the Federal Government's Home Affordable Modification Program (HAMP), knowing that Plaintiffs and others would not be able to modify their mortgages due to contractual obligations the Servicer Defendants were bound to adhere to, as specified in the Prospectus' and/or Pooling and Servicing Agreements governing the Servicer Defendants and the Trusts for which they serviced Plaintiffs' and others mortgages for. These deceptive and misleading business practices allowed the Servicer Defendants to use Plaintiffs and other borrowers as unwitting pawns in a fraudulent scheme to exploit and manipulate the complexities of said Prospectus' and/or Pooling and Servicing Agreements and the HAMP program's Guidelines and Supplemental Directives to significantly enrich themselves. The Servicer Defendants did so willfully, deceptively and purposefully, resulting in Plaintiffs and tens of thousands of other Rhode Island homeowners having their modification attempts hindered, strung along and otherwise stalled for months and/or years only to later discover that the Servicer Defendants could not (and/or would not) modify their mortgages. The fact that the Servicer Defendants were contractually restricted and/or prohibited from modifying Plaintiffs' and other borrowers mortgages (and/or that borrowers modification attempts were purposefully being stalled and/or hindered as part of an overall fraudulent scheme to reap billions in illicit  recoverable servicing advances) to

---

[1] Claims herein noted against Flagstar Bank are only with respect to their alleged role in a fraudulent scheme to foreclose mortgages in violation of State Uniform Commercial Code.

begin with was deceptively withheld from Plaintiffs and other Rhode Island homeowners and borrowers on an unprecedented scale;

c.    The Servicer and Trustee Defendants violated Rhode Island Uniform Commercial Code by attempting to foreclose on and/or foreclosing on Plaintiffs property when no actual default existed to the Holder of Plaintiffs' and others Notes. The Servicer and Trustee Defendants knew that no default existed and purposefully, willfully and fraudulently foreclosed on Plaintiffs anyway.

## JURISDICTION AND VENUE

4.        This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this complaint is a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are 100 or more members in the proposed class and the Named Plaintiffs are citizens of a State different from the majority of Defendants.

5.        The parties are joined in a single lawsuit due to the significant number of common issues of fact and law raised by the claims of the Plaintiffs as detailed below.

6.        Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because Plaintiffs are residents of Rhode Island and Defendants transact substantial business in this district.

## PARTIES

7.        Individual and Representative Plaintiff Abraham Diaz is a citizen of Rhode Island residing at 250 Washington Avenue, Providence, RI 02905 and claims to be one of the rightful owner of 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

8.        Individual and Representative Plaintiff Norma Pimentel is a citizen of Rhode Island residing at 26 Bergen Street, Providence, RI 02905 and claims to be one of the rightful owner of and is residing at 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

9.      Individual and Representative Plaintiff Sophin In is a citizen of Rhode Island, residing at and claims to be the rightful owner of 22 Iron Drive, West Warwick, RI 02893 which is one of the subject properties referred to herein.

10.     Individual and Representative Plaintiff Hui Ly is a citizen of Rhode Island and is residing at 114 Warwick Avenue, Cranston, RI 02905 and, claims to be the rightful owner of 1235-1237 Cranston Street, Cranston, RI 02920 which are part of the subject properties referred to herein.

11.     Married Couple and Representative Plaintiffs Charles F. & Michelle Gregory are citizens of Rhode Island residing at and owner of that property located at 199 Reservoir Avenue, Lincoln, RI 02865 which is one of the subject properties referred to herein.

12.     Individual and Representative Plaintiff Roth K. Neary is residing at and claims to be the rightful owner of 96-98 Roosevelt Street, Providence, RI 02909 which is one of the subject properties referred to herein.

13.     Individual and Representative Plaintiff, Carlos Franco is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 505 Fountain Street, Pawtucket, RI 02863 which is one of the subject properties referred to herein.

14.     Individual and Representative Plaintiff, Alejandro Barbel is a citizen of Rhode Island and is residing at and claims to be one of the rightful owners of 29 Dennis Avenue, Cranston, RI 02905 which is one of the subject properties referred to herein.

15.     Individual and Representative Plaintiff, Jose Barbel is a citizen of Rhode Island and is residing at and claims to be one of the rightful owners of 29 Dennis Avenue, Cranston, RI 02905 which is one of the subject properties referred to herein.

16.     Married couple and Representative Plaintiffs, Robert Bloomingburgh and Melinda Bloomingburgh are citizens of Rhode Island, residing at and claiming to be the rightful owners of 422 Chestnut Street, Warwick, RI 02888 which is one of the subject properties referred to herein.

17.     Individual and Representative Plaintiff, John Hernandez is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 37 Redwing Street, Unit 1, Providence, RI 02907 which is one of the subject properties referred to herein.

18.     Defendant Bank of America, N.A. is a banking services company with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

19.     Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

20.     Defendant Wells Fargo Bank, N.A. is a company which is the trustee for the certificate holders of various Trusts as noted herein. Upon information and belief Defendant Wells Fargo Bank, N.A. is located at 420 Montgomery Street, San Francisco, CA 94163.

21.     Defendant, Deutsche Bank National Trust Company ("Deutsche Bank") is located at 7575 Irvine Center Drive, Irvine, CA 92618.  Deutsche Bank is the Trustee for the certificate holders of various Trusts as noted herein.

22.     Defendant Harmon Law, PC is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Said foreclosure matters numbering in the hundreds if not thousands in the State of Rhode Island. Upon information and belief Defendant Harmon Law is located at 150 California Street, Newton, MA 02458.

23.     Defendant Ablitt Scofield is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Ablitt Scofield is located at 304 Cambridge Road, Woburn, MA 01801.

24.     Defendant Marinosci Law Group, P.C. is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Marinosci Law Group, P.C. is located at 1350 Division Road, Suite 301, West Warwick, RI 02893.

25.     Defendant Partridge Snow & Hahn, LLP is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Partridge Snow & Hahn, LLP is located at 2364 Post Road, Suite 100, Warwick, RI 02886.

26.     Defendant Korde & Associates, P.C. is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Korde & Associates, P.C. is located at 321 Billerica Road, Suite 210, Chelmsford, MA 01824.

27.     Defendant Independent National Mortgage Corporation (also known as IndyMac Bank was a banking and mortgage lending/servicing entity which was taken over by the FDIC in July of 2008 and was purchased from the FDIC by IMB HoldCo, Inc., at which time its headquarters were located in the state of California.

28.     Defendant OneWest Bank is a banking and mortgage lending/servicing entity which is a wholly owned subsidiary of IMB HoldCo, LLC, located at 888 East Walnut Street, Pasadena, California 91101.

29.     Defendant IMB HoldCo, LLC is a financial services holding company which is owned by IMB Management Holdings, LP, which upon information and belief is located at 888 East Walnut Street, Pasadena, California 91101.

30.     Defendant IMB Management Holdings, LP is a limited partnership is owned by a consortium of private equity investors, which controls and/or owns IMB HoldCo, LLC, which upon information and belief is located at 888 East Walnut Street, Pasadena, California 91101.

31.     Defendant Dune Capital, LLC is a limited liability company, which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 623 Fifth Avenue, 30th Floor, New York, NY 10022.

32.     Defendant J.C. Flowers & Co. is a company, which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 717 Fifth Avenue, 26th Floor, New York, NY 10022.

33.     Defendant MSD Capital, L.P. is a limited partnership which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 645 Fifth Avenue, 21st Floor, New York, NY 10022.

34.     Defendant Stone Point Capital is a company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 919 Third Avenue, Suite 39314, New York, NY 39314.

35.     Defendant SSP Offshore, LLC is a limited liability company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 888 Seventh Avenue, 33rd Floor, New York, NY 10106.

36.     Defendant Soros Fund Management, LLC is a limited liability company that controls and/or owns SSP Offshore, LLC, which upon information and belief is located at 888 Seventh Avenue, 33rd Floor, New York, NY 10106.

37.     Defendant SILAR MCF-1, LLC is a limited liability company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 333 Seventh Avenue, FL3, New York, NY 10001.

38.     Defendant Silar Advisors, LP is a limited partnership that controls and/or owns SILAR MCF-1, LLC, which upon information and belief is located at 333 Seventh Avenue, FL3, New York, NY 10001.

39.     Defendant Paulson & Co is a company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 1251 Avenue of the Americas, 50th Floor, New York, NY 10020.

40.     Defendant Federal National Mortgage Association is a mortgage servicing company which upon information and belief is located at 3900 Wisconsin Avenue, NW, Washington, DC 20016.

41.     Defendant JP Morgan Chase Bank, N.A., d.b.a., Chase Home Finance, LLC, and EMC Mortgage Corporation, are banking and mortgage servicing companies which upon information and belief has headquarters located at 270 Park Avenue, New York, NY 10017.

42.     Defendant Wells Fargo Bank, N.A., d.b.a., Wachovia, and Americas Servicing Company, are banking and mortgage servicing companies which upon information and belief has headquarters located at 420 Montgomery Street, San Francisco, CA 94104.

43.     Defendant Ocwen Loan Servicing, LLC, is a mortgage servicing company which upon information and belief has headquarters located at 1661 Worthington Road, West Palm Beach, FL 33409.

44.     Defendant Flagstar Bank, is a mortgage servicing and banking services company which upon information and belief has headquarters located at 5151 Corporate Drive, Troy, MI 48098.

45.     Defendant HSBC Holdings, PLC, is a global banking consortium which owned Decision One Mortgage prior to shutting it down in September 2007 which upon information and belief has headquarters located at 452 Fifth Avenue, New York, NY 10018.

46.     In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in 2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC.  On March 19, 2009 Defendant IMB HoldCo, LLC formed One West Bank and began operations as a newly formed Pasadena, California based federal savings bank.  From and after its acquisition of IndyMac in March 2009 and continuing to the present, both as a successor in interest to IndyMac and as principals, IMB HoldCo, LLC, IMB Management Holdings, LP, Dune Capital, LLC, J.C. Flowers & Co., MSD Capital, L.P., Stone Point Capital, Soros Fund Management, LLC, SSP Offshore, LLC, Paulson & Co., Silar Advisors, LP,  SILAR MCF-1, LLC (often referred to jointly as the "OneWest Servicer Defendants" where not otherwise described in their individual capacities) have engaged in and continued the wrongful conduct complained of herein. Each of these Servicer Defendants had actual and/or constructive knowledge of the acts of the other OneWest Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

47.     In 2007, Defendant Bank of America commenced negotiations to acquire Countrywide Home Loans, Inc. and Countrywide Financial Corporation (hereinafter referred to as "Countrywide").  By late 2007, Bank of America began merging its operations with Countrywide and adopting some of Countrywide's practices.  From and after its acquisition of Countrywide in July 2008 and continuing to the present, both as a successor in interest to Countrywide and as a principal, Bank of America has engaged in and continued the wrongful conduct complained of herein.

48.     Many of the Defendants had actual and/or constructive knowledge of the acts of other Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

## FACTUAL BACKGROUND

### A.     Fraudulent Scheme Designed and Executed by the Originator Defendants

49.     The Originator Defendants were/are among the leading providers of residential real estate mortgages in Rhode Island and in the United States during all times relevant to this complaint.

50.     The fraud perpetrated by the Originator Defendants from 2000 through 2009, was willful and pervasive.  It began with simple greed and then accelerated when said Defendants discovered they could not sustain their businesses, unless they systematically and significantly reduced their underwriting standards and created increasingly complex, esoteric, and high risk loan products to induce Plaintiffs and other borrowers into ever larger loans on increasingly risky terms.  As the Originator Defendants knew from no later than 2004, these loans were unsustainable for the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other Rhode Island borrowers.  Further, those actions would cause the high risk pools of mortgages the Originator Defendants had sold to Real Estate Mortgage Investment Conduits (REMICs) and/or Trusts to default on a nationwide scale.

11

51.     With their fraudulently obtained mortgages, the Originator Defendants executed their plan to continue the practice of "pooling" the foregoing mortgages and sell the pools for inflated value to REMIC/Trusts that would pay for the mortgages by issuing Bonds (mortgage backed securities/MBS) to investors on a global scale (securitizing).  This was part of a massive fraudulent scheme to absolve the Originator Defendants of any ownership interest in the mortgage loans they originated, and any impending financial consequences, from the massive nationwide mortgage loan defaults that the Originator defendants knew would be the direct result of their fraudulent underwriting tactics. The Originator Defendants knew that these mortgages had been made by significantly reducing credible underwriting standards to the point whereby, regardless of their representations to the contrary, the likelihood of borrower non-performance on these mortgages was extremely high.

52.     Rapidly, the Originator Defendants scheme grew into a brazen plan to disregard underwriting standards and create high risk lending instruments – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagors on an unprecedented scale.

53.     The Originator Defendants senior management teams knew the scheme would cause a liquidity crisis that would devastate Plaintiffs' and others home values and net worth.

54.     At the very least, at the time of entering into the Notes referenced herein with respect to Plaintiffs and others, the Originator Defendants, and each Defendant in the chain of title of the foregoing mortgages and the successors to each of the foregoing, were bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein, that the mortgages being offered to the Plaintiffs were, in fact, part of a massive fraud that the Originator Defendants knew would result in the loss of the Plaintiffs' and others home equity, would cause severe impairment to the Plaintiffs' and others credit ratings, and eventually the potential loss of Plaintiffs' and others homes through foreclosure.

12

55.     It is now all too clear that this was one of the ultimate high-stakes fraudulent investment schemes of the last decade.  Couched in banking and securities jargon, the Originator Defendants deceptive gamble with consumers' primary assets –their homes- was (and still is) nothing more than a financial fraud perpetrated by the Originator Defendants and others on a scale never before seen.

56.     This scheme was a significant contributing factor which led directly to a mortgage meltdown in Rhode Island (and nationwide) causing home values to decrease significantly. The Originator Defendants' business premise was to leave the borrowers, including Plaintiffs, and the Trusts they sold their mortgages to, responsible once the Originator Defendants and their executives had received huge salaries, bonuses, and sold their respective companies stock options or shares, while investors were still buying the Mortgage Backed Securities in increasingly overpriced and high risk mortgage pools before the inevitable market collapse, setting up a second scheme to earn billions of dollars in residential mortgage servicing fees from exploiting the servicing practices of defaulted mortgages.

57.     As a result, Plaintiffs' and others have lost equity in their homes, lost rightful property interests, their credit ratings and histories were damaged or destroyed, and Plaintiffs' incurred material costs and expenses.  At the same time, Defendants took from Plaintiffs' and other borrowers billions of dollars in principal and interest payments and fees, thereby generating billions of dollars in servicing profits.

### B.     The Foreclosure Crisis

58.     Over the last four years, the United States has been in a foreclosure crisis.  In late 2009, a congressional oversight panel noted that one in eight U.S. mortgages was in foreclosure or default.[2]

---

[2] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  *Available at* http://cop.senate.gov/reports/library/report100909-cop.cfin.

59.     For the third quarter of 2010, national foreclosure filings -- default notices, scheduled auctions and bank repossessions -- were reported on 930,437 properties in the 3rd quarter. One in every 139 U.S. housing units received a foreclosure filing in that quarter.[3]

60.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

61.     The foreclosure crisis is not over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011or 2012.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30,[4] (citing a Credit Suisse study showing monthly mortgage rate resets).

## C.     Creation of the Home Affordable Modification Program

62.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C. § 5201 *et seq.* (2009).

63.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."

64.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.

65.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

---

[3] Reality Trac Staff, *Foreclosure Activity Increases 4% in Third Quarter* (October 14, 2010). *Available at* http://www.realtytrac.com/content/press-releases/q3-2010-and-september-2010-foreclosure-reports-6108.
[4] *Available at* http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413

66.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

67.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."

68.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

69.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

70.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

71.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is the exploitation of this subprogram that is one of the issues in this case.

72.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

### D.   Duties of a Participating Servicer Under HAMP

73.     On various dates, the Servicer Defendants each became a participating servicer of the United States Treasury Department's Making Home Affordable Program (of which HAMP is

a subsidiary program) and executed Servicer Participation Agreements (SPA) agreeing to follow the guidelines and supplemental directives of the aforementioned programs (an example of a HAMP Program Servicer Participation Agreement is attached as Exhibit 1).

74.     When each Servicer Defendant signed a SPA with the U.S. Treasury it agreed in its capacity as loan servicer[5] to participate in HAMP, to abide by HAMP's requirements, and to perform loan modification and other foreclosure prevention services described in the program guidelines and supplemental directives and amounts to a public proclamation of its intention to do so.

75.     As a Congressional Oversight Panel evaluating HAMP noted, "participation in the program by servicers is voluntary, but once a servicer elects to participate, adherence to the program standards is mandatory for all the servicer's loans."  Congressional Oversight Panel, December 14, 2010 report –*Id. at pp. at 4*.[6]

76.     The SPAs executed by each Servicer Defendant incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation," *see* SPA § 1.A, and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  SPA §§ 1.A., 2.A.[7]

---

[5] "Servicer" is the industry term for a financial institution that acts as agent for the owner of a loan to perform many of the functions that deal directly with the homeowner, including processing of payment, loss mitigation and overseeing foreclosure.
[6] *Available at* http://cop.senate.gov/reports/library/report-121410-cop.cfm.
[7] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 3), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications and Supplemental Documentation-Frequently Asked, Supplemental Directive 09-08.  The Program Documentation has been consolidated by the U.S. Treasury Department into a single document known as the Making Home Affordable Handbook.  These documents together describe the basic activities required under HAMP and are incorporated by reference and are available at http://www.hmpadmin.com.

16

77.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels."  SD 09-01 (Exhibit 2 *Id. at pp.1*).  This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments."

78.     The Program Documentation requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria.  SD 09-01 (Exhibit 2 *Id. at pp. 4*).  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification (Exhibit 2 *Id. at pp. 3-4*).

79.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP") agreement.  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income.

80.     A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met.  Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

81.     HAMP Guidelines and Supplemental Directives thoroughly cover everything required of each Servicer participating in HAMP. These guidelines were designed to give homeowners

a fair shot at maintaining their homeownership even in the face of a nationwide economic set back precipitated by the Originator Defendants' actions and the resultant crash of the real estate market that destroyed the equity of Plaintiffs and others.

82.     Many of HAMP's guidelines and directives spell out specific timelines that participating servicers must adhere to in order to make the process proceed in a timely fashion. As stated in Supplemental Directive 10-01(Exhibit 3 –*id. at pp. 2-3*) participating servicers have only 10 business days following receipt of an initial request to notify the applicant in writing that the package was received. Further, within 30 calendar days from the date initial request is received, the servicer must review the submitted documentation, and if complete, send a Trial Period Plan Notice (acceptance into the program) or make a determination that the applicant is not eligible for the program . These timelines are further reinforced in Supplemental Directive 10-02 (Exhibit 4 –*id. at pp. 4*).

83.     There are also guidelines designed to protect applicants from foreclosure during the application process.  Supplemental Directive 09-01, (Exhibit 2 *Id. at pp.14*), states that participating servicers should not proceed with a foreclosure sale until a borrower has been evaluated for HAMP and that servicers must use reasonable efforts to contact borrowers to determine their eligibility. Supplemental Directive 10-02 (Exhibit 4), was issued to improve program effectiveness by amending policies and procedures related to initiation and continuation of foreclosure actions. Page 5 (Exhibit 4) of this Directive states that a servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of five circumstances exist.  Page 6 (Exhibit 4) of this Directive also sets a minimum time frame threshold in which a homeowner must request HAMP consideration in order to be entitled to such protection from foreclosure of 7 business days prior to a scheduled foreclosure date. Page 7 (Exhibit 4) of this Directive further states that servicers must implement written procedures applicable to all loans that are potentially eligible for HAMP and requires that the servicer provide a written certification to the foreclosure attorney/trustee that at least one of the five circumstances under the Directive (Exhibit 4), and that all other

available loss mitigation alternatives were exhausted and that a non-foreclosure outcome could not be reached. Furthermore said certification must be provided no sooner than 7 business days prior to the scheduled foreclosure sale date.  Servicer participants in the HAMP Program do not have discretion in applying these directives when it suits them.

84.     When the HAMP Program was introduced, the Servicer Defendants recognized right away that it could become an integral part of an overall scheme to unfairly earn billions of dollars in illicit profits from servicing income by exploiting the HAMP Program and using it as an excuse to keep millions of mortgages in a perpetual default status that should have been rightfully modified or foreclosed upon if good servicing practices were applied. In this scheme the applicant Plaintiffs and other homeowners are mentally and emotionally tortured during their attempts at modification and used as unwitting pawns, and in the end the Plaintiffs, other homeowners, and the Trusts (and ultimately the bond holders of those Trusts) that own the Mortgages and Notes are left holding the proverbial "bag".

85.     While each of the Servicer Defendants executed a HAMP SPA agreeing to follow the rules of the program, their actions demonstrate that they systematically ignore HAMP Guidelines and Supplemental Directives on a routine basis. Guidelines regarding timely review of applications are disregarded. Guidelines regarding deadlines for the request and return of documentation are ignored. Guidelines prohibiting foreclosure against applicants are summarily overlooked. Guidelines regarding written notifications during the process are sporadically applied, at best.

86.     The Plaintiffs and other applicants are met with a daunting challenge of misinformation, lost document claims, repetitive requests for documents already supplied and all manner of tactics designed to stall or otherwise hinder the application process by the Servicer Defendants.

87.     The aforementioned actions by the Servicer Defendants are all by intention, with the primary goal of keeping as many applications for modification (HAMP or otherwise) in a perpetual state of limbo, for as long as possible a period of time, in an effort to maximize

servicing income for the Servicer Defendants. This is accomplished by the combined exploitation of the HAMP Program, and the Pooling and Servicing Agreements governing the conduct of the Servicer Defendants regarding the pools of mortgages they service for the Trusts that own said pools.

### E.    The Servicer Defendants' Financial Incentives Against Modification

88.    The residential mortgage servicing industry was created decades ago when mortgage lenders designed a standardized system by which they could securitize mortgages and thereby recapitalize their lending capability, after having lent out the majority of their capital, much faster than waiting years for borrowers to pay off their mortgages. The premise was simple enough; a mortgage originator makes a large number of loans. That originator pools the loans into one large grouping known as a "pool of mortgages". That pool of mortgages is then sold to a Real Estate Mortgage Investment Conduit (REMIC). These REMICs are often named and referred to as Trusts. They are legal entities registered with the Securities and Exchange Commission. However, they are merely shells created for the sole purpose of acquiring the pools of mortgages, which become assets of the respective Trusts.

89.    The creation of this "mortgaged backed Trust" concept allows mortgage originators to get the loans it recently made, off their books. They no longer have ownership of the Mortgages and Notes they pooled together and consequently become recapitalized, giving originators the ability to lend again, in months as opposed to years. Originators also receive the added benefit that should mortgages default and eventually fail, they suffer no financial consequences as they no longer retain any ownership interest in those mortgages and notes that have been pooled and sold to Trusts.

90.    Trusts are inherently faced with two problems from the moment of their creations. First, because they are just shells (they have no physical address, no communications capability, and no personnel), they have no capital to pay for the pools of mortgages, and secondly, for the same reason as aforementioned, they have no personnel to service the mortgage accounts. The first problem is solved by the securitization of the Trust's assets. This

is done by selling bonds (sometimes referred to as certificates) commonly called Residential

Mortgage Backed Securities (RMBS) or simply Mortgage Backed Securities (MBS) to big

investors such as pension funds, retirement funds, etc. The second problem is solved by

paying companies (i.e. the Servicer Defendants) to deal with the day to day handling of

mortgage servicing related matters such as collecting monthly principal and interest payments,

paying taxes and insurance, etc. Thus the necessity of keeping the Trusts as separate entities,

in order for the recapitalization of mortgage originators to be accomplished through

securitization, gave rise to the mortgage servicing industry.

91.     When a securitization of mortgages takes place many documents are created to outline

the duties of the various participants of each securitization. These documents include required

forms that must be filed with the SEC and those that are not. Those documents relevant to this

complaint are the Prospectus and/or Prospectus Supplement, and the Pooling and Servicing

Agreement.

92.     The Prospectus and/or Prospectus Supplement are documents, registered with the

SEC, outlining the entire structure of a mortgage backed Trust's securitization. It's topics

range from descriptions of the mortgages in the pool, who originated those mortgages and

under what circumstances, who the Trustee of said Trust shall be and their duties, the delivery

of the Mortgages and Notes to the Trust, The Certificates (bonds) offered for sale, monthly

payments to the Certificate holders (bond holders), and who the servicer will be at the

inception of the Trust as well as the servicer's duties. The Prospectus and/or Prospectus

Supplement is the document given to potential purchasers of the MBSs being offered for sale

by the Trust in much the same manner that a company going public issues a prospectus prior

to the issuance of its stock on a public exchange.

93.     In a Prospectus and/or Prospectus Supplement another document is referenced called a

Pooling and Servicing Agreement (PSA). The majority of the clauses contained in the PSA

are contained in the Prospectus and/or Prospectus Supplement as the PSA is a contract

between the Trust and the servicer and is not necessarily required to be registered with the

SEC, so long as its relative content, as it relates to the financial impact it has on said Trust, is disclosed in full within the Prospectus and/or Prospectus Supplement.

94.     As stated in all Prospectus and/or Prospectus Supplements, mortgage servicers are paid by Trusts to service the Trust's mortgages and part of payment for the performance of those services is based as a percentage of the total amount of principal balance of all the loans in a given pool of mortgages the servicer services (i.e. $1,000,000,000 in pool principal balance @ .5% = $5,000,000 servicing fee).

95.     Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.  However, this incentive is countered by a number of financial factors that make it far more profitable for the Servicer Defendants to avoid modification, continue to keep a mortgage in a state of default or distress and to eventually push loans toward foreclosure or short sale.

96.     By purposefully hindering the modification process and delaying foreclosure, the Servicer Defendants are able to exploit a given pool of mortgages for maximal profitability, by keeping the total amount of principal balance of the pool artificially inflated so that they are able to maximize the amount of the servicing fee of said pool.

97.     Were the Servicer Defendants to simply foreclose on all borrowers as soon as good servicing practices would dictate, the servicing fees they collect would drop as suddenly and dramatically as the principal balance of the mortgages in said pools. Instead they purposefully and willfully delay foreclosure, by manipulating and hindering homeowner's attempts at modification, even when the Servicer Defendants know it is impossible for the majority homeowners to be modified, so as to lower servicing income in a controlled manner and maximize profits from servicing income for as long a time as is possible.

98.     This is of course, done at the expense of the borrowers applying for modifications who are given false hope and suffer the indignities of significant emotional and mental distress. The borrowers and the bond-holders of the various Trusts are left holding the bag in the end,

when foreclosure finally takes place and the property is liquidated for a fraction of the mortgage's value, while the Servicer Defendants reap billions of dollars in profits derived from illicit servicing fees based on values of pools of mortgages that have been artificially inflated by the Servicer Defendants' willful and purposeful false representations to be attempting to assist borrower requests for modifications they cannot possibly comply with or agree to (see section F - The Servicer Defendants Contractual Restrictions against Modification).

99.     Also stipulated in all Prospectus and/or Prospectus Supplements is a requirement that servicers must forward, from their own funds, monthly payments of principal and interest, less the servicing fees, to the Trusts on all mortgages in a given pool of mortgages, including those payments of non-performing loans and REO properties. These payments are called periodic/monthly/delinquency advances or simply "advances". This is evidenced as example in the Prospectus and/or Prospectus Supplement governing the Bank of America Alternative Loan Trust 2005-2 (Exhibit 5 *Id. at Article 1, section 1.01 defined terms, periodic advance and again at sections 3.08, 3.20 and 3.14)*. There are also other types of servicing advances required to be made by servicers stated in Prospectus' and/or Prospectus Supplements including, but not limited to, property inspections, broker price opinions, appraisals, property management and maintenance, legal fees, service processing, etc.

100.     Further stated in all Prospectus' and/or Prospectus Supplements, advances made by a servicer are recoverable by the servicer through either standard collection practices (from the borrower) or once a property, as security for a mortgage in the pool, is foreclosed on and the property (now considered Real Estate Owned or REO property of the Trust) is eventually liquidated. In the case of a liquidation of a property, the servicer is paid as first order of priority from the proceeds of said liquidation. Furthermore, recovery of advances often includes interest on the funds advanced enabling the Servicer Defendants to actually earn interest income from their advances made.

101.    Entering into a permanent modification will often significantly delay a servicer's ability to recover advances it is required to make to a Trust as compared to the aforementioned foreclosure/liquidation scenario.  This is due to the practice of adding those advances to the principal balance of the loan when a modification is made, thereby spreading out the recovery of those advances by the servicer, over the life of the loan. Also, a servicer's right to recover expenses from a Trust in a loan modification, rather than a foreclosure, is less clear and less generous. Considering that the Servicing Defendants are only interested in their own respective profitability (having no ownership interest in the Trust's assets; i.e. Mortgages & Notes), they are greatly incentivized against modification even further by these Pooling and Servicing Agreement requirements.

102.    Moreover, by exploiting loopholes in Pooling and Servicing Agreements, the Servicer Defendants profit handsomely by routinely using the "borrower has applied for a HAMP modification excuse" to justify delaying the foreclosure of defaulted mortgages to Trusts, for a time lengthily enough to incur a significant amount of aforementioned servicing advances, and foreclosing when defaults have effectively "ripened", making full recovery of said advances, often with interest. This is done by stringing along borrowers' attempts at modification, as aforementioned in preceding paragraphs, so as to justify the time delay to the Trusts, used primarily to allow the bill for servicing advances to pile up. Furthermore, this reimbursement structure limits the Servicer Defendants' incentive to rein in foreclosure costs and actually incentives them to increase and pad the costs of foreclosure.

103.    Servicers will charge for unnecessary work and/or work that was never done (referred to in the mortgage securitization industry as "Junk Fees"; see *Written Testimony of Adam J. Levitin Associate Professor of Law Georgetown University Law Center Before the House Financial Services Committee Subcommittee on Housing and Community Opportunity "Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing" November 18, 2010*- attached as Exhibit 6) in an effort to increase the costs of foreclosure and

subsequently the amount of servicing advance fees recovered when a foreclosure and liquidation of property eventually takes place.

104.     This is all a clever, fraudulent, misleading and deceptive balancing act employed by the Servicer Defendants to maximize profits using Plaintiff borrowers and others as unwitting pawns. While the Defendant Servicer is making servicing advances, it appears to be losing money on the foreclosure process, yet this is offset later when recovery is made (after foreclosure and final liquidation of property) and profit is realized from the recovery of all the necessary, unnecessary, and fraudulent servicing advances claimed to be paid out by the Defendant Servicer, plus interest. These advances are recovered by the Defendant Servicer as the first order of payment priority from sale proceeds upon liquidation (sale by the Trust) of a foreclosed property. To the Servicer Defendants, advances they are required to make with respect to defaulted mortgages, as stated in the Pooling and Servicing Agreements with the Trusts for which they service mortgages for, are quite literally like "money in the bank".

105.     It is by employing these types of fraudulent, deceptive and misleading business practices, exploiting loopholes in the Pooling and Servicing Agreements they are contractually bound to adhere to, and while using the HAMP Program in tandem to cover their tracks, the Servicer Defendants have made obscene profits from the servicing of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs and tens, if not hundreds, of thousands of other Rhode Island homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

106.     Additionally, the case of the OneWest Servicer Defendants, their conduct is particularly egregious. Servicer Defendant IMB HoldCo, LLC negotiated a loss sharing arrangement (Exhibit 7) as part of its agreement with the FDIC to purchase the assets of IndyMac Bank guaranteeing that they would be partially compensated for losses from qualifying loans as follows;

a.   New IndyMac *(i.e. OneWest Bank)* assuming the first 20% of losses after which the FDIC will share losses 80/20 for the next 10% of losses and 95/5 thereafter.

107.   This aforementioned loss sharing agreement with the FDIC additionally insulates the OneWest Servicer Defendants from the losses normally associated with defaulted mortgages and/or mortgage pools, not yet or just recently sold to Trusts in the securitization process at the time the FDIC halted IndyMac's business. This enabled the OneWest Servicer Defendants to foreclose (or facilitate short sales) on borrower's property and ultimately realize a profit on foreclosed properties and/or short sales of "qualified" loans as defined in said loss sharing agreement (and if necessary, enabling them to repurchase other mortgages and/or pools of mortgages, with minimal financial consequence). The OneWest Servicer Defendants knew they would be able to make significant profits by, ignoring their obligations and public proclamations to assist homeowners nationwide under a Federal Government program they agreed to abide by, and instead foreclose and/or facilitate short sales on as many FDIC "qualified" non-performing mortgages as possible.

108.   As the records pertaining to "qualified loans" under said loss sharing agreement are in the control of the OneWest Servicer Defendants, information regarding the scope of their actions regarding foreclosures of "qualified loans" as defined by the loss sharing agreement with the FDIC can only be obtained through discovery. However, it is upon information and belief that the OneWest Servicer Defendants exploited and manipulated said agreement and willfully denied homeowners the ability to pursue modification of their mortgages under the HAMP program in an effort to instead enrich themselves.

109.   As the records regarding servicing advances and periodic advances and/or advances made and recovered by the Servicer Defendants as a whole are in the control of each Servicer Defendant, specific information regarding the scope of their actions regarding the manipulation of HAMP program in conjunction with their exploitation of Pooling and Servicing Agreements can only be obtained through discovery. However, it is upon

information and belief, based on the facts presented herein, the Servicer Defendants routinely utilized these aforementioned fraudulent, deceptive and misleading tactics to willfully deny homeowners the ability to pursue modification of their mortgages under the HAMP program, fraudulently and deceptively mislead homeowners of their ability to obtain a modification at all, in an effort to instead enrich themselves, from the illicit servicing activities of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs herein and tens, if not hundreds, of thousands of other Rhode Island homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

**F.**  **The Servicer Defendant's Contractual Restrictions Against Modification**

110.    The Servicer Defendants violations of Rhode Island Law are compounded by their deceptive and misleading representations, statements and actions in dragging out the processing of Plaintiffs' and other homeowners HAMP applications over months and even years, while full well knowing that they could not possibly modify those homeowners mortgages due to mortgage modification restrictions and/or prohibitions against modifications as specified in the Prospectus' and Prospectus Supplements, and Pooling and Servicing Agreements governing the mortgages in the Trusts they serviced mortgages for.

111.    The aforementioned restrictions are typically part of every securitization of residential real estate mortgages as a method of protecting the integrity of the revenue stream paid to investors which purchased the Residential Mortgage Backed Securities (RMBSs) of given securitization. If a large enough percentage of mortgages in a given pool are modified then there will not be enough revenue to cover the payments due RMBS holders.

112.    Such a restriction, given by way of example and made part of this complaint herein, is the Prospectus Supplement governing the securitization of the Lehman XS Trust Mortgage Pass-Through Certificates Series 2007-12N (Exhibit 8 *Id. at pp. S-140 "Waiver on Modification of Mortgage Loan Terms."*) This section (clause) restricts the ability of the servicer to modify a given mortgage in the pool if the modification is "*materially adverse to the Trust Fund.*"

113.    After a certain number of modifications are performed in said pool of mortgages (as governed by the terms of its PSA) there becomes less and less money to pay the bond holders. When this begins to happen it becomes materially adverse to said Trust to modify any other mortgages in the pool. As a modification of borrower's mortgages as allowed by the aforementioned federal modification program would result in a violation of the section of the aforementioned PSA regarding modifications, any mortgage governed by the aforementioned PSA is highly unlikely to be modified after the materially adverse mathematical tipping point is reached.

114.    Moreover, the securitization of the Lehman XS Trust Mortgage Pass-Through Certificates Series 2007-12N is extremely complex. The mortgage pools and Servicers are of the multi-party variety. This Trust was created and purchased several mortgage sub-pools consisting of loans originated by IndyMac Bank, Residential Funding, Bank of America, Countrywide, Paul Financial, GreenPoint Mortgage Funding, and Aurora Loan Services (at the time a subsidiary of Lehman Brothers Bank).

115.    The loans were placed into three different pools all governed by the same Prospectus and owned by the same Trust. The companies originating these loans were given the servicing rights to the loans they originated with the exception of GreenPoint loans which transferred all of its servicing rights to Aurora in August 2007.

116.    This Trust was made up of approximately $1,304,325,000.00 worth of mortgage loans of the sub-prime variety, all of which had an expected high non-performance rate as noted in said Prospectus Supplement. The Mortgaged Backed Securities issued by this Trust to pay for said pools of mortgages were purchased by Lehman Brothers which, upon information and belief, repackaged said Mortgage Backed Securities in a second securities offering through another Trust backed, not by the original pools of mortgages, but by the Mortgaged Backed Securities of the original Trust themselves. This would mean that modifications of mortgages in any of the three pools of mortgages combined in this Trust would not only be materially

adverse to the original Trust and its Bond-holders but also to the second Trust backed by the Bonds of the First Trust as well.

117.    This "synthetic" type of Mortgage Backed Securities offering not only makes it more complex but creates a situation whereby most, if not all mortgages in a Trust of this type are impossible to modify due to the small and/or non-existent margin of loss allowed to cash flows of each Trust in order to ensure payments can be made to the inextricably linked bond-holders of each Trust. As such, modifying any given mortgage would create the "*materially adverse*" condition to the Trust, as stated in the foregoing Prospectus Supplement, making modification of mortgages in the pools a practical impossibility.

118.    Moreover, given as examples and made part of this complaint herein, are the Prospectus Supplements of Trusts serviced by the OneWest Defendants identified as the IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series 2006-AR15 (Exhibit 9 *Id. at pp. S-49 "Certain Modifications and Refinancings" ),* and the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, Home Equity Mortgage Loan Asset-Backed Certificates Series INABS 2007-B (Exhibit 10 *Id. at 45 "Certain Modifications and Refinancings" ).*

119.    These aforementioned sections (clauses) restrict the ability of the servicer to modify a given mortgage in those pools unless the servicer repurchases the loan from the Trust which owns it. This event is highly unlikely to take place, given the Servicer Defendants' proclivity for selling mortgages to recover capital to begin with.  Furthermore, the Servicer Defendants would almost certainly not willingly repurchase a loan that would be in default (or one whereby a reasonably foreseeable default is predicted) and as a result the OneWest Defendants, as servicer of the loans in those aforementioned Trusts, would not modify any of the loans held in those Trusts, as the repurchase of those loans would not be profitable.

120.    As additional example and made part of this complaint herein, is the Prospectus Supplement governing the servicing of mortgages owned by the Bank of America Alternative

Loan Trust 2005-2 (Exhibit 5 *Id. at section 3.21(b)(i)* under the heading *Modifications, Waivers, Amendments and Consents at 45*).

121.    This aforementioned section (clause) restricts the ability of the servicer to modify a given mortgage in the pool if the interest rate of the mortgage is permanently lowered. As example, if a mortgage of said pool of mortgages owned by said Trust has an interest rate of 6.25%, fixed rate for 30 years then a modification of said mortgage as allowed by the aforementioned federal modification program would initially reduce the rate of this mortgage over a five year time span after which time the rate will then gradually increase one percent per year and be capped at the current Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) for 30 year fixed rate conforming loans, rounded to the nearest 0.125%, as of the date such modification agreement is prepared. For the week of August 4, 2011, this rate was 4.39%. As such, there is reasonable belief that modifying the mortgage would result in a violation of the section of the aforementioned PSA regarding restrictions on modifications due to the fact that the Servicer Defendant may predict that the interest rate may be permanently lowered as result of said proposed modification and thus the mortgage could not be modified.

122.    Some Prospectus' and PSAs are less restrictive but still limit a servicer's ability to modify a certain number of loans in a Trust. The reasons for this are that after a certain number of modifications are performed in a given pool of mortgages there becomes less and less money to pay the bond holders. When this begins to happen it becomes materially adverse to modify any other mortgages in the pool. As a modification of mortgages as allowed by the HAMP program would result in a violation of the PSAs already in existence any mortgage governed by a standard private label PSA is highly unlikely to be modified if prohibited by the existing PSA and/or after the aforementioned tipping point of adverse effect on cash flow is reached in a PSA restricting modification.

123.    To compound the problems presented by this situation, PSAs require 100% of the bond holders consent in order to change the terms of a Prospectus or PSA. As a typical mortgage securitization results in thousands of bonds being sold globally, it is practically

impossible to obtain 100% consent regarding any issue once the securitization is complete. As consent of 100% of the Bondholders is needed to alter the PSA in a manner that would affect the Trust's cash-flow, as would certainly be the case as a result of widespread modifications to the underlying mortgages, the required consent to change the terms of a Trust is an event with a near zero probability of occurring.

124.    Lastly, the previous problem becomes even more complex when synthetic collateralized mortgage obligations are taken into consideration. Bonds issued by a CMO are often divided into what are called Tranches. Each of these Tranches represents a different payment/risk priority tier, each of which has a different rate of revenue, dividend and/or credit rating. The riskiest Tranches are not investment grade and as such cannot be sold to entities like pension and mutual funds, which make up the profile of a large percentage of purchasers of RMBS Bonds. Therefore, these non-investment grade Bonds are often re-securitized into what are called synthetic collateralized mortgage obligations (SCMO). These SCMOs are a securitization in which the assets of the SCMO are the RMBS Bonds issued by a CMO, rather than the underlying mortgages of said CMO. Despite the fact that a SCMO is nothing more than the repackaging of the riskiest Tranches of other CMOs, bonds issued by a SCMO are also divided into Tranches with similar payment/risk priority tiers. (While Moody's, as well as Standard & Poor's, rated most of these SCMOs as investment grade they were in fact made up almost entirely of BBB- or lower grade bonds from other CMOs). The process is again repeated and the worst of the worst is repackaged as SCMO2. This process can be repeated (and often is) an endless number of times thereby making it practically impossible to obtain consent of 100% of Bondholders necessary to change the terms of a Trust, Prospectus or PSA.

125.    As such, for those Plaintiffs and other homeowner HAMP applicants whose mortgages were owned by Trusts governed by PSAs with merely restrictive clauses regarding modification, the first initial applicants for the HAMP Program received modifications and those applying at a point in time when further modifications of loans in that pool would affect cash flows to bond holders, were simply purposefully left in limbo by the Servicer

Defendants, so as to maximize servicing fees and recoverable servicing expenses as part of the aforementioned scheme.

126.    For those Plaintiffs and other homeowners HAMP applicants whose mortgages were owned by Trusts governed by PSAs with clauses prohibiting modification, the Servicer Defendants of their mortgages never had any intention of modifying their mortgages due to the contractual prohibitions against modification contained in the PSAs governing the servicing of those mortgage loans. Instead the Servicer Defendants, exploited and ignored HAMP Guidelines and Directives and purposefully hindered, delayed and deceptively misled homeowners, regarding the likelihood of success of their legitimate modification attempts, in a scheme to instead enrich themselves in violation of Rhode Island Laws. Instead, the Servicer Defendants chose to "season" those mortgages so as to maximize servicing fees and recoverable servicing expenses as previously described herein.

127.    The Servicer Defendants knew that mortgages of the Plaintiffs' and others could not be modified and instead of notifying them of the impossibility of fulfilling their request in a timely manner as required under HAMP Guidelines, the Servicer Defendants did willfully, knowingly, deceptively mislead Plaintiffs and other Rhode Island HAMP applicants, week after week, month in, month out, for, in some cases, years, by repeatedly requesting duplicate documentation, falsely claiming that documents were lost and/or were never received, and falsely claiming that requests were stalled in underwriting, negotiation and/or quality control, all while ignoring HAMP Guidelines regarding the timely processing  of  HAMP requests, which allow only 30 calendar days in which to render a decision. Some of the Plaintiff HAMP applicants and others suffered the additional indignity of being granted modifications and/or Trail Period Plans, only to later discover that those binding contracts would not be honored by the Servicer Defendants.

128.    The overwhelming majority of the mortgages made by the Originator Defendants were securitized and this information was deceptively and purposefully withheld (and continues to be withheld) from the Plaintiffs and other homeowners in Rhode Island and nationwide.

129.     The Servicer Defendants were aware of these restrictions/prohibitions regarding modifications when each of them executed its agreement with the federal government to participate in the Treasury Department's Home Affordable Modification Program (HAMP) and abide by its guidelines and directives yet decided they would use their position as servicer to manipulate the situation in a scheme to enrich themselves.  The Servicer Defendants actions were, and continue to be, fraudulent and amount to deceptive and misleading business practices solely designed to exploit a United States Federal Government program designed to assist homeowners in saving their homes and property, and the Pooling and Servicing Agreements governing their actions regarding the mortgages they serviced for Trusts. The Servicer Defendants instead, did willfully fraudulently misrepresent to Plaintiffs and other homeowners their ability to pursue modification of their mortgages under the HAMP program (or otherwise), in an effort to instead enrich themselves, from the illicit servicing activities of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs herein and tens, if not hundreds, of thousands of other Rhode Island homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

    **H.     FNMA, Servicer & Trustee Defendants and Illegal Foreclosures**

130.     FNMA, the Servicer and Trustee Defendants also foreclosed (or attempted foreclosure) on Plaintiffs and others statewide knowing that under Rhode Island Law no default to the Holder of Plaintiffs' and others Notes actually existed.

131.     As aforementioned, in typical mortgage securitizations, mortgages are added together with other mortgages and a pool of mortgages is created. The resultant pool of mortgages is then sold to a Trust and/or REMIC which becomes the actual owner/holder of the Note and/or Mortgage.

132.     As such, the Note-holder cannot enforce the default provisions of said Note unless a default to said Note-holder exists. Under the governing Prospectus' and the PSAs entered into by The Servicer Defendants with the Trusts that purchased mortgage pools, the Servicer

33

Defendants and any other subsequent servicing entity of the loans in said Trusts are contractually required to forward, from their own funds, monthly payments of principal and interest not received by the Servicer Defendants, to said Trusts.

133.    This is a standard contractual obligation and practice in residential mortgage securitizations. This is evidenced in the Prospectus Supplements governing mortgages serviced by the OneWest Servicer Defendants identified as the Lehman XS Trust Mortgage Pass-Through Certificates Series 2007-12N (Exhibit 8 *Id*. *at pp. S-134 & S-141 "Servicers Responsibilities" & "Advances"* ), the IndyMac INDX Mortgage Loan Trust 2006 (Exhibit 9 *Id*. *at pp. S-48 "Advances"* ) and the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, Home Equity Mortgage Loan Asset-Backed Certificates Series INABS 2007-B (Exhibit 10 *Id. at section titled "Servicing of Mortgage Loans" paragraphs headed "Advances"* ). This fact is further evidenced in the PSA governing the Bank of America Alternative Loan Trust 2005-2 (Exhibit 5 at *Article 1, section 1.01 defined terms, periodic advance and again at sections 3.08, 3.20 and 3.14*).

134.    As evidenced and stipulated in the aforementioned Prospectus Supplements (and other Prospectus Supplements specific to the various Plaintiffs as noted subsequently herein), the various Servicer Defendants are contractually obligated to forward payments of principal and interest, from their own funds, on all defaulted loans, to the respective Trusts that own the mortgages they service. This is a standard contractual obligation of all mortgage securitizations. By fulfilling this contractual obligation, the Servicer Defendants act as a third party making payment on behalf of defaulted borrowers to the Holders of those Mortgages and/or Notes (Trusts). As only the true Holders of those Mortgages and Notes is able to enforce the default provisions of those documents, defaults to the true Holders of said Notes must exist.

135.    As the Servicer Defendants are contractually required (as aforementioned and evidenced in Exhibits 5, 8, 9,10,18,19 & 20), as a party with no security interest in the Plaintiffs' and others properties, Mortgages and/or Notes,  to pay the principal and interest

payments on behalf of those Plaintiffs' and others who have yet to remit payment, no default to the claimed Holders of said Notes existed (or exists) in any situation whereby foreclosure action commenced and/or was completed regarding any foreclosure whereby Plaintiffs' and others Mortgages and Notes are governed by Prospectus', Prospectus Supplements, and Pooling and Servicing Agreements of any Securitized Mortgage Backed Trust.

136.    As such the Plaintiff's and others mortgage payments were in fact received by the actual Note-holders and no enforceable defaults existed at time of foreclosures. As the records regarding the advances made to Trusts regarding Plaintiff's and others Mortgages are held by the Servicer Defendants and the Trustee Defendants, the information regarding these Defendants' custodial accounts as they relate to said Trusts can only be obtained through discovery. However, it is clear that if the terms of said governing Prospectus', Prospectus Supplements and/or PSAs, made part of this complaint and referenced herein, were adhered to, no actual default to the claimed Note-holder has or had occurred of Plaintiffs and others Notes in related foreclosure actions on a massive scale.

137.    In cases whereby Defendant FNMA claims to be the purported owner of a Plaintiff's mortgage it is important to be familiar with said Defendant's business mechanism.

138.    FNMA buys loans from approved mortgage sellers, FNMA securitizes mortgages (creates and establishes Trusts that become the true owner of the Mortgages and Notes in the same fashion as the aforementioned private label mortgage backed Trusts), appoints itself as Trustee of the Trusts it creates which then sells the resultant mortgage-backed securities to investors, with FNMA's unconditional  guarantee that all of the stated principal and interest payments of the mortgage loans held by said Trust will be timely passed through to the Trust and ultimately the investors. Stated on page one of the Amended and Restated 2007 FNMA Single Family Trust Agreement dated January 1, 2009 (Exhibit 11) is as follows;

> C.    Fannie Mae has purchased and intends to purchase residential mortgage loans.
>
> D.    Fannie Mae intends to set aside and transfer residential loans

acquired by it to various Trusts established pursuant to this Trust Agreement and the related Issue Supplements and to issue guaranteed mortgage pass through certificates representing undivided beneficial ownership interest in the assets of the related Trusts.

E.      Fannie Mae intends to guarantee to each Trust sufficient funds to permit timely distribution s to Holders of principal and interest on Certificates, a required by this Trust Agreement.

F.      Fannie Mae intends to be the Master Servicer of the Mortgage Loans held in each Trust and to arrange for and supervise the contractual servicing of the Mortgage Loans by Direct Servicers.

G.      Fannie Mae intends to be the Trustee for each Trust.


139.    FNMA creates Trusts, exactly like a private label securitization of mortgages, and remains as Trustee (and Master Servicer) of each Trust. The Trusts now becomes the claimed true Holders of Notes and Mortgages of each securitization, not FNMA. As stated in the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11) the Direct Servicer (i.e. the Servicer Defendants) may be responsible for *"Delinquency Advances"*(Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans, just as in Prospectus', Prospectus Supplements, and PSAs governing private label securitizations. However, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA unconditionally guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59)*.

140.    As Defendant FNMA is a major purchaser of mortgages and seller of mortgage backed securities but is not required to register it's Trusts and/or governing Direct Servicer Agreement's with the U.S. Securities and Exchange Commission, the records regarding the identities of said FNMA Trusts and the monthly payment advances regarding the Plaintiffs'

and others mortgages purportedly owned, guaranteed or held by FNMA Trusts (or "Pools" as they are often referred to) are in the sole possession of Defendant FNMA and can only be obtained through discovery.

141.    However, it is upon information and belief that FNMA, acting in its capacity as Trustee of the Trusts it created, was not the owner of Plaintiffs and others mortgages prior to foreclosure auctions and/or recording of foreclosure deeds. FNMA merely claims ownership after purchasing said properties at auction, acting in its capacity as Trustee, on behalf of said Trusts.

142.    FNMA does offer a limited purchase of mortgage loans or REO property from Trusts as stated in their Master Trust Agreement (Exhibit 10 *Id. at Sec 2.5, 2.5(1) sub paragraphs (d) (iii) being most relevant to Plaintiff's and others claims*). However, as FNMA is in sole possession of the records as to whether or not said "limited purchase of mortgage loans or REO property" clause was exercised in the case of Plaintiffs' and others loans, and these facts can only be obtained through discovery, it is upon information and belief, the Plaintiffs' so named herein, and tens, if not hundreds of thousands of other Rhode Island homeowners have been foreclosed on by FNMA (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction) in violation of Rhode Island Law, on a scale so enormous it is almost unfathomable.

143.    Furthermore, it is upon information and belief that FNMA established Trusts were the actual Holders of Plaintiffs' and tens, if not hundreds of thousands of others Mortgages and Notes at the time foreclosure action was initiated and concluded against them in the name of FNMA (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction, which is more often the case) as the claimed holder, in the State of Rhode Island.

144.    Moreover, Defendant FNMA, acting in its capacity as Master Servicer, forwarded to the Trusts that claimed to hold Plaintiffs' and others Mortgages and Notes, the monthly scheduled payments of principal and interest due, as is required by FNMA's unconditional guarantee, as a third party, on behalf of Plaintiffs' and others, regardless of whether they were

received by the Direct Servicer (the Servicer Defendants) or FNMA as Master Servicer. As such, the Notes of Plaintiffs' and others were not in default to the claimed Holders of same (FNMA Trusts) at the time of foreclosure action.

145. Trustee Defendant FNMA knew that they, as a third party, had in fact paid the obligations of the Plaintiffs' and others so situated, to the Holders of Plaintiffs' and others Mortgages and/or Notes and, as such, was aware that no default of said Notes existed to the Holders of Plaintiffs and others Mortgages and/or Notes at the time foreclosure action was commenced and/or completed.

146. Moreover, the Servicer Defendants are most certainly aware of the payments they have made to the actual Note Holders with respect to advances of delinquent monthly mortgage payments of Plaintiffs and others, be those payments to private-label securitized mortgage backed trusts or FNMA created mortgage backed trusts. As such, they are fully aware that Note-holders receiving payment of delinquent monthly mortgage payments of Plaintiffs and others, in the form of Advances as stipulated to, in the respective pooling and servicing agreements of each Trust, constituted payment of those Notes.

147. Plaintiffs and others are not responsible for this legally flawed, industry standard business practice, as aforementioned. Plaintiffs and others were completely unaware (and many still are) of the existence of such practices, and are not party to any of the contractually binding agreements between mortgage servicers, trustees of trusts and the trusts themselves. It is clearly evidenced herein, that monthly mortgage loan payments are made, on Plaintiffs and others behalf, to the true Holders of their Notes, without Plaintiffs' and others knowledge and/or consent.

148. This industry-wide practice was designed and developed by extremely sophisticated Mortgage Banking professionals and Wall Street Bankers, who Plaintiffs can only assume, had the best legal counsel advising them in such matters. With such sophistication and legal guidance, it would be hard to imagine that the Defendants herein, were not aware that payment to Note-holders, of delinquent monthly mortgage payments of Plaintiffs and others,

in the form of Advances as stipulated to, in the respective pooling and servicing agreements of each Trust, did in fact constitute a payment of those Notes. Servicer Defendants were aware that this practice constituted the payment of said Notes, yet claimed, fraudulently, that said Notes were defaulted and proceed with foreclosure action, regardless of the Law.

149.    Claiming that a Note is in default and exercising the Statutory Power of Sale given by a mortgage, when possessing the full knowledge that no actual default of said Note exists to its Holder, is a clear violation of Uniform Commercial Code in every State, including the State of Rhode Island, making all subsequent foreclosure and eviction actions not only illegal, but void and without force and effect.

150.     Making the Servicer Defendants conduct even more egregious is the fact that they are the very entities carrying out said illegal foreclosure actions, in the name of FNMA and the Trustee Defendants, acting as nominee for FNMA and/or Trustee Defendants, in spite of the fact that they are also the very entities making the delinquency advance payments to the actual Note-holders.

151.    Typically, mortgage servicers are granted the power to act as nominee for the Trustee (be it FNMA or the Trustee of a private-label securitized Trust), which gives them the ability to act with complete authority and control over the foreclosure process of the mortgages it services for Trusts.

152.    This fact is evidenced in the FNMA Master Trust Agreement (Exhibit 11 *Id at pp. 33-34, Section 5.1(3)(ix) "Direct Servicer Responsibilities"*), and in Prospectus Supplements of private-label securitized Trusts (i.e.  Exhibit 8 *Id at pp. 131 "Servicers", ¶ 5, pp. 135 "Servicing and Administrative Responsibilities";*  -  Exhibit 9 *Id at pp. 80 "Servicing of Mortgage Loans – The Servicer", ¶ 2, pp 84 "Default Management Services"*; - Exhibit 10 *Id at pp. 45 "Default Management Services", ¶ 4*).

153.    Foreclosure and eviction actions are carried out, often in the name of the Private Label Trust and/or FNMA, by the servicer. This gives the servicer complete control over all foreclosure, eviction and liquidation actions. As such, it is impossible for the Servicer

Defendants to be unaware that their actions regarding foreclosures are in violation of State Uniform Commercial Code. The Servicer Defendants make the delinquency advance payments and then handle all foreclosure, eviction and liquidation of Plaintiffs' and others homes having the full knowledge that all those actions are in fact preceded by a violation of State Uniform Commercial Code and are subsequently illegal.

154.    Trustee Defendants Harmon Law, P.C., Ablitt Scofield, Marinosci Law Group, P.C. & Associates, Partridge Snow & Hahn, LLP, and Korde & Associates acted (and continue to act) as legal counsel for Servicer Defendants OneWest, Bank of America, JPMorgan Chase, Flagstar Bank, and Wells Fargo Bank, as well as Trustee Defendants FNMA, Deutsche Bank, Wells Fargo, US Bank and JPMorgan Chase and has represented them in hundreds if not thousands of foreclosures in the State of Rhode Island.

155.    As such they are culpable for their actions and involvement regarding said aforementioned illegal foreclosure attempts, and illegal foreclosures and/or evictions of Plaintiffs' and others, whose Notes were not in default, by virtue of payment of monthly Mortgage payments of principal and interest, on behalf Plaintiffs' and others, by the Servicer Defendants and/or FNMA, acting as third parties remitting payment on behalf of Plaintiffs and others to the claimed Holders of their Notes and Mortgages.

156.    Trustee Defendants Harmon Law, P.C., Ablitt Scofield, Marinosci Law Group, P.C. & Associates, Partridge Snow & Hahn, LLP, and Korde & Associates have a duty as legal counsel to enforce only those foreclosure actions that complied with Rhode Island Law and either informed their clients of said violations of the Law and participated in systematic illegal foreclosure/eviction actions anyway and/or or failed to inform their clients at all.

157.    Much has been made of late by various official law enforcement offices regarding the proclivity of mortgage originators and servicers alike for concealing the true chain of title and ownership interest in originally executed mortgages and notes, in the State of Rhode Island and nationwide. It took recent Court Decisions in Massachusetts (i.e. *U.S. Bank National Association v. Ibanez*, 458 Mass. 637, 647-*2011*) to get servicers and Trustee Defendants to

identify the Trusts as the true holders of said obligations, in foreclosure filings and documents today.

158.    However, it is not effectual, from the standpoint of justice for those Plaintiffs and others so damaged, to merely know that these deceptive tactics are being employed. It must also be demonstrated why these tactics are being employed, in order to obtain a true understanding of the magnitude of the fraud that has been perpetrated upon the people of the State of Rhode Island and others nationwide, in order for appropriate damages to be merited.

159.    The Servicer, Trustee, and FNMA Defendants have, collectively, attempted and succeeded in many cases, to conceal the true identity of the present holders of mortgages and notes in foreclosure proceedings and official documents, and as the foregoing paragraphs have elucidated, these practices still continue in regards to all foreclosures involving mortgages and notes owned by FNMA sponsored Trusts, in spite of the aforementioned recent Court Decisions.

160.    The Servicer, Trustee, and FNMA Defendants, attempt to conceal the beneficial ownership of said obligations because by revealing said facts, they lead to the documents governing their complex interactions and relationships among each other, and within these documents is the evidence and true scope of their wrongdoing.

161.    During this entire nationwide foreclosure crisis, the Servicer ,Trustee, and FNMA Defendants have tried to keep the knowledge of their contractual obligations to each other, and their complex interactions and relationships out of public knowledge, for fear of being found that many of their practices are willfully, knowingly and purposefully designed to flaunt and violate State and Federal Laws as if they were of no consequence, all in an precise, well organized effort to reap billions of dollars in illicit profits for their respective firms while financially damaging, and mentally and emotionally torturing the Plaintiffs and others, and severely damaging the economic wellbeing of the State of Rhode Island and this Nation as a whole.

162.    The Servicer Defendants' improper acts still continue, including, *inter alia*;

a.   fraudulently misrepresenting their intentions to arrange loan modifications for Plaintiffs and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiffs and others of the opportunity to seek assistance under a federal government program Defendants publicly represented they would abide by but knew they could and/or would not;

b.   deceptively misleading Plaintiffs and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet instead are purposefully ignoring guidelines and directives of said federal program, seeking to enrich themselves by keeping Plaintiffs' and others modification requests in limbo while ever increasing the billing of servicing advances and eventually foreclosing (and/or facilitating short sales) on borrowers properties, while borrowers seek, in good faith, to modify their mortgages under said federal program;

c.   willfully, purposefully and systematically stalling Plaintiffs' and others legitimate requests to cancel foreclosures while actively seeking to be considered for a said modification program, in direct violation of guidelines and directives of aforementioned program;

163.    Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, the Servicer Defendants have;

a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

42

b.   deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or (in the case of the OneWest Servicer Defendants) take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

164.   Because the Servicer Defendants have or are ignoring guidelines and directives of a government program they agreed to abide by, while fraudulently, deceptively, misleadingly, and publicly representing to follow said guidelines,  hundreds or thousands of homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.

165.    By employing the aforementioned fraudulent, and deceptive and misleading business practices, the Defendants have left, i.e. hundreds or thousands of borrowers seeking modifications, in a state of limbo – often worse off than they were before they sought a modification from the Servicer Defendants and knowingly inflicted severe emotional and mental distress on Plaintiffs and others. The Servicer Defendants' actions are fraudulent, misleading and purposefully deceptive, and are unfair under state laws.

166.    The Trustee Defendants' improper acts still continue, including, *inter alia*;

> a.   Deceptively, misleadingly, fraudulently, and otherwise illegally seeking to foreclose and/or completing foreclosures and/or evictions on Plaintiffs' and other's homes while having full knowledge that no actual default to the Holder of Plaintiffs' and others Notes exists and/or existed.

> b.   deceptively concealing from Plaintiffs and others the fact that Notes purported to be in default were actually in good standing as the Note-holder was in fact receiving Plaintiffs' and others monthly payments of principal and interest from the Servicer Defendants and/or FNMA.

167.    These acts continue to this day with hardball tactics and deception that continues to threaten Plaintiffs' and others Constitutional rights and financial security, as well as the economic future of the State of Rhode Island, the nation, and the worldwide economic system.

### CLAIMS OF THE NAMED PLAINTIFFS
#### As To The Originator Defendants

**Fraudulently Misrepresenting the Financial Soundness of Mortgage Products**

**Abraham Diaz, Norma Pimentel v IndyMac Bank, F.S.B.**

168.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

169.    Individual and Representative Plaintiff Abraham Diaz is a citizen of Rhode Island residing at 250 Washington Avenue, Providence, RI 02905 and claims to be one of the

rightful owner of 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

170.    Individual and Representative Plaintiff Norma Pimentel is a citizen of Rhode Island residing at 26 Bergen Street, Providence, RI 02905 and claims to be one of the rightful owner of and is residing at 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

171.    Plaintiffs made an application for a refinance of the subject property, to the IndyMac Originator Defendant, for consideration for a mortgage loan on or about January 2007.

172.    Defendant IndyMac informed Plaintiffs they would make the mortgage loan by placing the Plaintiffs in a non-conforming "No-Income–No Asset Verification" mortgage loan program. This loan would require no income verification or documentation as well as no asset verification or documentation. IndyMac would not require any verification documents of any kind, hence the acronym, "No-Doc Loan".

173.    Furthermore, IndyMac would allow the Plaintiffs to receive a generous amount of cash out of the refinance transaction that would allow for a loan amount with an exceedingly high ratio of loan to value, leaving Plaintiffs with little or no equity in the subject property after said refinance.

174.    Moreover, Plaintiffs had less than good credit and were given adjustable interest rate terms. The financial product used was a six month adjustable mortgage, tied to the LIBOR with a start rate of 10.625% and a 16.625% interest rate cap. This type of mortgage was an entirely risk based loan product with a high rate due to the fact that it was a high loan to value, sub-prime credit, cash out refinance, no-doc mortgage. Such loan products are often used as short term debt vehicles by sophisticated investors.

175.    On or about April 24, 2007, Plaintiffs were granted said refinance mortgage loan by IndyMac Bank, F.S.B. and executed a Mortgage and Note with in the amount of One Hundred Forty Thousand and 00/100 dollars ($140,000.00) secured by the subject property. Said Mortgage was recorded in the Providence Recorder of Deeds Office in Book 8650, at page 16

176.     Defendant IndyMac Bank, F.S.B. knew Plaintiffs did not earn enough income to qualify for said loan, and by offering them a mortgage loan which would not require a true and accurate disclosure of Plaintiffs' income, said Defendant could make said mortgage loan even while knowing that Plaintiff did not have the ability to repay said mortgage loan and that future default of said mortgage loan was extremely high. Defendant IndyMac knew Plaintiffs had insufficient income to repay said No-Doc Loan, and most certainly knew that allowing Plaintiffs to refinance said subject property with a high risk, sophisticated lending instrument would eventually create a situation at some point whereby Plaintiffs would be unable to repay said mortgage.

177.     By using a mortgage lending product designed solely to provide Defendant IndyMac Bank, F.S.B. the ability to make said mortgage loans to Plaintiffs and other borrower's so similarly situated, regardless of their ability to repay said mortgage loans, said Defendant made hundreds, if not thousands of mortgage loans in the State of Rhode Island that should have never been made. This was done merely to satisfy IndyMac Bank, F.S.B.'s greed and obsession for corporate profit, without ever once considering the consequences that would eventually befall the Plaintiffs, other borrowers and the Bondholders of the Trusts they sold said mortgages to. Defendant IndyMac Bank, F.S.B. made said loans, purposefully and willfully knowing that Plaintiffs and others did not realistically and/or literally earn enough income to repay said mortgage loans, and that said mortgage loans had an extremely high likelihood of default.

178.     At best the Plaintiffs are unsophisticated consumers who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to them. Knowing these facts, IndyMac reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiffs' situation (and others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiffs, thereby

placing Plaintiffs in a financial position with extreme likelihood of failure, knowing

repayment was unlikely, and that said loan would cause injury to the Plaintiffs.

**Hui Ly v IndyMac Bank, F.S.B.**

179.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

180.    Plaintiff, Hui Ly is a citizen of Rhode Island and is residing at 114 Warwick Avenue,

Cranston, RI 02905 and claims to be the rightful owner of 1235-1237 Cranston Street,

Cranston, RI 02920 which is one of the subject properties referenced herein.

181.    Plaintiff made an application to the IndyMac Originator Defendant for consideration

for a mortgage loan on or about March 2006.

182.    Defendant IndyMac informed Plaintiff they would make the mortgage loan by placing

the Plaintiff in a non-conforming "No-Income–No Asset Verification" mortgage loan

program. This loan would require no income verification or documentation as well as no asset

verification or documentation. IndyMac would not require any verification documents of any

kind, hence the acronym, "No-Doc Loan".

183.    Furthermore, IndyMac did not require a down payment regarding said loan for

Plaintiff to purchase said subject property.

184.    On or about May 15, 2006, Plaintiff executed a Mortgage and Note with IndyMac

Bank, F.S.B. in the amount of Two Hundred Twenty Eight Thousand and 00/100 dollars

($228,000.00) for the purchase of the subject property which had a total purchase price of

Two Hundred Twenty Eight Thousand and 00/100 dollars ($228,000.00).

185.    This was done because Defendant IndyMac Bank, F.S.B. knew Plaintiff did not earn

enough income to qualify for said loan, and by offering him a mortgage loan which would not

require a true and accurate disclosure of Plaintiff's income, said Defendant could make said

mortgage loan even while knowing that Plaintiff did not have the ability to repay said

mortgage loan and that future default of said mortgage loan was extremely high. Defendant

IndyMac knew borrower had insufficient income to repay said No-Doc Loan, and most

certainly knew that allowing Plaintiff to purchase said subject property with no down payment

would eliminate any financial interest of Plaintiff, should he, at some point be unable to repay said mortgage.

186.    By using a mortgage lending product designed solely to provide Defendant IndyMac Bank, F.S.B. the ability to make said mortgage loans to Plaintiff and other borrower's so similarly situated, regardless of their ability to repay said mortgage loans, said Defendant made hundreds, if not thousands of mortgage loans in the State of Rhode Island that should have never been made. This was done merely to satisfy IndyMac Bank, F.S.B.'s greed and obsession for corporate profit, without ever once considering the consequences that would eventually befall the Plaintiff, other borrowers and the Bondholders of the Trusts they sold said mortgages to. Defendant IndyMac Bank, F.S.B. made said loans, purposefully and willfully knowing that Plaintiff and others did not realistically and/or literally earn enough income to repay said mortgage loans, that Plaintiff and other borrowers would have no binding financial interest (i.e. down payment, etc.) in said property's purchase, and that said mortgage loans had an extremely high likelihood of default.

187.    At best the Plaintiff is an unsophisticated consumer who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to him. Knowing these facts, IndyMac reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiff's situation (and others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff, thereby placing Plaintiff in a financial position with extreme likelihood of failure, knowing repayment was unlikely, and that said loan would cause injury to the Plaintiff.

**John Hernandez v HSBC Holdings, PLC**

188.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

189.    Individual and Representative Plaintiff John Hernandez is a citizen of Rhode Island residing at and claims to be one of the rightful owner of 37 Redwing Street, Providence, RI 02907 which is one of the subject properties referred to herein.

190.    Plaintiff made an application, for a mortgage loan to purchase the subject property, to the HSBC Originator Defendant, through its wholly owned subsidiary Decision One Mortgage on or about April 2006.

191.    Defendant HSBC informed Plaintiff they would make the mortgage loan by placing the Plaintiff in a non-conforming "100% Financing, No-Income Verification" mortgage loan program. This loan would require no income verification or documentation as well as no down payment.

192.    On or about June 27, 2006, Plaintiff was granted said mortgage loan by Defendant HSBC's Decision One Mortgage unit and executed two Mortgages and Notes with in the amount of One Hundred Thirty Six Thousand and 00/100 dollars ($136,000.00) and Thirty Four Thousand and 00/100 ($34,000.00) Dollars, respectively, each of which was secured by the subject property. Said Mortgages were recorded in the Providence Recorder of Deeds Office in Book 8135, at page 318 (1st Mortgage), and Book 8135, at page 335 (2nd Mortgage).

193.    Defendant HSBC, through its wholly owned subsidiary, Decision One Mortgage, knew Plaintiff did not earn enough income to qualify for said loan, and by offering him a mortgage loan which would not require a true and accurate disclosure of Plaintiff's income, said Defendant could make said mortgage loan even while knowing that Plaintiff did not have the ability to repay said mortgage loan and that future default of said mortgage loan was extremely high. Defendant IndyMac knew Plaintiffs had insufficient income to repay said No-Doc Loan, and most certainly knew and most certainly knew that allowing Plaintiff to purchase said subject property with no down payment would eliminate any financial interest of Plaintiff, should he, at some point be unable to repay said mortgage.

194.    By using a mortgage lending product designed solely to provide Defendant HSBC the ability to make said mortgage loans to Plaintiff and other borrower's so similarly situated, regardless of their ability to repay said mortgage loans and/or to be financially vested in property, said Defendant made hundreds, if not thousands of mortgage loans in the State of

Rhode Island that should have never been made. This was done merely to satisfy HSBC's greed and obsession for corporate profit, without ever once considering the consequences that would eventually befall the Plaintiff, other borrowers and the Bondholders of the Trusts they sold said mortgages to. Defendant HSBC made said loans, purposefully and willfully knowing that Plaintiff and others did not realistically and/or literally earn enough income to repay said mortgage loans, and that said mortgage loans had an extremely high likelihood of default.

195.    At best the Plaintiff is an unsophisticated consumer who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to him. Knowing these facts, HSBC, through its wholly owned subsidiary, Decision One Mortgage, reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiff's situation (and others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff, thereby placing Plaintiff in a financial position with extreme likelihood of failure, knowing repayment was unlikely, and that said loan would cause injury to the Plaintiff.

## Defendant's Actions Caused Injury to Plaintiffs

196.    Plaintiffs have suffered injury caused by the Originator Defendant's actions, including but not limited to the creation of a situation whereby Plaintiffs would be unable to repay their mortgage loan obligations, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, legal fees for defense of foreclosure and/or eviction, rental payments, and the eventual loss of their home and property.

## As to The Servicer Defendants

## Deceptive And Misleading Representations and Business Practices
## Regarding their Modification Activities
## and/or Fraud

**Abraham Diaz, Norma Pimentel v The One West Servicer Defendants**

197.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

198.    Individual and Representative Plaintiff Abraham Diaz is a citizen of Rhode Island residing at 250 Washington Avenue, Providence, RI 02905 and claims to be one of the rightful owner of 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

199.    Individual and Representative Plaintiff Norma Pimentel is a citizen of Rhode Island residing at 26 Bergen Street, Providence, RI 02905 and claims to be one of the rightful owner of and is residing at 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

200.    On or about April 24, 2007, Plaintiffs were granted a refinance mortgage loan by IndyMac Bank, F.S.B. and executed a Mortgage and Note with in the amount of One Hundred Forty Thousand and 00/100 dollars ($140,000.00) secured by the subject property. Said Mortgage was recorded in the Providence Recorder of Deeds Office in Book 8650, at page 16

201.    Sometime after said refinance Plaintiffs began experiencing difficulties repaying their mortgage obligation due in part to the significant rise in the interest rate they were required to pay.

202.    In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in 2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC.  On March 19, 2009 Defendant IMB HoldCo, LLC formed One West Bank and began operations as a newly formed Pasadena, California based federal savings bank.  From and after its acquisition of IndyMac in March 2009, OneWest Bank, F.S.B. was the servicer of Plaintiffs' mortgage loan.

203.    Unknown to the Plaintiffs, IndyMac Bank had sold Plaintiffs' Mortgage and Note to a Mortgage Backed Trust, named the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, on or about June 12, 2007. Trustee Defendant Deutsche Bank National Trust Company was appointed as Trustee for said Trust.

204.    Plaintiffs made an application to the OneWest Bank Servicer Defendants for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about April, 2009.

205.    During the twelve months since they first applied for the HAMP program, Plaintiffs were stalled by the OneWest Servicer Defendants' customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in their modification attempts.

206.    As stated in the Prospectus Supplement of the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B (the Trust), the servicer (OneWest) of the Mortgages and Notes owned by said Trust is allowed to modify the Mortgages owned by said Trust only if it purchases the Mortgages said servicer intends to modify from said Trust (Exhibit 10 *Id. at pp. 45 "Certain Modifications and Refinancings"*).

207.    This aforementioned section (clause) restricts the ability of the servicer to modify a given mortgage in those pools unless the servicer repurchases the loan from the Trust which owns it. This event is highly unlikely to take place, given the Servicer Defendants' proclivity for selling mortgages to recover capital to begin with.  Furthermore, the Servicer Defendants would almost certainly not willingly repurchase a loan that would be in default (or one whereby a reasonably foreseeable default is predicted) and as a result the OneWest Servicer Defendants, as servicer of the loans in the aforementioned Trust, would not likely modify any of the loans held in said Trust, as the repurchase of those loans would not be profitable.

208.    Instead of informing the Plaintiffs of its contractual restriction regarding Plaintiffs' modification requests, the OneWest Servicer Defendants purposely and fraudulently mislead Plaintiffs, encouraging them to continue their modification attempts for twelve months, all while knowing they had no intention of even considering Plaintiffs' request.

209.    During the time period of Plaintiffs' request for HAMP consideration they suffered extreme emotional and mental distress as the OneWest Servicer Defendants and Defendant Ablitt Scofield threatened them repeatedly with foreclosure in notices sent to Plaintiffs.

210.    On or about April 6, 2010 a foreclosure sale was held by the Trustee Defendant Deutsche Bank National Trust Company and the Plaintiffs' subject property was sold at auction and subsequently purchased at said auction by said Deutsche Bank Trustee Defendant.

211.    It is upon information and belief that the OneWest Servicer Defendants purposefully and fraudulently misled Plaintiffs, and purposefully hindered their modification requests. The OneWest Servicer Defendants misrepresented to Plaintiffs their intentions, which were to use Plaintiffs as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiffs' and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, interest on recoverable advances, and/or to exploit the OneWest Servicer Defendants loss sharing agreement with the FDIC.

212.    The OneWest Servicer Defendants knew that they would not grant Plaintiffs' request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiffs' and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, interest earning advances to accumulate.

213.    The Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the OneWest Servicer Defendants publicly represented they would administer;

b.   fraudulently and deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no

actual default under the terms of the note/deed of trust exists.

214.    Defendants' conduct as described in this complaint was willful or knowing.

**Sophin In v The One West Servicer Defendants**

215.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

216.    Plaintiff, Sophin In is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 22 Iron Drive, West Warwick, RI 02893 which is one of the subject properties referred to herein.

217.    Plaintiff refinanced the subject property on or about March 15, 2007 for Two Hundred Twenty Four Thousand and 00/100 dollars ($224,000.00) and was given a mortgage loan from IndyMac Bank, F.S.B.

218.    Sometime after said refinance Plaintiff began experiencing difficulties repaying her mortgage obligation due in part to the significant rise in the interest rate she was required to pay.

219.    In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in 2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC.  On March 19, 2009 Defendant IMB HoldCo, LLC formed One West Bank and began operations as a newly formed Pasadena, California based federal savings bank.  From and after its acquisition of IndyMac in March 2009, OneWest Bank, F.S.B. was the servicer of Plaintiff's mortgage loan.

220.    Plaintiff made an application to the Defendant OneWest Bank for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about June 15, 2009.

221.    On or about July 1, 2009 Plaintiff was told by said Defendant to resubmit the entire application package a second time. Plaintiff complied with said request and forwarded her request again on or about July 1, 2009.

222.    On or about July 21, 2009 Plaintiff spoke with Defendant's representative named Melissa and was told that her request would take 30-90 days to be reviewed.

223.    On or about July 30, 2009 Plaintiff spoke with Defendant's representative named Ken and was informed that her request was still "in review" [stage].

224.    On or about August 4, 2009 Plaintiff spoke with Defendant's representative named Angela and was informed that her request had been put on hold due to a bankruptcy filing by the Plaintiff (Chapter 13 filed on April 1, 2009) and Defendant was not sure if they could process a request if the borrower on an account was in bankruptcy.

225.    On or about October 19, 2009 Plaintiff spoke with Defendant's representative (unnamed) and was informed that she would have to resubmit all application documents in order to "re-open" her request. On or about that aforementioned date Plaintiff did comply with said request and forwarded all or her application documents again.

226.    On or about December 17, 2009 Plaintiff was informed by her legal counsel handling her bankruptcy that she could submit her request for modification through the bankruptcy court in Rhode Island and that by doing so she might have better luck.

227.    On or about February 8, 2010 Plaintiff forwarded all documentation necessary to apply for modification consideration under the HAMP Program to her Attorney handling her bankruptcy case. Said Attorney did forward said documentation to the OneWest Servicer Defendants for consideration.

228.    Sometime after receiving said documentation the OneWest Servicer Defendants denied Plaintiff's request for modification under HAMP Guidelines. Defendants claimed that Plaintiff had insufficient income to qualify. Plaintiff, on information and belief believes that this decision was wrongful and states truthfully that she had sufficient income to qualify for modification under the guidelines of the HAMP Program.

229.    During the entire one year and seven months since she first applied for the HAMP program, Plaintiff was stalled by the OneWest Servicer Defendants' customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in her modification attempts.

230.    During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as the OneWest Servicer Defendants and Defendant Harmon Law threatened her repeatedly with foreclosure in notices sent to Plaintiff.

231.    On or about February 7, 2011 a foreclosure sale was held by the OneWest Servicer Defendants and the Plaintiff's subject property was sold at auction and subsequently purchased at said auction by Trustee Defendant FNMA.

232.    It is upon information and belief that the OneWest Servicer Defendants purposefully and fraudulently misled Plaintiff, and purposefully hindered her modification requests. The OneWest Servicer Defendants misrepresented to Plaintiff their intentions, which were to use Plaintiff as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiff's and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, interest on recoverable advances, and/or to exploit the OneWest Servicer Defendants loss sharing agreement with the FDIC.

233.    The OneWest Servicer Defendants knew that they would not grant Plaintiff's request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiff's and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, interest earning advances to accumulate.

234.    The Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the OneWest Servicer Defendants publicly represented they would administer;

b.   deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no

58

actual default under the terms of the note/deed of trust exists.

Defendants' conduct as described in this complaint was willful or knowing.

**Roth K. Neary v Ocwen Loan Servicing, LLC**

235.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

236.    Plaintiff, Roth K. Neary is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 96-98 Roosevelt Street, Providence, RI 02909 which is one of the subject properties referred to herein.

237.    Plaintiff purchased the subject property on or about April 27, 2006 for Three Hundred Twenty Two Thousand and 00/100 dollars ($322,000.00) and was given a mortgage loan of Two Hundred Eighty Nine Thousand Eight Hundred and -------00/100 ($289, 800.00) dollars from New Century Mortgage Corporation.

238.    On or about August, 2006, Defendant Ocwen Loan Servicing, LLC became the servicer of said Plaintiff's mortgage loan.

239.    Sometime after said purchase Plaintiff began experiencing difficulties repaying her mortgage obligation due in part to the significant rise in the interest rate she was required to pay.

240.    Plaintiff made an application to Defendant Ocwen Loan Servicing, LLC (Ocwen) for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about May 17, 2010.

241.    On or about October 23, 2010, Plaintiff was granted acceptance into the Trial Period Plan under HAMP. Plaintiff executed the documents sent to her by Ocwen and returned them with her first payment of One Thousand Two Hundred Forty and -------48/100 ($1,240.48) dollars in the form of money orders in the amounts of $500.00 (2) and $240.48 respectively

(Exhibit 12). Said documents and payment were sent to Ocwen via United States Postal Services, Express Mail, on October 29, 2010, tracking number EG4017122900US (Exhibit 13). Said documents and payment was received by Ocwen at their West Palm Beach headquarters, on October 30, 2010 at 10:36 am, and said package was accepted and signed for by an Ocwen employee named A. Biamonte (Exhibit 14).

242.    On or about November 11, 2010, Ocwen sent a letter to Plaintiff stating that she was eligible for a Home Affordable Modification (Exhibit 15). Enclosed with said letter were two copies of a Modification Agreement or a Final Modification. Said letter instructed the Plaintiff to sign and execute both Modification Agreements and return them by February 1, 2011. Plaintiff executed and had her signature notarized on both Modification Agreements and returned them to Ocwen on or about January 23, 2011.

243.    On or about February 14, 2011, Plaintiff received her mortgage loan billing statement from Ocwen. On said statement she noticed that her monthly payment due did not reflect her modified payment amount so she contacted Ocwen. A representative from Ocwen claimed that they had not received her fully signed and executed Modification Agreement, which Plaintiff had previously forwarded. Said representative said that it was no problem and that he would send out another agreement to Plaintiff right away.

244.    Plaintiff received a second set of Modification Agreements from Ocwen, on or about March 6, 2011. Plaintiff executed said Modification Agreements (Exhibit 16) and returned them to Ocwen, via United States Postal Service, 1st Class Mail, on March 10, 2011.

245.    Plaintiff made all payments required under her Trial Period Plan and Modification Agreement, in full and on time (Exhibit 17).

246.    On or about September 16, 2011, Ocwen and Trustee Defendant Deutsche Bank National Trust Company initiated foreclosure action against Plaintiff, through their Attorney, Defendant Korde & Associates, P.C.

247.    In spite of the Plaintiffs numerous attempts to demonstrate to Ocwen and Korde & Associates, P.C, that she had a Modification Agreement in place, and had made all of the

agreed upon payments under said Modification Agreement, the subject property was sold at auction on November 9, 2011. Ocwen returned to Plaintiff a portion of the payments (approximately 5 months worth) Plaintiff made under said Modification Agreement in order to establish that they were not accepting payments under said Modification agreement during the 5 months prior to  said auction .

248.    During the entire one year and six months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by Ocwen's customer service representatives, inundated with repetitive requests for the same documentation over and over again, otherwise purposefully hindered in her modification attempts, was repeatedly told that her fully executed Modification Agreements, which Plaintiff had returned to Ocwen twice, had not been received and repeatedly threatened with foreclosure.

249.    It is upon information and belief that Ocwen fraudulently and purposefully misled Plaintiff and hindered her modification requests in an effort to enrich themselves by ignoring her legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

250.    During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as she was threatened repeatedly with foreclosure.

251.    It is upon information and belief that the Ocwen Servicer Defendant purposefully and fraudulently misled Plaintiff, and purposefully hindered her modification requests. The Ocwen Servicer Defendant misrepresented to Plaintiff their intentions, which were to use Plaintiff as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiff's and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, and interest on recoverable advances.

252.    Contained in the Prospectus outlining the organization of the Trust that owned and/or owns Plaintiff's Mortgage and Note, the GSAMP Trust 2006-NC2, modification of the

Mortgages owned by said Trust is allowed (Exhibit 18 *id. at pp. 154 {S-89} "Collections and Other Servicing Procedures"*).

253.    However, in modifying Plaintiff mortgage loan, Ocwen would only make $1,000.00 and recovery of its servicing advances made on behalf of Plaintiff's mortgage loan account would be added to the principal balance of said mortgage loan and paid out over the 25 year time period of the modified loan. Ocwen knew it would be far more profitable to simply ignore the fact that they had granted Plaintiff a HAMP modification and foreclose on her property instead, in order to recover its illicit servicing advances sooner so as to increase short term profits.

254.    The Ocwen Servicer Defendants knew that they would not grant Plaintiff's request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiff's and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, potentially interest earning advances to accumulate.

255.    The Servicer Defendants' conduct was fraudulent, unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

        a.  fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Ocwen Servicer Defendant publicly represented they would administer;

        b.  fraudulently and deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich

themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading other members of the class by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that other members of the class' mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of said mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

Defendants' conduct as described in this complaint was willful or knowing.

**Carlos Franco v Wells Fargo Home Mortgage & Wells Fargo Bank, N.A.**

256.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

257.   Plaintiff, Carlos Franco is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 505 Fountain Street, Pawtucket, RI 02863 which is one of the subject properties referred to herein.

258.   Plaintiff refinanced the subject property on or about November 18, 2005 and was given a mortgage loan of Two Hundred Twenty Two Thousand and -------00/100 ($222, 000.00) dollars from Webster Bank National Association.

259.    Approximately one year after said refinance transaction, Servicer Defendant Wells Fargo Home Mortgage, a wholly owned subsidiary of Wells Fargo Bank, N.A., became the servicer of Plaintiff's said mortgage loan.

260.    Sometime during the first quarter of 2010 Plaintiff began experiencing difficulties repaying his mortgage obligation.

261.    Plaintiff made an application to the Wells Fargo Servicer Defendants for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about July 1, 2010.

262.    During the entire one year and three months since Plaintiff first applied for the HAMP program (the subject property was foreclosed on or about October 20, 2011), Plaintiff was stalled by the Wells Fargo Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, otherwise purposefully hindered in his modification attempts, was repeatedly told that his documents sent to them had not been received and/or lost and repeatedly threatened with foreclosure. Plaintiff was told by the Wells Fargo Defendant Servicer's representatives that his file was in the short sale department, when no such request for a short sale existed and was informed that Wells Fargo automatically put HAMP Modification requests into short sale as a matter of policy.

263.    Making this Plaintiff's case particularly egregious is the fact that his mortgage is owned by a FNMA Mortgage Backed Trust. As FNMA is one of the administrators of the HAMP Program on behalf of the U.S. Government and most if not all homeowners that meet HAMP Qualifications should easily be able to obtain a HAMP Modification as FNMA does not restrict or prohibit modifications of mortgages owned by the Trusts it acts as Trustee for, under HAMP. It is this Plaintiff's claim that he was qualified for a HAMP Modification and that his denial of such by the Wells Fargo Servicer Defendant was wrongful.

264.    Moreover, it is upon information and belief that the Wells Fargo Servicer Defendants fraudulently and purposefully misled Plaintiff and hindered his modification requests in an effort to enrich themselves by ignoring his legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

265.    The Wells Fargo Servicer Defendant fraudulently misrepresented to Plaintiff their intentions, which were to use Plaintiff as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiff's and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, and interest on recoverable advances.

266.    In modifying Plaintiff's mortgage loan, the Wells Fargo Servicer Defendants would only make $1,000.00 and recovery of its servicing advances made on behalf of Plaintiff's mortgage loan account would be added to the principal balance of said mortgage loan and paid out over the fully amortized time period of the modified loan. The Wells Fargo Servicer Defendants knew it would be far more profitable to simply ignore Plaintiff's requests for consideration for a HAMP modification and foreclose on his property instead, in order to recover its illicit servicing advances sooner so as to increase short term profits.

267.    The Wells Fargo Servicer Defendants knew that they would not grant Plaintiff's request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiff's and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, potentially interest earning advances to accumulate.

268.    The Servicer Defendants' conduct was fraudulent, unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

> a.  fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity

to seek assistance under a federal government program the Wells Fargo Servicer Defendants publicly represented they would administer;

b.   fraudulently and deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

Defendants' conduct as described in this complaint was willful or knowing.

**John Hernandez v BAC Home Loans Servicing, LP & Bank of America, N.A.**

269.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

270.   Individual and Representative Plaintiff John Hernandez is a citizen of Rhode Island residing at and claims to be one of the rightful owner of 37 Redwing Street, Providence, RI 02907 which is one of the subject properties referred to herein.

271.   On or about June 27, 2006, Plaintiff was granted a mortgage loan by Defendant HSBC's Decision One Mortgage unit to purchase the subject property and executed two Mortgages and Notes with in the amount of One Hundred Thirty Six Thousand and 00/100 dollars ($136,000.00) and Thirty Four Thousand and 00/100 ($34,000.00) Dollars,

respectively, each of which was secured by the subject property. Said Mortgages were recorded in the Providence Recorder of Deeds Office in Book 8135, at page 318 (1st Mortgage), and Book 8135, at page 335 (2nd Mortgage).

272.    On or about November 2006, Countrywide became the servicer of Plaintiffs 1st mortgage loan, and through its acquisition of Countrywide, eventually Bank of America, N.A., through its wholly owned subsidiary, BAC Home Loans Servicing, LP (hereinafter BAC), became the servicer of Plaintiff's said mortgage loan.

273.    On or about October 2009 Plaintiff began experiencing difficulties repaying his mortgage obligation.

274.    Plaintiff made an application to the BAC Servicer Defendant for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about November 6, 2009.

275.    During the entire two years since Plaintiff first applied for the HAMP program (Plaintiff gave up modification attempts on or about November 2011), Plaintiff was stalled by the BAC Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, otherwise purposefully hindered in his modification attempts, was repeatedly told that his documents sent to them had not been received and/or lost and repeatedly threatened with foreclosure.

276.    Making this Plaintiff's case particularly egregious is the fact that his mortgage is owned by a Mortgage Backed Trust named the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7 and this Trust does allow for modification of the mortgages in the pool of mortgages it owns. As stated in the Prospectus Supplement of the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7 modifications of mortgages owned by said Trust is not restricted or prohibited (Exhibit  20 *Id. at pp. 92 "Collection and Other Servicing*

*Procedures"*). It is this Plaintiff's claim that he was qualified for a HAMP Modification and that his denial and/or refusal by BAC to properly review his request was wrongful.

277.    Moreover, it is upon information and belief that the BAC Servicer Defendants fraudulently and purposefully misled Plaintiff and hindered his modification requests in an effort to enrich themselves by ignoring his legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

278.    The BAC Servicer Defendant fraudulently misrepresented to Plaintiff their intentions, which were to use Plaintiff as a pawn as part of a massive scheme designed solely to enrich themselves by willfully and purposefully ignoring Plaintiff's and others legitimate requests for modification under HAMP so as to maximize servicing income, servicing expenses, and interest on recoverable advances.

279.    In modifying Plaintiff's mortgage loan, the BAC Servicer Defendant would only make $1,000.00 and recovery of its servicing advances made on behalf of Plaintiff's mortgage loan account would be added to the principal balance of said mortgage loan and paid out over the fully amortized time period of the modified loan. The BAC Servicer Defendant knew it would be far more profitable to simply ignore Plaintiff's requests for consideration for a HAMP modification and foreclose on his property instead, in order to recover its illicit servicing advances sooner so as to increase short term profits.

280.    The BAC Servicer Defendant knew that they would not grant Plaintiff's request for modification under HAMP (or otherwise) and were intent on purposefully, willfully and systematically keeping Plaintiff's and others modification requests in a state of semi-permanent limbo so as to allow for the continued illicit collection of servicing fees and permit recoverable, potentially interest earning advances to accumulate.

281.    The Servicer Defendants' conduct was fraudulent, unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

  a. fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the BAC  Servicer Defendant's publicly represented they would administer;

  b. fraudulently and deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

  c. deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

Defendants' conduct as described in this complaint was willful or knowing.

  **The Servicer Defendants' Actions Caused Injury to Plaintiffs**

282. Plaintiffs have suffered injury caused by the Servicer Defendants' actions, including but not limited to, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.

283.    Moreover, whenever the Servicer Defendants delay the tender of a timely review of a modification request, TPP agreement and/or permanent HAMP modification the terms of such a modification are less beneficial to the homeowner than they otherwise would be had the Servicer Defendants properly performed.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to.   If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.  If an eligible homeowner has been serially strung along in violation of HAMP Guidelines, then their injury is measured by the difference between their current circumstances and the terms of a modification to which they were entitled. Further, if an eligible homeowner has been foreclosed upon during the modification process, in violation of HAMP Guidelines and Supplemental Directives, then the Plaintiffs' are entitled to the return of said property and/or any value of same and/or costs arising from said foreclosure.

284.    The Servicer Defendants' behavior has also left class members in limbo, wondering if their homes can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward trial period-level payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

285.    Plaintiffs have been damaged because many are being, or have been, foreclosed upon, may have suffered the loss of rightful property, and have incurred the costs of legal fees associated with foreclosure and eviction defense and in some cases made rental payments to the purported new owner of their rightful property.

286.    Furthermore, the Plaintiffs owe far more money on their loans than they would have had the Servicer Defendants not fraudulently, misleadingly and deceptively represented to the

public and to the borrowers of the mortgages it holds and/or services that it would follow the guidelines and supplemental directives of HAMP.

287.    Furthermore, Plaintiffs have suffered significant mental and emotional distress as a direct result of the Servicer Defendants' actions. Said damages are representative of damages sustained by other members of the class.

### FNMA, Servicer & Trustee Defendants Attempt and/or Complete Foreclosure when No Default Exists to Note-Holder/Owner of Mortgage

**Abraham Diaz, Norma Pimentel v Deutsche Bank National Trust Company, The OneWest Servicer Defendants, and Ablitt Scofield, P.C.**

288.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

289.    Individual and Representative Plaintiff Abraham Diaz is a citizen of Rhode Island residing at 250 Washington Avenue, Providence, RI 02905 and claims to be one of the rightful owner of 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

290.    Individual and Representative Plaintiff Norma Pimentel is a citizen of Rhode Island residing at 26 Bergen Street, Providence, RI 02905 and claims to be one of the rightful owner of and is residing at 247 Indiana Avenue, Providence, RI 02905 which is one of the subject properties referred to herein.

291.    On or about April 24, 2007, Plaintiffs were granted a refinance mortgage loan by IndyMac Bank, F.S.B. and executed a Mortgage and Note with in the amount of One Hundred Forty Thousand and 00/100 dollars ($140,000.00) secured by the subject property. Said Mortgage was recorded in the Providence Recorder of Deeds Office in Book 8650, at page 16

292.    Sometime after said refinance Plaintiffs began experiencing difficulties repaying their mortgage obligation due in part to the significant rise in the interest rate they were required to pay.

293.    In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in 2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC.  On March 19, 2009 Defendant IMB HoldCo, LLC formed One West Bank and began operations as a newly formed Pasadena, California based federal savings bank.  From and after its acquisition of IndyMac in March 2009, OneWest Bank, F.S.B. was the servicer of Plaintiffs' mortgage loan.

294.    Unknown to the Plaintiffs, IndyMac Bank had sold Plaintiffs' Mortgage and Note to a Mortgage Backed Trust, named the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, on or about June 12, 2007. Trustee Defendant Deutsche Bank National Trust Company was appointed as Trustee for said Trust.

295.    Plaintiffs made an application to the OneWest Bank Servicer Defendants for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about April, 2009.

296.    On or about February 12, 2010, Defendant Ablitt Scofield, P.C. served a Notice of Mortgage Foreclosure Sale to Plaintiffs, on behalf of its client, Deutsche Bank National Trust Company as Trustee for the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B (the Trust), to foreclose on the subject property located at 247 Indiana Avenue, Providence, RI 02905 on or about April 6, 2010.

297.    The Defendant Deutsche Bank National Trust Company sold said Plaintiffs' subject property at foreclosure auction on or about April 6, 2010, and said subject property was subsequently purchased on behalf of said Trust, by Deutsche Bank National Trust Company, acting as its Trustee.

298.    Unknown to Plaintiffs at that time, upon information and belief, the OneWest Servicer Defendants had in fact made all Plaintiffs' mortgage payments, on Plaintiffs' behalf, as a third party servicer with no security interest, to the true Holder of Plaintiffs' Note and Mortgage, the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, as is required

under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiffs' mortgage loan, secured by 247 Indiana Avenue, Providence, RI 02905 (Exhibit 10 *Id. at pp. 44 "Advances"*).

299.   As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiffs' Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

300.   The Plaintiffs do not dispute that their Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

301.   As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

302.   The actions taken by the OneWest Servicer Defendants, and Trustee Defendants Deutsche Bank and Ablitt Scofield, P.C., are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

303.   The documents, records and information pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of the OneWest Servicer Defendants and Deutsche Bank National Trust Company and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

304.   Plaintiffs suffered extreme emotional damage and mental distress as their efforts to stay a subsequent illegal eviction action instituted against them in lower Courts failed and Plaintiff Abraham Diaz, his wife and three children were forcibly evicted in an action involving multiple local law enforcement officers.

305.    This type of action is representative of the OneWest Servicer Defendants and Trustee Defendants Deutsche Bank National Trust Company and Ablitt Scofield, P.C.'s behavior in

all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in this Plaintiff's case, in the State of Rhode Island and nationwide.

**Sophin In v  FNMA, The One West Servicer Defendants, and Harmon Law, P.C.**

306.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

307.    Plaintiff, Sophin In is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 22 Iron Drive, West Warwick, RI 02893 which is one of the subject properties referred to herein.

308.    Plaintiff refinanced the subject property on or about March 15, 2007 for Two Hundred Twenty Four Thousand and 00/100 dollars ($224,000.00) and was given a mortgage loan from IndyMac Bank.

309.    Upon information and belief sometime on or about April - May 2007, Plaintiff's mortgage was purchased by an as yet accurately identified FNMA created Mortgage Backed Trust. At that point in time, said as yet identified Trust became the true Holder in Due Course of the Plaintiff's Mortgage and Note.

310.    Sometime after said refinance Plaintiff began experiencing difficulties repaying her mortgage obligation due in part to the significant rise in the interest rate she was required to pay and she fell behind on her mortgage obligation.

311.    The OneWest Servicer Defendants initiated foreclosure action, through their Attorney, Harmon Law, P.C., against Plaintiff's property on or about December 14, 2010.

312.    On or about February 7, 2011 a foreclosure sale was held by the OneWest Servicer Defendants and the Plaintiff's subject property was sold at auction and subsequently purchased at said auction by Trustee Defendant FNMA.

313.    Unknown to Plaintiff at that time, upon information and belief, the OneWest Servicer Defendants and /or FNMA, by virtue of its guarantee, did in fact make all of Plaintiff's

mortgage payments, on Plaintiff's behalf, as a third party with no security interest, to the true Holder of Plaintiff's Mortgage and/or Note (said Trust), without her knowledge or consent. As such the Note referenced herein is believed to have been in good standing at the time foreclosure was initiated and completed, due to the Delinquency Advances paid by the OneWest Servicer Defendants and/or FNMA, on behalf of the Plaintiff, to said as yet identified true Note Holder in Due Course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11).

314.    In said Master Trust Agreement the Direct Servicer (i.e. IndyMac/OneWest) is often responsible for *"Delinquency Advances"* (Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans to the FNMA created Mortgage Backed Trusts it services mortgages for.

315.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not (or is not required to) forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59)*.

316.    Regardless of whether the OneWest Servicer Defendants or FNMA paid the Plaintiff's mortgage payments on her behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee were adhered to, all of the Plaintiff's mortgage payments were paid to the true Holder in Due Course of her Note and Mortgage and as such there existed no default of the Note at the time foreclosure action was commenced and/or completed.

317.    Upon information and belief the OneWest Servicer Defendants were not the Holder of Plaintiff's Mortgage and/or Note instruments at the time of said auction and were merely foreclosing at the instruction of FNMA, which was acting in its capacity as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

318.   Furthermore, FNMA's subsequent purchase (on behalf of said Trust) of Plaintiff's property at auction was an action by FNMA as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

319.   The Plaintiff does not dispute that her Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

320.   As no default of the Note existed to said, as yet identified, FNMA Mortgage Backed Trust, which was the Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

321.   The actions taken by the OneWest Servicer Defendants, and Trustee Defendants FNMA and Harmon Law, P.C. are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

322.   The documents, records and information regarding the identification of said Mortgage Backed Trust that was (and/or may still be) the true Holder of Plaintiff's Note and Mortgage, and the records pertaining to the payments made to said Trust regarding Plaintiff's mortgage loan, are in the exclusive control of Defendant FNMA (and the OneWest Servicer Defendants with respect to any payments they may have made on behalf of Plaintiff) and as such can only be obtained through discovery. However, if the terms of said FNMA Master Trust Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

323.    This type of action is representative of the OneWest Servicer Defendants, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized by FNMA and whereby their

servicing is governed by Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Rhode Island and nationwide.

**Hui Ly v Deutsche Bank National Trust Company, The OneWest Servicer Defendants, and Ablitt Scofield, P.C.**

324.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

325.    Plaintiff, Hui Ly is a citizen of Rhode Island and is residing at 114 Warwick Avenue, Cranston, RI 02905 and claims to be the rightful owner of 1235-1237 Cranston Street, Cranston, RI 02920 which is one of the subject properties referenced herein.

326.    Plaintiff Ly's first mortgage loan was originated by IndyMac Bank, serviced by Defendants IndyMac and through acquisition of IndyMac, OneWest Bank and its consortium of investors.

327.    On or about May 1 2006, Defendant IndyMac sold Plaintiff's mortgage to a Real Estate Mortgage Investment Conduit entity named IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series 2006-AR15 (hereinafter referred to as the "Trust").

328.    Defendant Deutsche Bank National Trust Company was appointed Trustee of said Trust.

329.    On or about September 17, 2010, Defendant Ablitt Scofield, P.C. served a Notice of Mortgage Foreclosure Sale to Plaintiff, on behalf of its client, Deutsche Bank National Trust Company as Trustee for IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series 2006-AR15, to foreclose on the subject property located at 1235-1237 Cranston Street, Cranston, RI 02920 on or about November 8, 2010.

330.    The OneWest Servicer Defendants sold said Plaintiff's property (1235-1237 Cranston Street) at foreclosure auction on or about November 8, 2010, and said subject property was subsequently purchased on behalf of said Trust, by Deutsche Bank National Trust Company, acting as its Trustee.

331.    Unknown to Plaintiff at that time, upon information and belief, the OneWest Servicer Defendants had in fact made all Plaintiff's mortgage payments, on Plaintiff's behalf, as a third party servicer with no security interest, to the true Holder of Plaintiff's Note and Mortgage, IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series 2006-AR15, as is required under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiff's mortgage loan, secured by 1235-1237 Cranston Street, Cranston, RI 02920 (Exhibit 9 *Id. at pp. S-48 "Advances"*).

332.    As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

333.    The Plaintiff does not dispute that his Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

334.    As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

335.    The actions taken by the OneWest Servicer Defendants, and Trustee Defendants Deutsche Bank and Ablitt Scofield, P.C., are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

336.    The documents, records and information pertaining to the payments made to said Trust regarding Plaintiff's mortgage loan, are in the exclusive control of the OneWest Servicer Defendants and Deutsche Bank National Trust Company and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

337.     This type of action is representative of the OneWest Servicer Defendants and Trustee Defendants Deutsche Bank National Trust Company and Ablitt Scofield, P.C.'s behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in this Plaintiff's case, in the State of Rhode Island and nationwide.

**Charles F. & Michelle Gregory v JPMorgan Chase Bank, N.A., E.M.C Mortgage, Bank of America, N.A., and Marinosci Law Group, P.C.**

338.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

339.     Married Couple and Representative Plaintiffs Charles F. & Michelle Gregory are citizens of Rhode Island residing at and owner of that property located at 199 Reservoir Avenue, Lincoln, RI 02865 which is one of the subject properties referred to herein.

340.     Plaintiffs refinanced the subject property on or about June 1, 2004 for One Hundred Sixty Eight Thousand Seven Hundred Fifty and 00/100 dollars ($168,750.00) and were given a mortgage loan from Fremont Investment and Loan d/b/a Fremont Mortgage.

341.     On or about October 28, 2004, Plaintiffs received notification from EMC Mortgage Corporation that the servicing of their mortgage loan had been transferred from Fremont Investment & Loan to EMC Mortgage (which is now a wholly owned subsidiary of JPMorgan Chase Bank, N.A.), effective November 1, 2004.

342.     Sometime after said refinance Plaintiffs began experiencing difficulties repaying their mortgage obligation due in part to the significant rise in the interest rate they were required to pay.

343.     Unknown to Plaintiffs at the time, on or about October 29, 2004, Fremont Investment & Loan sold Plaintiff's Mortgage and Note to a Real Estate Mortgage Investment Conduit entity named Bear Sterns Asset Backed Securities I, LLC, Asset Backed Certificates, Series 2004-FR-3 (hereinafter referred to as the "Trust").

344.    LaSalle Bank National Association was appointed Trustee of said Trust, and through its acquisition of LaSalle Bank, Bank of America, N.A. became Trustee of said Trust as successor by merger.

345.    On or about June 23, 2010, October 12, 2011 and December 20, 2011 Defendant Marinosci Law Group, P.C. served a Notice of Intent to Foreclose and Notices of Mortgage Foreclosure Sale to Plaintiffs, on behalf of its client, Bank of America, N.A. as Trustee for Bear Stearns Asset Backed Securities I, LLC, Asset Backed Certificates, Series 2004-FR-3, to foreclose on the subject property located at 199 Reservoir Avenue, Lincoln, RI 02865 on or about November 11, 2011 and February 10, 2012 respectively.

346.    Unknown to Plaintiffs at that time, upon information and belief, the JPMorgan Chase Bank, N.A. and/or EMC Mortgage Corporation Servicer Defendants had in fact made all Plaintiffs' mortgage payments, on Plaintiffs' behalf, as a third party servicer with no security interest, to the true Holder of Plaintiffs' Note and Mortgage, Bear Stearns Asset Backed Securities I, LLC, Asset Backed Certificates, Series 2004-FR-3, as is required under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiffs' mortgage loan, secured by 199 Reservoir Avenue, Lincoln, RI 02865 (Exhibit 19 *Id. at pp. 17, {S-10} and 70, {S-37} "Advances"*).

347.    As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiffs' Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

348.    The Plaintiffs do not dispute that their Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

349.    As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

350.    The actions taken by the JPMorgan Chase Bank, N.A. and/or EMC Mortgage Corporation Servicer Defendants, and Trustee Defendants Bank of America, N.A. and

Marinosci Law Group, P.C., are without any force or effect relative to the actual attempted sale of the subject property because upon information and belief no default regarding payment of the Note to the actual Note Holder exists and/or has ever existed.

351.    The documents, records and information pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of the JPMorgan Chase Bank, N.A. and EMC Mortgage Corporation Servicer Defendants and Bank of America, N.A. and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted.

352.    This type of action is representative of the JPMorgan Chase Bank, N.A. and/or EMC Mortgage Corporation Servicer Defendants and Trustee Defendants Bank of America, N.A. and Marinosci Law Group, P.C.'s behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in these Plaintiffs case, in the State of Rhode Island and nationwide.

**Roth K. Neary v Ocwen Loan Servicing, LLC, Deutsch Bank National Trust Company, and Korde & Associates, P.C.**

353.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

354.    Plaintiff, Roth K. Neary is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 96-98 Roosevelt Street, Providence, RI 02909 which is one of the subject properties referred to herein.

355.    Plaintiff purchased the subject property on or about April 27, 2006 for Three Hundred Twenty Two Thousand and 00/100 dollars ($322,000.00) and was given a mortgage loan of Two Hundred Eighty Nine Thousand Eight Hundred and -------00/100 ($289, 800.00) dollars from New Century Mortgage Corporation.

356.     On or about August, 2006, Defendant Ocwen Loan Servicing, LLC became the servicer of said Plaintiff's mortgage loan.

357.     Sometime after said purchase Plaintiff began experiencing difficulties repaying her mortgage obligation due in part to the significant rise in the interest rate she was required to pay.

358.     Unknown to Plaintiff at the time, on or about June 26, 2006, New Century Mortgage Corporation sold Plaintiff's Mortgage and Note to a Real Estate Mortgage Investment Conduit entity named GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2 (hereinafter referred to as the "Trust").

359.     Deutsche Bank National Trust Company was appointed Trustee of said Trust.

360.     Plaintiff made an application to Defendant Ocwen Loan Servicing, LLC (Ocwen) for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about May 17, 2010.

361.     On or about October 23, 2010, Plaintiff was granted acceptance into the Trial Period Plan under HAMP. Plaintiff executed the documents sent to her by Ocwen and returned them with her first payment of One Thousand Two Hundred Forty and -------48/100 ($1,240.48) dollars in the form of money orders in the amounts of $500.00 (2) and $240.48 respectively (Exhibit 12). Said documents and payment were sent to Ocwen via United States Postal Services, Express Mail, on October 29, 2010, tracking number EG4017122900US (Exhibit 13). Said documents and payment was received by Ocwen at their West Palm Beach headquarters, on October 30, 2010 at 10:36 am, and said package was accepted and signed for by an Ocwen employee named A. Biamonte (Exhibit 14).

362.     On or about November 11, 2010, Ocwen sent a letter to Plaintiff stating that she was eligible for a Home Affordable Modification (Exhibit 15). Enclosed with said letter were two copies of a Modification Agreement or a Final Modification. Said letter instructed the Plaintiff

to sign and execute both Modification Agreements and return them by February 1, 2011. Plaintiff executed and had her signature notarized on both Modification Agreements and returned them to Ocwen on or about January 23, 2011.

363.    On or about February 14, 2011, Plaintiff received her mortgage loan billing statement from Ocwen. On said statement she noticed that her monthly payment due did not reflect her modified payment amount so she contacted Ocwen. A representative from Ocwen claimed that they had not received her fully signed and executed Modification Agreement, which Plaintiff had previously forwarded. Said representative said that it was no problem and that he would send out another agreement to Plaintiff right away.

364.    Plaintiff received a second set of Modification Agreements from Ocwen, on or about March 6, 2011. Plaintiff executed said Modification Agreements (Exhibit 16) and returned them to Ocwen, via United States Postal Service, 1st Class Mail, on March 10, 2011.

365.    Plaintiff made all payments required under her Trial Period Plan and Modification Agreement, in full and on time (Exhibit 17).

366.    On or about September 16, 2011, Ocwen and Trustee Defendant Deutsche Bank National Trust Company initiated foreclosure action against Plaintiff, through their Attorney, Defendant Korde & Associates, P.C.

367.    In spite of the Plaintiffs numerous attempts to demonstrate to Ocwen and Korde & Associates, P.C, that she had a Modification Agreement in place, and had made all of the agreed upon payments under said Modification Agreement, the subject property was sold at auction on November 9, 2011. Ocwen returned to Plaintiff a portion of the payments (approximately 5 months worth) Plaintiff made under said Modification Agreement in order to establish that they were not accepting payments under said Modification agreement during the 5 months prior to  said auction.

368.    Unknown to Plaintiff at that time, upon information and belief, the Ocwen Servicer Defendant had in fact made all Plaintiff's mortgage payments, on Plaintiffs' behalf, as a third party servicer with no security interest, to the true Holder of Plaintiff's Note and Mortgage,

GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2, as is required under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiff's mortgage loan (Exhibit 18 *Id. at pp. 21, {S-12} "Advances", 148-150, {S-86-87} "P & I Advances and Servicing Advances", and 366-367 "Advances"*).

369.    As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

370.    The Plaintiff does not dispute that her Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have been legally be exercised.

371.    As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

372.    The actions taken by the Ocwen Servicer Defendant, and Trustee Defendants Deutsche Bank National Trust Company and Korde & Associates, P.C., are without any force or effect relative to the actual sale of the subject property because upon information and belief no default regarding payment of the Note to the actual Note Holder exists and/or has ever existed.

373.    The documents, records and information pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of the Ocwen Servicer Defendant and Deutsche Bank National Trust Company and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

374.    This type of action is representative of the Ocwen Loan Servicing, LLC Servicer Defendant's and Trustee Defendants Deutsche Bank National Trust Company and Korde & Associates, P.C.'s behavior in all cases where foreclosure has been initiated and/or completed,

on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in this Plaintiff's case, in the State of Rhode Island and nationwide.

**Carlos Franco v  FNMA, Wells Fargo Bank, N.A., and Harmon Law, P.C.**

375.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

376.   Plaintiff, Carlos Franco is a citizen of Rhode Island and is residing at and claims to be the rightful owner of 505 Fountain Street, Pawtucket, RI 02863 which is one of the subject properties referred to herein.

377.   Plaintiff refinanced the subject property on or about November 18, 2005 and was given a mortgage loan of Two Hundred Twenty Two Thousand and -------00/100 ($222, 000.00) dollars from Webster Bank National Association.

378.   Upon information and belief sometime on or about January – February 2006, Plaintiff's mortgage was purchased by an as yet accurately identified FNMA created Mortgage Backed Trust (hereinafter referred to as the "Trust"). At that point in time, said as yet identified Trust became the true Holder in Due Course of the Plaintiff's Mortgage and Note

379.   Approximately one year after said refinance transaction, Servicer Defendant Wells Fargo Home Mortgage, a wholly owned subsidiary of Wells Fargo Bank, N.A., became the servicer of Plaintiff's said mortgage loan.

380.   Sometime during the first quarter of 2010 Plaintiff began experiencing difficulties repaying his mortgage obligation.

381.   Plaintiff made an application to the Wells Fargo Servicer Defendants for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program

that included personal financial information, tax information, and a statement attesting to his hardship on or about July 1, 2010.

382.    During the time Plaintiff was attempting to request a HAMP Modification, Wells Fargo Bank, N.A. initiated foreclosure action, through their Attorney, Harmon Law, P.C., against Plaintiff's property, by sending him Notices of Mortgage Foreclosure Sale, on or about November 15, 2010 and again on August 29, 2011.

383.    On or about October 20, 2011 a foreclosure sale was held by Wells Fargo Bank, N.A. and the Plaintiff's subject property was sold at auction and subsequently purchased at said auction by Trustee Defendant FNMA.

384.    Unknown to Plaintiff at that time, upon information and belief, Wells Fargo Bank, N.A. and /or FNMA, by virtue of its guarantee, did in fact make all of Plaintiff's mortgage payments, on Plaintiff's behalf, as a third party with no security interest, to the true Holder of Plaintiff's Mortgage and/or Note (said Trust), without his knowledge or consent. As such the Note referenced herein is believed to have been in good standing at the time foreclosure was initiated and completed, due to the Delinquency Advances paid by Wells Fargo Bank, N.A. and/or FNMA, on behalf of the Plaintiff, to said as yet identified true Note Holder in Due Course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11).

385.    In said Master Trust Agreement the Direct Servicer (i.e. Wells Fargo Bank, N.A.) is often responsible for *"Delinquency Advances"* (Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans to the FNMA created Mortgage Backed Trusts it services mortgages for.

386.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not (or is not required to) forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it

created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59).*

387.     Regardless of whether the Wells Fargo Servicer Defendant or FNMA paid the Plaintiff's mortgage payments on his behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee were adhered to, all of the Plaintiff's mortgage payments were paid to the true Holder in Due Course of his Note and Mortgage and as such there existed no default of the Note at the time foreclosure action was commenced and/or completed.

388.     Upon information and belief Wells Fargo Bank, N.A. was not the Holder of Plaintiff's Mortgage and/or Note instruments at the time of said auction and were merely foreclosing at the instruction of FNMA, which was acting in its capacity as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

389.     Furthermore, FNMA's subsequent purchase (on behalf of said Trust) of Plaintiff's property at auction was an action by FNMA as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

390.     The Plaintiff does not dispute that his Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

391.     As no default of the Note existed to said, as yet identified, FNMA Mortgage Backed Trust, which was the Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

392.     The actions taken by Wells Fargo Bank, N.A., and Trustee Defendants FNMA and Harmon Law, P.C. are without any force or effect relative to the actual sale of the property

because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

393.    The documents, records and information regarding the identification of said Mortgage Backed Trust that was (and/or may still be) the true Holder of Plaintiff's Note and Mortgage, and the records pertaining to the payments made to said Trust regarding Plaintiff's mortgage loan, are in the exclusive control of Defendant FNMA (and the Wells Fargo Bank, N.A. with respect to any payments they may have made on behalf of Plaintiff) and as such can only be obtained through discovery. However, if the terms of said FNMA Master Trust Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

394.    This type of action is representative of Wells Fargo Bank, N.A., FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized by FNMA and whereby their servicing is governed by Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Rhode Island and nationwide.

**Alejandro Barbel and Jose Barbel v  FNMA, Wells Fargo Bank, N.A., and Harmon Law, P.C.**

395.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

396.    Plaintiffs, Alejandro Barbel and Jose Barbel are citizens of Rhode Island residing at and claiming to be the rightful owner of 29 Dennis Avenue, Cranston, RI 02905 which is one of the subject properties referred to herein.

397.    Plaintiffs refinanced the subject property on or about April 23, 2008 and was given a mortgage loan of One Hundred Seventy Thousand and -------00/100 ($170, 000.00) dollars from Wells Fargo Bank, N.A.

398.    Upon information and belief sometime on or about May – June 2008, Plaintiffs' mortgage was purchased by an as yet accurately identified FNMA created Mortgage Backed

Trust (hereinafter referred to as the "Trust"). At that point in time, said as yet identified Trust became the true Holder in Due Course of the Plaintiff's Mortgage and Note.

399.    Sometime during the first quarter of 2010 Plaintiffs began experiencing difficulties repaying their mortgage obligation.

400.    Plaintiffs made an application to the Wells Fargo Servicer Defendants for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to their hardship on or about February 2011.

401.    During the time Plaintiff was attempting to request a HAMP Modification, Wells Fargo Bank, N.A. initiated foreclosure action, through their Attorney, Harmon Law, P.C., against Plaintiff's property, by sending them Notices of Mortgage Foreclosure Sale, on or about January 11, 2011, January 14, 2011, September 1, 2011, December 1, 2011 and again on March 1, 2012.

402.    Unknown to Plaintiffs at those times, upon information and belief, Wells Fargo Bank, N.A. and /or FNMA, by virtue of its guarantee, did in fact make all of Plaintiffs' mortgage payments, on Plaintiffs' behalf, as a third party with no security interest, to the true Holder of Plaintiffs' Mortgage and/or Note (said Trust), without their knowledge or consent. As such the Note referenced herein is believed to have been in good standing at the time foreclosure was initiated, due to the Delinquency Advances paid by Wells Fargo Bank, N.A. and/or FNMA, on behalf of the Plaintiffs, to said as yet identified true Note Holder in Due Course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11).

403.    In said Master Trust Agreement the Direct Servicer (i.e. Wells Fargo Bank, N.A.) is often responsible for *"Delinquency Advances"* (Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or

Sub-Servicer, if applicable) to advance payment on any non-performing loans to the FNMA created Mortgage Backed Trusts it services mortgages for.

404.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not (or is not required to) forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59).*

405.    Regardless of whether the Wells Fargo Servicer Defendant or FNMA paid the Plaintiffs' mortgage payments on his behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee were adhered to, all of the Plaintiffs' mortgage payments were paid to the true Holder in Due Course of his Note and Mortgage and as such there existed no default of the Note at the time foreclosure action was commenced and/or completed.

406.    Upon information and belief Wells Fargo Bank, N.A. was not the Holder of Plaintiff's Mortgage and/or Note instruments at the time of said auction and were merely foreclosing at the instruction of FNMA, which was acting in its capacity as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

407.    The Plaintiffs do not dispute that their Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

408.    As no default of the Note existed to said, as yet identified, FNMA Mortgage Backed Trust, which was the Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

409.    The actions taken by Wells Fargo Bank, N.A., and Trustee Defendants FNMA and Harmon Law, P.C. are without any force or effect relative to the attempted sale of the property

because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

410.    The documents, records and information regarding the identification of said Mortgage Backed Trust that is the true Holder of Plaintiffs' Note and Mortgage, and the records pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of Defendant FNMA (and the Wells Fargo Bank, N.A. with respect to any payments they may have made on behalf of Plaintiffs) and as such can only be obtained through discovery. However, if the terms of said FNMA Master Trust Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

411.    This type of action is representative of Wells Fargo Bank, N.A., FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized by FNMA and whereby their servicing is governed by Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Rhode Island and nationwide.


**Robert & Melinda Bloomingburgh v  FNMA, Flagstar Bank, and Partridge Snow & Hahn, LLP**

412.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

413.    Plaintiffs, Robert & Melinda Bloomingburgh are citizens of Rhode Island residing at and claiming to be the rightful owner of 422 Chestnut Street, Warwick, RI 02888 which is one of the subject properties referred to herein.

414.    Plaintiffs refinanced the subject property on or about September 21, 2006 and was given a mortgage loan of Two Hundred Six Thousand Two Hundred and -------00/100 ($206, 200.00) dollars from Absolute Mortgage Corporation.

415.    Upon information and belief sometime on or about November – December 2006, Plaintiffs' mortgage was purchased by an as yet accurately identified FNMA created

Mortgage Backed Trust (hereinafter referred to as the "Trust"). At that point in time, said as yet identified Trust became the true Holder in Due Course of the Plaintiff's Mortgage and Note. On or about November 1, 2006, Flagstar Bank became the servicer of Plaintiffs' mortgage loan.

416.    Sometime during the first quarter of 2009 Plaintiffs began experiencing difficulties repaying their mortgage obligation.

417.    Plaintiffs made an application to the Flagstar Bank Servicer Defendant for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to their hardship on or about June 12, 2009.

418.    Plaintiffs were granted a Trail Period Plan under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program on  or about July 7, 2009.

419.    Plaintiffs complied with all requests for documentation and requests from Flagstar Bank and made all payments as required under said Trial Period Plan.

420.    Servicer Defendant Flagstar Bank initiated foreclosure action, through their Attorney, Partridge Snow & Hahn, LLP, against Plaintiff's property, by sending them Notices of Mortgage Foreclosure Sale, on or about April 18, 2011 and again on August 16, 2011.

421.    Unknown to Plaintiffs at those times, upon information and belief, Flagstar Bank and /or FNMA, by virtue of its guarantee, did in fact make all of Plaintiffs' mortgage payments, on Plaintiffs' behalf, as a third party with no security interest, to the true Holder of Plaintiffs' Mortgage and/or Note (said Trust), without their knowledge or consent. As such the Note referenced herein is believed to have been in good standing at the time foreclosure was initiated, due to the Delinquency Advances paid by Flagstar Bank and/or FNMA, on behalf of the Plaintiffs, to said as yet identified true Note Holder in Due Course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11).

422.    In said Master Trust Agreement the Direct Servicer (i.e. Flagstar Bank) is often responsible for *"Delinquency Advances"* (Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans to the FNMA created Mortgage Backed Trusts it services mortgages for.

423.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not (or is not required to) forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59)*.

424.    Regardless of whether the Flagstar Bank Servicer Defendant or FNMA paid the Plaintiffs' mortgage payments on his behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee were adhered to, all of the Plaintiffs' mortgage payments were paid to the true Holder in Due Course of his Note and Mortgage and as such there existed no default of the Note at the time foreclosure action was commenced and/or completed.

425.    Upon information and belief Flagstar Bank was not the Holder of Plaintiff's Mortgage and/or Note instruments at the time of said auction and were merely foreclosing at the instruction of FNMA, which was acting in its capacity as Trustee for said as yet identified FNMA created Mortgage Backed Trust, which, upon information and belief was the true Holder in Due Course of said instruments.

426.    The Plaintiffs do not dispute that their Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

427.     As no default of the Note existed to said, as yet identified, FNMA Mortgage Backed

Trust, which was the Holder in Due Course of said Mortgage and Note, the foreclosure and

foreclosure proceedings were invalid.

428.     The actions taken by Flagstar Bank, and Trustee Defendants FNMA and Partridge

Snow & Hahn, LLP are without any force or effect relative to the attempted sale of the

property because upon information and belief no default regarding payment of the Note to the

actual Note Holder ever existed.

429.     The documents, records and information regarding the identification of said Mortgage

Backed Trust that is the true Holder of Plaintiffs' Note and Mortgage, and the records

pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the

exclusive control of Defendant FNMA (and Flagstar Bank with respect to any payments they

may have made on behalf of Plaintiffs) and as such can only be obtained through discovery.

However, if the terms of said FNMA Master Trust Agreement were in fact adhered to, no

default of the Note existed at the time foreclosure action was attempted and/or completed.

430.     This type of action is representative of Flagstar Bank, FNMA, and Trustee Defendant

Partridge Snow & Hahn's behavior in all cases where foreclosure has been initiated and/or

completed, on mortgage loans that were securitized by FNMA and whereby their servicing is

governed by Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State

of Rhode Island and nationwide.

**John Hernandez v Deutsche Bank National Trust Company, The Bank of America, N.A.**
**Servicer Defendants, and Harmon Law, P.C.**

431.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

432.     Individual and Representative Plaintiff John Hernandez is a citizen of Rhode Island

residing at and claims to be one of the rightful owner of 37 Redwing Street, Providence, RI

02907 which is one of the subject properties referred to herein.

433.     On or about June 27, 2006, Plaintiff was granted a mortgage loan by Defendant

HSBC's Decision One Mortgage unit to purchase the subject property and executed two

Mortgages and Notes with in the amount of One Hundred Thirty Six Thousand and 00/100 dollars ($136,000.00) and Thirty Four Thousand and 00/100 ($34,000.00) Dollars, respectively, each of which was secured by the subject property. Said Mortgages were recorded in the Providence Recorder of Deeds Office in Book 8135, at page 318 (1st Mortgage), and Book 8135, at page 335 (2nd Mortgage).

434.     On or about November 2006, Countrywide became the servicer of Plaintiffs 1st mortgage loan, and through its acquisition of Countrywide, eventually Bank of America, N.A., through its wholly owned subsidiary, BAC Home Loans Servicing, LP (hereinafter BAC), became the servicer of Plaintiff's said mortgage loan.

435.     Unknown to the Plaintiffs, Decision One Mortgage had sold Plaintiffs' Mortgage and Note to a Mortgage Backed Trust, named the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7, on or about October 31, 2006. Trustee Defendant Deutsche Bank National Trust Company was appointed as Trustee for said Trust.

436.     On or about October 2009 Plaintiff began experiencing difficulties repaying his mortgage obligation.

437.     Plaintiff made an application to the BAC Servicer Defendant for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about November 6, 2009.

438.     On or about October 22, 2009, Defendant Harmon Law, P.C. caused a Notice of Intent to Foreclosure to be recorded at the Providence Recorder of Deeds Office in Book 9553, at Page 316 to Plaintiffs, on behalf of its client, Deutsche Bank National Trust Company as Trustee for the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7 (the Trust), to foreclose on the subject property located at 37 Redwing Street, Unit 1, Providence, RI 02907 on or about November 9, 2009.

439.    Unknown to Plaintiff at that time, upon information and belief, the OneWest Servicer Defendants had in fact made all Plaintiff's mortgage payments, on Plaintiff's behalf, as a third party servicer with no security interest, to the true Holder of Plaintiff's Note and Mortgage, the Morgan Stanley ABS Capital I, Inc. Trust 2006-HE7, as is required under the Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement evidenced herein governing the servicing of Plaintiff's mortgage loan,  secured by 37 Redwing Street, Unit 1, Providence, RI 02907 (Exhibit 20 *Id. at pp. 14 "Advances", 72 "Payments on the Mortgage Loans", and 90 "P&I Advances and Servicing Advances"*).

440.    As no default of the Note existed to said Trust, which was the lawful Holder of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

441.    The Plaintiff does not dispute that his Mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

442.    As no default of the Note existed to said Trust, which was the true Holder in Due Course of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

443.    The actions taken by the Bank of America, N.A. Servicer Defendants, and Trustee Defendants Deutsche Bank and Harmon Law, P.C., are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note Holder ever existed.

444.    The documents, records and information pertaining to the payments made to said Trust regarding Plaintiffs' mortgage loan, are in the exclusive control of the Bank of America, N.A. Servicer Defendants and Deutsche Bank National Trust Company and as such can only be obtained through discovery. However, if the terms of said Prospectus, Prospectus Supplement and/or Pooling and Servicing Agreement were in fact adhered to, no default of the Note existed at the time foreclosure action was attempted and/or completed.

445.    Plaintiff has suffered (and still suffers) extreme emotional damage and mental distress as he was repeatedly, and currently is still, threatened with foreclosure.

446.    This type of action is representative of the Bank of America, N.A. Servicer Defendants and Trustee Defendants Deutsche Bank National Trust Company and Harmon Law, P.C.'s behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized in Private Label Mortgage Backed Trusts and whereby the servicing of mortgage loans held by said Trusts is governed by standardized Pooling and Servicing Agreements and/or as referenced in Prospectus' and Prospectus Supplements as demonstrated and evidenced in this Plaintiff's case, in the State of Rhode Island and nationwide

**Defendant's Actions Caused Injury to Plaintiffs**

447.    Plaintiffs have suffered injury caused by Defendant's actions, including but not limited to, the loss of property through foreclosure, legal costs incurred to stay eviction and contest foreclosure, severe mental and emotional distress intentionally inflicted by Defendants.

## CLASS ACTION ALLEGATIONS

448.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

449.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

450.    So as to the Originator Defendants, the named Plaintiffs sue on behalf of themselves and all Rhode Island homeowners whose loans have been originated by the Originator Defendants using significantly reduced underwriting standards designed to allow borrowers to obtain mortgages without proper verification of income, no-doc and no money down programs, offering extremely risky credit terms to unsophisticated borrowers such as negative amortization, interest only payment options and, adjustable rate mortgage terms that the Originator Defendants knew would be unsustainable for borrowers.

451.    So as to the Servicer Defendants, the named Plaintiffs sue on behalf of themselves and all Rhode Island homeowners whose loans were originated, since January 2000, but not after December 31, 2008, and/or have been serviced by the Servicer Defendants, and who, since March 5, 2009, have requested consideration and/or applied with the Servicer Defendants for a HAMP modification and whereby the Servicer Defendants fraudulently represented it was a participating servicer in the HAMP Program, bound to abide by its rules, guidelines and supplemental directives all while knowing they could not modify Plaintiffs' and others mortgages due to contractual limitations contained in the Prospectus' and/or Pooling and Servicing Agreements they had previously entered into governing the servicing of Plaintiffs' and others mortgages yet fraudulently misrepresented to those Plaintiffs and others that their mortgages could in fact be modified and purposefully hindered the modification process in an effort to enrich themselves, and also Plaintiffs and others who were either;

   a.    Referred to foreclosure while being considered for a HAMP modification and/or while under a HAMP Trial Period Plan agreement and/or having been granted a HAMP permanent modification;

   or

   b.    Foreclosed upon while being considered for a HAMP modification and/or while under a HAMP Trial Period Plan agreement and/or having been granted a HAMP permanent modification;

   or

   c.    Suffered systematic, redundant and repetitive documentation requests, deceptive claims that documents were lost or never received,  deceptive and misleading claims that request were

stalled in underwriting, negotiation and/or quality control, in violation of HAMP Guidelines and Supplemental Directives regarding the timely review of requests, in an effort to keep those mortgage loans in a near perpetual state of default as part of a scheme to increase servicing fees through artificial inflation of principal balance totals, the billing of servicing advances and other illicit mortgage servicing activities as described herein of the pools of mortgages they serviced;

or

d.      Denied a HAMP Modification without due cause;

452.    So as to the Trustee Defendants, the named Plaintiffs sue on behalf of themselves and all Rhode Island homeowners whose loans have been serviced by the Servicer Defendants, that are/were held in Trusts governed by standard Private Label Prospectus' and/or Pooling and Servicing agreements and/or FNMA Master Trust Agreements, with respect to periodic/delinquent/monthly advances required to be made by the Servicer Defendants and or FNMA, as servicer and/or Master Servicer, regarding all payments not received by the Servicer Defendants and/or FNMA, to the Trusts which owned Plaintiffs' and others Mortgages and/or Notes serviced by the Servicer Defendants and/or FNMA acting in its capacity as Master Servicer and/or Trustee, and had foreclosure proceedings initiated against and/or completed against them by the Trustee Defendants and or the Servicer Defendants acting on behalf of, or at the instruction of, the Trustee Defendants and/or FNMA who were either;

    a.      Referred to foreclosure whereby fraudulent and false representations were made to establish a default of Note to true owner of said Note;

or

    b.      Foreclosed upon whereby fraudulent and false representations were made to establish a right to chain of title of said Mortgage/Note (i.e. "robo-signing", wrongful and invalid assignments, etc.);

453.    Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, the Defendants' current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

454.    Plaintiffs do not know the exact size or identities of members of the Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses tens or hundreds of thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the Class is so numerous that joinder of all members is impracticable.

455.    All members of the Class have been subject to and affected by the same conduct.  The claims are based on standard form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

    a.      the nature and scope of the Servicer Defendants' misrepresentations regarding its intentions to properly administer and adhere to the guidelines

and supplemental directives of the HAMP program and its fraudulent
misrepresentations to homeowners regarding HAMP and their ability to
obtain a HAMP modification;

b.    whether all Defendants' conduct in the circumstances described herein and
in the underlying complaints amounts to fraud;

c.    whether all Defendants' conduct in the circumstances described herein and
in the underlying complaints amounts to deceptive and misleading
business practices;

d.    whether all Defendants' conduct in the circumstances described herein and
in the underlying complaints violates state consumer protection laws;

e.    whether the Originator Defendants' conduct violates applicable predatory
lending laws;

f.    whether the Servicer and Trustee Defendants' conduct violates state
foreclosure law;

g.    whether Servicer and Trustee Defendants' conduct violates applicable
state Commercial Code and corresponding regulations; and

h.    whether the Court can order damages and enter injunctive relief.

456.    The claims of the Named Plaintiffs are typical of the claims of the Class and do not
conflict with the interests of any other members of the class in that the Named Plaintiffs and
the other members of the class were subject to the same conduct.

457.    The named Plaintiffs will fairly and adequately represent the interests of the Class.
They are committed to the vigorous prosecution of the class claims and have retained
attorneys who are qualified to pursue this litigation and have experience in class actions – in
particular, consumer protection actions.

458.    A class action is superior to other methods for the fast and efficient adjudication of this
controversy.  A class action regarding the issues in this case does not create any problems of
manageability.

459.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and

Fed. R. Civ. P. 23(b)(3).

460.    The Defendants acted or refused to act on grounds that apply generally to the class so

that final injunctive relief or corresponding declaratory relief is appropriate respecting the

class as a whole.


## COUNT I

### *Fraud and Deceptive Trade Practices*

### *Re: Originator Defendants' Representations*

### *Regarding Soundness of its Mortgage Products*

461.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

462.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the

Class described above.

463.    Plaintiffs suffered damages as a result of Defendants originating residential mortgage

loans using significantly reduced underwriting standards designed to allow borrowers to

obtain mortgages without proper verification of income, and no money down programs,

offering extremely risky credit terms to borrowers such as negative amortization, interest only

payment options and, adjustable rate mortgage terms that Defendants knew would be

unsustainable for borrowers.

464.    Plaintiffs suffered damages as a result of Defendants' fraudulent misrepresentations

regarding financial soundness of its mortgage loan products. Defendants knew Plaintiffs and

other borrowers had paid no down payment in property purchase transactions, that Plaintiffs

and other borrowers did not earn enough income to qualify for mortgage loan transactions,

etc., yet had developed high risk lending instruments specifically tailored to the Plaintiffs' and

others situations so as to make said loan(s) to enrich themselves by fraudulently

misrepresenting the financial soundness of these lending instruments to Plaintiffs (and to

others so similarly situated), knowing said loans would cause injury to the Plaintiffs and others.

465.    Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants' fraudulent, deceptive and misleading statements, including but not limited to longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, the wrongful loss of a property interest for those who have suffered foreclosure, and legal fees for defense of foreclosure and eviction.

466.    As a result of these fraudulent misrepresentations, Defendants caused Plaintiffs and others harm, as alleged above.  Defendants' bad faith was thus to Plaintiffs' detriment.

467.    Defendants' conduct amounts to Fraud and Deceptive Trade Practices and is in violation of R.I.G.L. § 6-13.1-1(6)(vii), (xii) & (xiii).

468.    Defendants' represented that their goods or services were of a particular standard, quality, or grade and were of another.

469.    Defendants' engaged in conduct that created confusion and misunderstanding.

470.    Defendants' engaged in practices that were unfair and deceptive to consumers.


## COUNT II

### *Violations of Rhode Island General Laws § 6-13.1 and Applicable Regulations*
### *And/or Fraud*
### *By the Servicer Defendants*

471.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

472.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

473.    Defendants have violated and continue to violate the R.I.G.L. § 6-13.1-1 including, without limitation;

      a.    § 6-13.1-1(6)(ii), in that Defendants' conduct caused the likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services;

      b.    § 6-13.1-1(6)(v), in that Defendants' conduct represented that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities they did not have;

      c.    § 6-13.1-1(6)(xii), in that Defendants' made deceptive representations or failed to disclose relevant information as to its intentions regarding its administration of the HAMP program, its contractual obligations under pre-existing Pooling and Servicing Agreements with the Trusts it serviced mortgages for (and for the OneWest Servicer Defendants - the misuse of its Loss Sharing Agreement with the FDIC). Said conduct was intended to create the likelihood of confusion or misunderstanding; and

      d.    § 6-13.1-1(6)(xiii), in that it is a Mortgage Lender and made false or misleading representations to borrowers. Said conduct was Fraudulent, part of an overall fraudulent scheme to illegally profit from recovery of servicing advances and other related fees, and was unfair and deceptive to consumers.

474.    Plaintiffs have been injured suffering damages as a result of Defendants' fraudulent misrepresentations regarding the defaulted status of their Notes

475.    Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants' fraudulent, deceptive and misleading statements, including the wrongful loss of a property interest for those who have suffered foreclosure.

476.    Defendants conduct as described in this complaint was and is willful or knowing within the meaning of the Rhode Island General Laws § 6-13.1.

477.    As a result of these violations of Rhode Island General Laws § 6-13.1, Defendants caused Plaintiffs and others harm, as alleged above.  Defendants' bad faith was thus to Plaintiffs' detriment.

478.    Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

479.    As a result of Defendants conduct, Plaintiffs and others suffered ascertainable damages and ascertainable losses including:

> a.    wrongful foreclosures;
>
> b.    otherwise avoidable losses of homes to foreclosure;
>
> c.    increased fees and other costs to avoid or attempt to avoid foreclosure;
>
> d.    loss of savings in pointless attempts at modification;
>
> e.    loss of opportunities to pursue other loss mitigation strategies;
>
> f.    significant stress and emotional distress, and;

480.    Plaintiffs are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

### *COUNT III*

### *Violation of Rhode Island General Laws–*

### *Title 6A -Uniform Commercial Code § 6A-3-602*
### *By FNMA and the Trustee & Servicer Defendants*

481.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

482.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

483. As the entity responsible for exercising the statutory power of sale, Defendants owed Plaintiff a duty of good faith and fair dealing in their conduct leading up to the foreclosure proceedings and sale.

484. Defendants knew that Plaintiffs' and others mortgage payments had been made to the true Holder in due course of the instrument (Note) on behalf of Plaintiffs by third parties (Servicer Defendants and/or FNMA) and as such Plaintiffs' monthly obligations were discharged.

485. Defendants conduct as set forth herein affects the public interest and is part of a generalized course of conduct affecting numerous consumers.

486. Defendants have violated and continue to violate the Rhode Island Uniform Commercial Code, § 6A-3-602 including, without limitation;

      a. §6A-3-602(a); the instruments (Notes) were paid to the extent payment was made on behalf of the parties obliged to pay the instruments, yet the default provisions of the instruments were enforced;

487. Plaintiffs and others have been injured suffered damages as a result of Defendants' fraudulent misrepresentations regarding the defaulted status of their Mortgages and/or Notes.

488. Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

489. As a result of these violations of Rhode Island General Laws § 6A-3-602, Defendants caused Plaintiffs and others harm, as alleged above. Defendants' bad faith was thus to Plaintiffs' detriment.

490. Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

491. Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

492.    Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

493.    As a result of Defendants conduct, Plaintiffs and others suffered ascertainable damages and ascertainable losses including:

        a.    wrongful foreclosures and/or foreclosure attempts;

        b.    otherwise avoidable losses of homes to foreclosure;

        c.    wrongful evictions

        d.    significant stress and emotional distress, and;

494.    Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

495.    Plaintiffs and others were damaged by this violation of law including without limitation, loss of equity, lost opportunity to work out modification of their mortgages, imposition of inappropriate foreclosure fees, extreme mental and emotional distress, and costs of defending themselves from foreclosure and/or eviction.

496.    The Plaintiffs and others are entitled to a declaratory judgment determining that the foreclosure proceedings and/or sales of their property are void.

497.    Plaintiffs and others are entitled to an injunction requiring that Defendants' take all necessary steps to restore legal title to their property as if no foreclosure sale had ever occurred.

498.    Plaintiffs and others are entitled to an injunction requiring that the Defendants be prevented from foreclosure action against Plaintiffs and others so similarly situated, or any eviction action until such time as proper notice is made pursuant to statute.

499.    The Plaintiffs and others so similarly situated are entitled to cancellation of costs and fees assessed to their accounts for wrongful foreclosure, together with additional damages.

500.   Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

501.   Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.   Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.   Enter a judgment declaring the acts and practices of Defendants complained of herein do constitute a fraud, unfair and deceptive acts and practices, breach of duty of good faith and reasonable diligence, violations of state uniform commercial code, and violations of state foreclosure law together with an award of monetary damages and other available relief on those claims;

c.   Grant a permanent or final injunction enjoining Defendants agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.   Order Defendants to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.   Order specific performance of Defendants obligations together with other relief required by law;

f.   Award actual, exemplary and/or statutory minimum damages;

g.   Award restitution and prejudgment interest;

h.      Award damages for severe emotional and mental distress:

i.      Award punitive damages;

j.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

k.      Grant Plaintiff and the Class such other and further relief as this Court finds necessary and proper.

Dated April 19, 2012

Respectfully Submitted,

___/s/ Todd S. Dion_____
Todd S. Dion, Esq. (#6852)
1319 Cranston Street
Cranston, RI 02920
Telephone: 401-942-9924
Facsimile:  401-942-9925
toddsdion@msn.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2012, a copy of the foregoing document, filed through the CM/ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on the parties listed on the NEF as not receiving electronic notice.

___/s/ Todd S. Dion___
Todd S. Dion, Esq.